IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| ANASCAPE, LTD. | § | |
| | § | Hon. Ron Clark |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 9:06-CV-00158-RC |
| | § | |
| MICROSOFT CORPORATION, and | § | |
| NINTENDO OF AMERICA, INC., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT MICROSOFT CORPORATION'S BRIEF
IN SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTION FOR
THE PATENTS ASSERTED AGAINST BOTH MICROSOFT AND NINTENDO**

Dockets.Justia.com

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iv

INDEX TO EXHIBITS ...................................................................................................... vii

I.    INTRODUCTION ................................................................................................... 1

II.   THE LAW RELEVANT TO CLAIM CONSTRUCTION .................................... 2

      A.    Overview Of Claim Construction Law ...................................................... 2

III.  BACKGROUND OF ARMSTRONG'S ALLEGED INVENTION ................................... 2

      A.    The "Abstract" Only Describes A Single Input Member 6DOF Controller ........... 3

      B.    The "Background Of The Invention" Section
            Only Describes A Single Input Member 6DOF Controller ................................... 3

      C.    The "Summary Of The Invention" Section Only
            Describes A Single Input Member 6DOF Controller ............................................ 5

      D.    The "Best Modes For Carrying Out The Invention"
            Section Only Describes A Single Input Member 6DOF Controller ...................... 6

IV.   DISPUTED TERMS ................................................................................................ 8

      A.    "Image Controller"  ('525 Patent, Claims 1, 5-6, 12-20)
            "3-D Graphics Controller"  ('700 Patent, Claims 1-15, 32-33)
            "Hand Operated Controller"  ('700 Patent, Claims 19-20, 22-23, 26-29, 31)......... 8

            1.    The "controller" disclosed in all embodiments
                  is a single input member "manipulatable" in 6DOF.................................. 8

            2.    The embodiments Anascape points to as
                  establishing multiple input member 6DOF
                  controllers do not in fact show multiple input members.......................... 11

                  a)    The "trackball" of Fig. 4 is a hand
                        operable single input member 6DOF controller ........................... 11

                  b)    The "collet" is merely an optional
                        component of the single input member 6DOF trackball............... 12

                  c)    Fig. 47 does not vary from
                        a single input member 6DOF controller ...................................... 14

3.      Anascape and Mr. Armstrong assert that the
'525 and '700 Patents described the same "invention" ........................... 14

4.      Anascape's mischaracterization of Microsoft's '700 Patent
reexam request does not aid Anascape's claim construction position ...... 16

B.    "Input Member," "First [Second] [Third] …Elements" . . . ................................. 18

1.      "Input member" ('525 Patent, Claims 1, 5, 12) ........................................ 18

2.      "Elements," "bi-directional proportional  sensors" and "rotary
potentiometers" ('700 Patent) ................................................................. 18

C.    "Moveable On At Least Two Axes" ('525 Patent, Claims 1, 5, 12)
"Moveable On Two Axes" ('700 Patent, Claim 14) "Movable On
Two Mutually Perpendicular Axes" ('700 Patent, Claims 19, 26) ...................... 20

D.    "Flexible Membrane Sheet" ('525 Patent,
Claims 1, 5, 12, 19) ('700 Patent, Claims 1, 3, 5-6, 9, 26) ................................... 21

E.    "At Least One Sheet" ('525 Patent, Claims 1,
5, 12, 19) ('700 Patent, Claims 1, 3, 5-6, 8-10, 20, 26) ........................................ 25

F.    "At Least One Sheet…Connecting…To The Sensors…"
('525 Patent, Claims 1, 5, 12) "[The Sensors …] Connected [To]
[By] At Least One Sheet…" ('700 Patent, Claims 1, 3, 5-6, 8-10, 20, 26) .......... 27

G.    "Said At Least One Sheet Comprises A Flexible Membrane
Sheet Connected To A [Rigid Circuit Board] [Second Sheet]"
('525 Patent, Claims 1, 5, 19) "A Circuit Board Sheet Connected
To A Flexible Membrane Sheet" ('700 Patent, Claims 1, 3, 5-6, 9, 26) .............. 28

H.    "Electrically Conductive Traces Located On
Said At Least One Sheet" ('525 Patent, Claim 1)
"Said At Least One Sheet Includes Electrically Conductive
Traces, Said Traces Engaging The Sensors" ('525 Patent, Claim 5).................... 29

I.    "Navigating A Viewpoint" ('700 Patent, Claims 19, 26) ...................................... 30

J.    "Detectable By The User" ('700 Patent, Claims 1, 3, 6, 9, 12, 15, 19, 26) .......... 30

K.    "Economical Combination Of Elements" ('700 Patent, Claim 32) ...................... 33

1.      The phrase is indefinite because it is subjective ....................................... 33

2.      The phrase is a claim limitation, even though it is in the preamble.......... 34

V.  CONCLUSION.................................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*All Dental Prodx, LLC v. Advantage Dental Prods.*,
    309 F.3d 774 (Fed. Cir. 2002)...................................................................................... 30

*Alloc, Inc. v. ITC*,
    342 F.3d 1361 (Fed. Cir. 2003)...................................................................................... 10

*Amgen Inc., v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)...................................................................................... 31

*Andersen Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361 (Fed. Cir. 2007)................................................................................. 10, 17

*Bell Atlantic Network Servs., Inc. v. Covad Commns. Group, Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001)...................................................................................... 20

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)........................................................................................ 33

*Catalina Mktg. Int'l. v. Coolsavings.com*,
    289 F.3d 801 (Fed. Cir. 2002)..................................................................................... 8, 34

*Chimie v. PPG Indus., Inc.*,
    402 F.3d 1371 (Fed. Cir. 2005)...................................................................................... 30

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)...................................................................................... 31

*Eaton Corp. v. Rockwell Int'l Corp.*,
    323 F.3d 1332 (Fed. Cir. 2003)...................................................................................... 34

*Ekchian v. Home Depot,*,
    104 F.3d 1299 (Fed. Cir. 1997)........................................................................................ 4

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir.1999)......................................................................................... 26

*Halliburton Energy Servs., Inc. v. M-I, LLC*,
    456 F. Supp. 2d 811 (E.D. Tex. 2006)........................................................................... 31

*Honeywell Int'l v. ITT Indus.*,
    452 F.3d 1312 (Fed. Cir. 2006)............................................................................. 1, 9, 10

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
    450 F.3d 1350 (Fed. Cir. 2006)........................................................................................ 9

*Jonsson v. The Stanley Works,*
  903 F.2d 812 (Fed.Cir.1990)......................................................................... 26

*Karsten Mfg. Corp. v. Cleveland Golf Co.,*
  242 F.3d at 1376 (Fed. Cir. 2001)................................................................ 34

*Laitram Corp. v. Morehouse Indus., Inc.,*
  143 F.3d 1456 (Fed. Cir. 1998)..................................................................... 17

*Leggett & Platt, Inc. v. Vutek, Inc.,*
  2006 WL 3813677 (E.D. Mo. Dec. 26, 2006) ........................................... 31

*Modine Mfg. Co. v. U. S. Int'l. Trade Comm'n.,*
  75 F.3d 1545 (Fed. Cir. 1996)........................................................................ 5

*Netword, LLC v. Centraal Corp.,*
  242 F.3d 1347 (Fed. Cir. 2001)............................................................ 9, 10, 17

*On Demand Mach. Corp. v. Ingram Indus.,*
  442 F.3d 1331 (Fed. Cir. 2006)............................................................... passim

*Personalized Media Communs., LLC v. ITC,*
  161 F.3d 696 (Fed. Cir. 1998)...................................................................... 31

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................ 2, 9

*Poly-America, L.P. v. GSE Lining Tech., Inc.,*
  383 F.3d 1303 (Fed. Cir. 2004)....................................................................... 8

*Rackable Sys., Inc. v. Super Micro Computer, Inc.,*
  2006 WL 3065577 (N.D. Cal. Oct. 27, 2006)............................................ 31

*SciMed Life Sys. v. Advanced Cardiovascular Sys.,*
  242 F.3d 1337 (Fed. Cir. 2001)....................................................................... 5

*Tronzo v. Biomet,*
  156 F.3d 1154 (Fed. Cir. 1998)....................................................................... 4

*Vitronics Corp., v. Conceptronic Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996)...................................................................... 17

*Wang Labs v. Am. Online,*
  197 F.3d 1377 (Fed. Cir. 1999)....................................................................... 5

*Watts v. XL Sys.,*
  232 F.3d 877 (Fed. Cir. 2000)...................................................................... 10

**Statutes**

35 U.S.C. § 112 ............................................................................................. 30, 31, 32, 33

## INDEX TO EXHIBITS

Exhibit 1       '525 Patent file history, July 7, 1998 Response to Office Action

Exhibit 2       '525 Patent file history, January 28, 2000 Response to Office Action

Exhibit 3       Armstrong Deposition Transcript (selected pages)

Exhibit 4       '700 Patent file history, October 25, 2002 Amendment

Exhibit 5       Request for Inter Partes Reexamination – '700 Patent (selected pages)

Exhibit 6       '700 Patent file history, July 15, 2002 Preliminary Amendment

Exhibit 7       '700 Patent file history, March 11, 2003 Amendment

Exhibit 8       '700 Patent file history, December 4, 2003 Information Disclosure Statement

Exhibit 9       '525 Patent file history, August 31, 2000 Office Action

Exhibit 10      '525 Patent file history, August 4, 2000 Response to Office Action

Exhibit 11      '525 Patent file history, July 31, 2000 Interview Summary

Exhibit 12      '700 Patent file history, December 17, 2002 Notice of Allowability

Exhibit 13      *Leggett & Platt, Inc. v. Vutek, Inc.*, 2006 WL 3813677 (E.D. Mo. Dec. 26, 2006)

Exhibit 14      *Rackable Sys., Inc. v. Super Micro Computer, Inc.*, 2006 WL 3065577 (N.D. Cal. Oct. 27, 2006)

## I.     <u>INTRODUCTION</u>

Time and time again, Anascape's '525 Patent makes it clear that the only "inventive" controller that it describes is a ***hand operable, single input member controller moveable in six degrees of freedom relative to a reference member of the housing*** ("6DOF").  Nor does the '700 Patent add any other "inventions."  In fact, Anascape treats the described "invention" in the '525 and '700 Patents as one and the same, asserting in this litigation and in its opening claim construction brief that the specifications of the '525 and '700 Patents are nearly identical and that the '700 Patent adds no new subject matter.

Since this hand operable, single input member controller moveable in 6DOF is asserted again and again as the "invention" and never identified as a merely optional embodiment, this aspect of the "invention" must govern and control claim construction under well-established Federal Circuit law.  Accordingly, the claims of the '525 and '700 Patents cannot be construed to cover any controller other than a hand operable, single input member moveable in 6DOF.  "[T]he scope and outer boundary of claims is set by the patentee's description of his invention…." *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006).  Further, "each term must be construed to implement the invention described in the specification." *Id.* at 1344. "The public is entitled to take the patentee at his word" regarding what he describes as the "invention." *Honeywell Int'l v. ITT Indus.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).  In the '525 and '700 Patents, Anascape's "word" to the public was that the "invention" is a single input member controller moveable in 6DOF.  Although it now finds itself in a bind because Microsoft's products do not have a single input member operating in 6DOF, Anascape cannot be allowed to take back what it told the public in its patents.

II.     **THE LAW RELEVANT TO CLAIM CONSTRUCTION**

A.     **Overview Of Claim Construction Law**

The law of claim construction is clearly set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). The language of the claims is the starting point for a claim construction analysis. *Id.* at 1312. In its proper context, a claim term is given the ordinary and customary meaning "that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. What is the proper context? "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."[1] *Id.* "[T]he court in *Phillips*, resolving conflict, stressed the dominance of the specification in understanding the scope and defining the limits of the terms used in the claim." *On Demand*, 442 F.3d at 1337-38. Indeed, the *Phillips* decision reinforced that the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. In addition to consulting the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Id.* at 1317. Further claim construction law particularly pertinent to the analysis of the disputed claim terms is set forth below.

III.     **BACKGROUND OF ARMSTRONG'S ALLEGED INVENTION**

The '525 Patent describes the "invention" as requiring a hand operable, single input

---

[1] A person of ordinary skill in the art is one who has at least a bachelor's degree in mechanical or electrical engineering and at least several years experience in designing and improving controllers for video games, robotics, computers, or other electronic devices. (Some of the claims of the '525 and '700 Patents asserted against Microsoft contain "pressure-sensitive variable sensor" limitations. To the extent necessary, a person of ordinary skill in the art for this subject matter is identified in Microsoft's separate claim construction brief for the "PSVC" patents.)

member moveable in 6DOF relative to a reference member of the controller,[2] as evidenced

throughout the written specification and drawings.

### A.    The "Abstract" Only Describes A Single Input Member 6DOF Controller

First, the "Abstract" of the '525 Patent refers to "appropriately structured multiple axes

controllers" as being "*comprised of a single input member operable in 6DOF* relative to a

reference member of the controller."[3] ('525 Patent, Abstract.) The Abstract goes on to describe

two variations of this single input 6DOF member; namely, a joystick type and a trackball type.

> A sensor connecting sheet material for inclusion in appropriately structured
> multiple-axes controllers comprised of a *single input member operable in 6DOF*
> relative to a reference member of the controller. *The input member* having
> return-to-center resiliency relative to the reference member on at least the three
> perpendicular linear axes. *The input member* can be of a continuously rotatable
> trackball-type or a limited rotation joystick-type, and the reference member can be
> a shaft, a base or a housing. [*Id.*]

### B.    The "Background Of The Invention" Section
### Only Describes A Single Input Member 6DOF Controller

The '525 Patent explains that prior art controllers are undesirable if they lack a single

input member which can be operated or manipulated in six degrees of freedom. Specifically, the

'525 Patent described the "Chang" controller as a 6DOF controller which lacked the "inventive"

element required in the Armstrong controller:

> [Chang's] *lack of a hand operable single input member operable in six degrees
> of freedom has many significant disadvantages. Further the Chang controller
> does not have a any [sic] input member capable of being manipulated in 6DOF
> relative to any reference member* of the controller, which yields significant
> disadvantages. [*Id.*, 3:30-36.]
>
> *The Chang controller does not have a single input member such as one ball or*

---

[2] For brevity, the phrase "relative to a reference member of the controller" will not always be restated when referring to the single input member 6DOF controller.

[3] Unless otherwise noted, emphases appearing in quoted references are added.

*one handle which can be operated (causing representative electrical output) in six degrees of freedom. Nor can any one Chang input member be manipulated (moved) relative to a reference member on the controller in six degrees of freedom. Thus, the Chang device is functionally and structurally deficient.* [*Id.*, 4:24-30.]

Prior art controllers with only two or three degrees of freedom are discussed and distinguished because "an increasing number of sensors is necessary for the additional axes control." (*Id.*, 1:51-52.) Further, the '525 Patent distinguishes prior art using multiple input members as "functionally and structurally deficient." (*Id.*, 4:24-30.)

The "Background Of The Invention" section of the '525 Patent also makes it clear that the "invention" requires a single input member moveable in 6DOF. For example:

In the prior art there exist *6DOF controllers of a type having a hand operable, single input member moveable in six degrees of freedom for axes control* relative to a reference member of the controller. This type of *controller having the 6DOF operable input member outputs a signal(s) for each degree of freedom input, and it is this type of 6DOF controller which is believed to be by far the most easily used for 3-D graphics control, and it is with this type of 6DOF controller that the present invention is primarily concerned.* [*Id.*, 1:61-2:2];

Another failure in prior art *6DOF controllers of the type having a hand operable single input member* is the failure to use or anticipate use of inexpensive, flexible membrane sensor sheets…. [*Id.*, 2:16-19]; See also *Id.*, 2:3-6; 2:28-37.

The above discussion in the written description supports the conclusion that the claims should not be read so broadly as to encompass the distinguished prior art structures, namely those controllers utilizing input members providing less than six degrees of freedom, or controllers using multiple input members to provide six degrees of freedom. *See, e.g., Tronzo v. Biomet,* 156 F.3d 1154, 1159 (Fed. Cir. 1998) (where the specification distinguished prior art structures as inferior and touted advantages of a conical shaped cup for use in an artificial hip device; "[s]uch statements make clear that the '589 patent discloses *only* conical shaped cups and nothing further") (emphasis in original); *Ekchian v. Home Depot,,* 104 F.3d 1299, 1304 (Fed.

Cir. 1997) ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection.")

      **C.**      **The "Summary Of The Invention" Section Only<br>Describes A Single Input Member 6DOF Controller**

The "Summary Of The Invention" portion of the '525 Patent describes "the present invention" as having "structuring for converting *full six degrees of freedom physical input provided by a human hand on a hand operable single input member* into representative outputs or signals useful either directly or indirectly for controlling or assisting in controlling graphic image displays." ('525 Patent, 4:50-55.) The characterization of the "present invention" includes numerous additional references to the 6DOF single input member structure, for example:

> The present invention solves the aforementioned prior art problems associated with ***6DOF controllers having one 6DOF input member***, with multiple, individually hand mounted and positioned sensors or sensor units in widely spread constellations, and the problems of hand applied wiring of individually insulated wire to the individual sensors or sensor units. ***The present 6DOF controller solves these problems primarily with sheet supported sensor structuring....*** [*Id.*, 5:56-64.]

The characterization of the 6DOF single input member configuration as part of the "present invention" is strong evidence that the claims should not be read to encompass the opposite structure, for instance, an input member providing less than 6DOF or multiple input members for providing six degrees of freedom. *See SciMed Life Sys. v. Advanced Cardiovascular Sys.,* 242 F.3d 1337, 1343 (Fed. Cir. 2001); *see also Wang Labs v. Am. Online,* 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("when the 'preferred embodiment' is described as the invention itself, the claims are not entitled to a broader scope than that embodiment.") (citing *Modine Mfg. Co. v. U. S. Int'l. Trade Comm'n.*, 75 F.3d 1545, 1557 (Fed. Cir. 1996)).

This is underscored from a further review of the "Summary Of The Invention" which

identifies objects of the purported invention - *all* of which include or incorporate the concept of using a single input member for providing 6DOF:

> SUMMARY OF THE INVENTION
>
> In order that *6DOF controllers* be more affordable, and for a user to be easily able to control objects and/or navigate a viewpoint within a three-dimensional graphics display, I have developed improved, low-cost hand operated *6DOF controllers* for use with a computer or computerized television or the like host device. *The controllers provide structuring for converting full six degrees of freedom physical input provided by a human hand on a hand operable single input member* into representative outputs or signals useful either directly or indirectly for controlling or assisting in controlling graphic image displays. ['525 Patent, 4:45-55];
>
> *A primary object of the invention is to provide a 6DOF image controller (physical-to-electrical converter), which includes a single input member being hand operable relative to a reference member of the controller,* and the controller providing structure with the advantage of mounting the sensors in a generally single area or on at least one planar area.... [*Id.*, 7:50-56];
>
> Another object of the invention is to *provide and meet the aforementioned objects in a 6DOF controller....* [*Id.*, 8:35-36]; See also *Id.*, 7:59-66; 8:3-7; 8:11-16; 8:19-23; 8:25-31; 8:49-50.

### D.    The "Best Modes For Carrying Out The Invention" Section Only Describes A Single Input Member 6DOF Controller

That Armstrong discloses only a single input member to provide 6DOF is underscored from a review of the described embodiments of the "invention" namely the trackball and joystick embodiments.  As shown in the Figures below, there is a "trackball" embodiment and two very similar "joystick" embodiments.  In each of the three embodiments, the input member structure (either the trackball or joystick handle) is grasped by the human hand in order to manipulate a carriage (Element 14 in Figs. 2 and 12; Element 314 in Fig. 20) relative to a housing (Element 10 in Figs. 2 and 12; Element 317 in Fig. 20) in such a manner that the carriage activates linear movement sensors to sense movement along three mutually perpendicular axes (up-down, forward-back, right-left).  In turn, the trackball or joystick is rotated so that it can activate

rotation sensors for the yaw, pitch and roll axes (e.g., "x, y and z" axes). The combination of these three linear and three rotational aspects of the single hand operated input member thus allows for 6DOF.



**Fig. 1** – Figs. 2, 12 and 20 of the '525 and '700 Patents - Showing
<u>Trackball and Joystick Embodiments of Hand Operable, Single Input Member 6DOF Controllers</u>

Anascape argues that Armstrong's references to the single input 6DOF member during prosecution and in the specification of the '525 Patent are meant only to refer to a preferred embodiment of the invention, and not to limit the claims to a single input member 6DOF structure. (See Opening Brief, p. 6.) That argument, however, flies in the face of the many

statements in the written description that define "the invention" as employing a single input

member 6DOF structure, and that distinguish prior art that used multiple input members as

"functionally and structurally deficient." ('525 Patent, 4:30.)[4]

## IV.    DISPUTED TERMS

### A.    "Image Controller"  ('525 Patent, Claims 1, 5-6, 12-20)
###          "3-D Graphics Controller"  ('700 Patent, Claims 1-15, 32-33)
###          "Hand Operated Controller"  ('700 Patent, Claims 19-20, 22-23, 26-29, 31)[5]

| PROPOSED CONSTRUCTION |
| --- |
| A controller having a hand operable, single input member that is moveable along and/or rotatable about three mutually perpendicular axes in six degrees of freedom ("6DOF") relative to a reference member of the controller. |

### 1.    The "controller" disclosed in all embodiments
###         is a single input member "manipulatable" in 6DOF

The '525 Patent indicates that the "invention" is a ***6DOF image controller...which***

***includes a single input member being hand operable relative to a reference member of the***

***controller.*"  ('525 Patent, 7:50-53.)  The '525 Patent goes on to state what it means for the

---

[4]  It should be noted that the '525 Patent does include a description of so-called "secondary input members." However, the secondary input members (e.g., "two thumb select switches 144 and two finger select switches 146") ('525 Patent, 18:4-5) were not described as providing six degrees of freedom, but rather functioning as "auxiliary secondary input buttons (select, fire buttons, special function keys, etc.)"  (*Id.*, 26:56-59.)

[5]  Anascape's contention that these are preamble terms and not limitations of the claims is unfounded.  As is the case here, preamble terms serve as limitations where the specification emphasizes and describes the invention or the importance of a fundamental feature of the invention in a manner relating to the preamble terms.  *Catalina Mktg. Int'l. v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002); s*ee also Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (holding that the phrase "blown-film" in the preamble was limiting where the specification was "replete with references to the invention as a 'blown-film' liner" including the patent title and "Summary of the Invention"; the preamble language "does not state a purpose or intended use, but rather discloses a fundamental characteristic of the claimed invention").  In addition, the preambles in the asserted claims are limitations, since absent them, the claims would not describe a complete invention.  *On Demand*, 442 F.3d at 1343–44 ("[w]e conclude that the preamble in this case necessarily limits the claims, in that it states the framework of the invention, whose purpose is rapid single-copy printing of a customer's selected book as stated in clauses [5], [6], [7], and [8].")

single input member to be "manipulatable" in six degrees of freedom: [6]

> The term "manipulate", and all derivatives (manipulated, manipulating, *manipulatable*, manipulation, etc.), is used in the context of the input member being *manipulatable in 6DOF relative to the reference member. This means that the input member or handle can be linearly moved along and/or rotated about the three mutually perpendicular axes in 6DOF but it does <u>not necessarily mean that sensors are being stimulated</u> or that the device is outputting a representative signal.* It only means that it can be moved and/or rotated in such a manner. It may or may not be stimulating sensors or outputting information representative of the handle manipulation. A handle capable of being "manipulated" in 6DOF means only that it can be linearly moved and/or rotated relative to the reference member. [*Id.*, 7:1-14.]

Under Federal Circuit law, Mr. Armstrong's description of his "invention" controls the scope of his claims. *On Demand*, 442 F.3d at 1339-40 (construing "customer" to be limited to retail consumer because the specification said that was the invention). Indeed, "claims *cannot be of broader scope* than the invention that is set forth in the specification." *Id.* at 1340 (citing *Phillips,* 415 F.3d at 1321). "Although claims need not be limited to the preferred embodiment when the invention is more broadly described, 'neither do the claims enlarge what is patented beyond what the inventor has described as the invention.'" *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1355 (Fed. Cir. 2006) (quoting *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1352 (Fed. Cir. 2001).

Both before and after *Phillips*, the Federal Circuit has confirmed that the patent's characterization of the "invention" must govern claim construction. For example, in *Honeywell International v. ITT Industries*, 452 F.3d 1312 (Fed. Cir. 2006), the court limited the broad term

---

[6] Anascape argues that because certain dependent claims recite that the input member is "operable in 6DOF," the independent claims upon which they depend cannot require a 6DOF controller, according to claim differentiation. (Opening Brief, pp. 14-15.) This is incorrect. By claiming "operability" in 6DOF, dependent claims 4, 9 and 10 add the element that "the sensors are [necessarily] being stimulated" in 6DOF, while this is not necessarily true where sensors are "manipulatable" in 6DOF. (Contrast the "definition" of "manipulate" with the "definition" of "operate," '525 Patent, 7:1-22.)

"fuel injection system component" to one specific component, a fuel filter, because the patent described a fuel filter as "this invention":

> Here, the written description uses language that leads us to the conclusion that a fuel filter is the only "fuel injection system component" that the claims cover, and that a fuel filter was not merely discussed as a preferred embodiment.  On at least four occasions, the written description refers to the fuel filter as "this invention" or "the present invention" ....  ***The public is entitled to take the patentee at his word and the word was that the invention is a fuel filter***.  [*Id.,* 452 F.3d at 1318.]

Likewise, in *Netword,* the patent application disclosed that an object of the described "local" computer invention was to "cache aliases," but the patent's claims recited "one or more local computers" without reciting whether they cached aliases.  242 F.3d at 1352.  The Federal Circuit limited the claims to local computers that cache aliases because a patent's claims do not "enlarge what is patented beyond what the inventor has described as the invention."  *Id*.

And, in *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007), the claims referred to a "composite composition" but did not expressly state whether or not this composition had to be in a pellet or extrudate form.  However, the specification stated that "[t]he ***invention*** relates to a composition comprising a polymer and wood fiber composite that can be used in the form of a linear extrudate or thermoplastic pellet to manufacture structural members."  *Id*. at 1367.  The Court held that "[w]hile nothing on the face of the asserted claims stated that the term 'composite composition' is limited to a mixture that is in pellet or linear extrudate form, the specifications make clear that the term . . . must be construed to be limited in that manner."  *Id*. at 1366.  *See also Watts v. XL Sys.*, 232 F.3d 877, 880-81 (Fed. Cir. 2000).

To allow Anascape to more broadly claim other types of controllers that do not include such a single 6DOF input member would injure the public's right "to take the patentee at his word" regarding his "invention."  *Honeywell*, 452 F.3d at 1318;  s*ee also Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370-71 (Fed. Cir. 2003).

2.    **The embodiments Anascape points to as
establishing multiple input member 6DOF
controllers do not in fact show multiple input members**

a)    **The "trackball" of Fig. 4 is a hand
operable single input member 6DOF controller**

Anascape points to embodiments which it claims show use of multiple input members to provide 6DOF. For example, Anascape points to Fig. 4 of the '525 Patent which shows a trackball surrounded by a collet.

Incredibly, what Anascape omits from its brief is that the '525 Patent actually refers to the trackball shown in Fig. 4 as a *"hand operable single input member operable in full six degrees of freedom"*:

> With reference to *FIGS. 1-4* in particular wherein trackball-type embodiment 9, being a *hand operable 6DOF controller* for outputting control information is illustrated showing a rectangular housing 10 which is considered a reference member relative to which is *operated trackball 12 which in this example is the hand operable single input member operable in full six degrees of freedom.* FIGS. 2-3 being cross-sectional views of the FIG. 1 embodiment showing housing 10 which can at least in part support, retain and protect moveable carriage 14. ['525 Patent, 11:19-28.]

In fact, in 1998, Mr. Armstrong himself admitted during prosecution of the '525 Patent that the same trackball/collet structure shown in Figs. 1-6 of the '525 Patent was a single input member controlling 6DOF:

> Shown in Figs. 2 and 3 and thoroughly structurally described in the patent '891 as a whole is a fully functional multi-axis controller with sufficient numbers of *sensors all mounted on a single member 20 to convert six degrees of freedom of an input member (trackball 12) relative to a reference member (housing 10)....*

(Ex. 1, '525 Patent file history, July 7, 1998 Response to Office Action, p. 4.) Figs. 2 and 3 of the '891 patent are identical in structure to Figs. 2 and 3 of the '525 Patent, the structure of which Anascape now claims does not show a single input member 6DOF trackball when it is shown in another view in Fig. 4. (Opening Brief, p. 16.)

In essence, the first joystick embodiment ('525 Patent, Fig. 12) is simply a variation on the trackball embodiment (*Id.*, 18:45-59), with a joystick handle replacing the optional graspable collet to allow the user to more effectively grasp the trackball assembly to impart linear movement through the carriage.[7]  Again, in another instance during prosecution of the '525 Patent, Armstrong acknowledged that both the trackball and joystick in Figs. 3 and 12 were "6 axis" (or 6DOF) controllers:

> Please see drawing figure 3 of my patent 5,565,891 and compare it to drawing figure 12 of the instant application wherein one can see that only a stick (rod or joystick) needs to be attached to the ball of a 6 axis trackball to have a 6 axis joystick....

(Ex. 2, '525 Patent file history, January 28, 2000 Response, p. 2.)

In other words, Anascape's current position is an about-face of what it told the Patent Office during prosecution of the '525 Patent and is simply not believable.

**b)      The "collet" is merely an optional
<u>component of the single input member 6DOF trackball</u>**

Anascape claims that the "collet" is a secondary input member, functioning like a separate joystick to provide additional degrees of freedom.  (Opening Brief, p. 17.)  However, even in the section cited by Anascape, the specification unambiguously states otherwise:

> ***Collet 16, if utilized, serves as an easily gripped member allowing the human hand to move carriage 14 and thus trackball 12 in any linear direction desired***, although when collet 16 is not utilized, trackball 12 can be grasped by the fingers of the hand to also move carriage 14 in any linear direction.  ***If a graspable collet is not used, then the exposed portion of trackball 12 is available for grasping with the fingers to apply force in any linear direction,*** much like a basketball player grasps a basketball in one hand or in the fingers.  ['525 Patent, 12:49-58.]

Thus, the collet is simply serving the grasping function for the trackball input member

---

[7] Anascape claims that the collet itself captures linear movement.  (Opening Brief, p. 17.)  That is incorrect.  In both embodiments, linear movements by the single input member carriage are sensed by the housing.

(which is served by the handle in the joystick embodiment (*see, e.g.,* Fig. 12)).  The collet itself

is not functioning as a separate input member, any more than the handle of the joystick serves as

a separate input member from its base in Fig. 12.  To the contrary, the trackball, collet, and the

supporting carriage all move in unison as a single unit to provide the linear movement that is

sensed by the reference member, namely the housing:

> The structure of carriage 14 and collet 16 ***if the extending collet is used***, is sufficiently close in fit to trackball 12 to render a substantial link in linear movement between carriage 14, collet 16 and trackball 12.  In other words, ***linear movements in trackball 12 are substantially equal to linear movement of carriage 14 and collet 16.***"  ['525 Patent, 13:8-13];

> ***Clearly since trackball 12 and collet 16 are linked to move linearly with carriage 14, trackball 12 can be moved linearly in all directions relative to housing 10, wherein housing 10 is considered the reference member.***  [*Id.*, 13:27-30.]

Armstrong himself stated that he considered the collet to be part of the carriage, which forms an

integral portion of the single input member shown in Figs. 1-4:

> It should be noted that ***I consider collet*** 16 as shown in FIG. 2 and some other drawings, whether it is a fixed or rotatable collet (to be detailed) ***to be part of carriage 14 since it is supported or fastened to carriage 14 and moves therewith***.  [*Id.*, 13:13-17.]

> The '525 Patent alternatively describes using the collet as a "secondary input member":

> Further, the trackball 12 input member may be interpretable on all six axes as previously described, and the rotatable collet can serve as an additional secondary input member for whatever use may be desired by a software designer or end-user.  [*Id.*, 17:20-23.]

However, the trackball is still a single input 6DOF controller even when the collett serves as a

"secondary input member."  (The collet is just that – "secondary" to the full 6DOF function of

the trackball.)  Such secondary functions (such as firing a weapon in a video game) are

elsewhere described for buttons, which are also referred to as "secondary input members,"

likewise have nothing to do with providing six degrees of freedom:[8]

> Additionally, auxiliary secondary input buttons (select, fire buttons, special function keys, etc.) are readily integrated in an economical and rugged fashion for operation by the user's finger(s).  [*Id.*, 26:56-59; see also 18:3-7; *supra* fn. 4].

In sum, the "collet" argument by Anascape is a red herring since the collet is superfluous or optional to the single input member 6DOF trackball.

c)    **Fig. 47 does not vary from <br> a single input member 6DOF controller**

Further, Anascape points to Fig. 47, which it claims is an input member capable of accepting inputs along only two axes.  Anascape argues that this element "could be deployed by itself as an input member capable of movement along two axes."  (Opening Brief, p. 17.) Nowhere in the specification of the '525 Patent or the '700 Patent is such a use for the structure in Fig. 47 disclosed.  Rather, the specification states that the structure (with bidirectional sensors) shown in Fig. 47 is used "for creating 6DOF functional structures *with previously described structures of the embodiment of Figs. 20-28*, thus for full 6DOF operability six bi-directional sensors would be used."  ('525 Patent, 31:11-15.)  None of the structures into which the specification describes placing the element of Fig. 47 utilizes multiple input members, and never is it suggested that the element may be used alone as a 2DOF input member.

3.    **Anascape and Mr. Armstrong assert that the <br> '525 and '700 Patents described the same "invention"**

As stated above, the '525 Patent (and its 1996 application) requires a single input

---

[8] The '525 Patent optionally discloses using a rotatable collet as an additional means of sensing rotation about the yaw axis, as shown in Figs. 5 and 6.  ('525 Patent, 17:14-19.)  However, this additional sensor does not replace the sensor which senses rotation of the trackball about the yaw axis.  Thus, the added optional (and superfluous) rotatable collet sensor is not required to provide 6DOF to any trackball embodiment, nor does it make the embodiment disclosed in Figs. 5 and 6 anything other than a 6DOF single input member embodiment, as demonstrated by Armstrong's statement that "[a] 6DOF trackball-type embodiment is illustrated in FIGS. 1-10…." (*Id.*, 7:47-48.)

member moveable in 6DOF.  Anascape asserts that the '525 and '700 Patent specifications are "nearly identical."  (*See, e.g.,* Opening Brief, p. 2, fn 4.)  Anascape's Opening Brief does not attempt to show any differences between the specifications of the '525 and '700 Patents with respect to the claimed controller.  Anascape does not assert that the '700 Patent's specification was broadened or changed in scope when it was filed in 2000, four years after the filing of the '525 Patent in 1996.  In fact, Anascape told the Patent Office during prosecution of the '700 Patent application that it was a "continuation application" of the '525 Patent application, not a "continuation-in-part" application containing new subject matter.  (*See, e.g.*, '700 Patent, 1:6-8).[9] Similarly, Anascape alleges that the '525 and '700 Patents are entitled to the same priority or "invention date"[10] (*i.e.*, Anascape does not contend that the '700 Patent describes some other type of controller conceived by Mr. Armstrong after the '525 Patent was filed).  Indeed, as recently as April 19, 2007, Mr. Armstrong stated in his deposition that the '700 Patent only ***clarifies*** the alleged invention disclosed in the '525 Patent, and that it did not broaden the scope or change the alleged invention of the '525 Patent.  (Ex. 3, Armstrong Depo. Tr., p. 169, lines 11-21.)

The term 6DOF in the '525 Patent is largely replaced by the term "3-D" in the '700 Patent.  Thus, when Armstrong refers in claims 1-15 and 32-33 of the '700 Patent to a "3-D graphics controller," this is essentially the same as claiming a "6DOF graphics controller." Armstrong himself has admitted this in the litigation:

> Q.  Because you don't think that changing six degree of freedom controllers, that language to 3-D graphic image controllers, broadens the definition in any

---

[9]  Originally, Armstrong claimed that the '700 Patent application was a continuation-in-part of the '525 Patent application.  He first claimed priority as a "continuation" two years after filing, on October 25, 2002.  (Ex. 4, '700 Patent file history, October 25, 2002 Amendment, p. 4.)

[10] See Anascape, Ltd.'s Disclosure of Asserted Claims and Preliminary Infringement Contentions, p. 3-4.

way.  You think it keeps it exactly the same in terms of scope, correct?

    A.  Yes.

    Q.  That's your testimony?

    A.  I think it clarifies, yeah.

    Q.  And it - - and it doesn't broaden it in - -

    A.  It does not broaden the scope.

(*Id*.)

### 4.    Anascape's mischaracterization of Microsoft's '700 Patent reexam request does not aid Anascape's claim construction position

Anascape contends that the '700 Patent is a "continuation" application of the '525 Patent, and that the '700 Patent is entitled to an alleged priority date at least as early as the filing of the '525 Patent application in 1996 (and, in fact, even to his earlier 1992 and 1995 applications), and not the 2000 filing date of the '700 Patent application.  Nevertheless, Anascape contends that the claims of the '700 Patent are not limited to the single-input member 6DOF controller described as the "invention" in the '525 Patent.

In other words, Anascape wants to have it both ways in this litigation.  It wants a claim construction not limited to a single-input member 6DOF controller because Microsoft's products do not have a single input member moveable in 6DOF.  But Anascape also wants the claims (as it construes them) to have a priority date earlier than the '700 Patent's filing date because the claims would undoubtedly be invalid in view of prior art controllers which existed before that date.

Anascape cannot have it both ways, and Microsoft is simply entitled to challenge the validity of Anascape's claims as construed by Anascape via a reexamination in the U.S. Patent Office (or "Request").  Microsoft filed its original reexamination Request with the Patent Office on Jan. 31, 2007.  Microsoft indicated that the Request was based on Anascape's claim

construction contentions in the litigation, disputed that Anascape's priority claims would be proper based at least on that construction, and that Microsoft did not admit that the interpretations of the claims would be proper in the litigation. (Ex. 5, Request for Inter Partes Reexamination, '700 Patent, e.g. p. 4, 20-21). Anascape cites to one sentence out of Microsoft's original 168-page Request to argue that Microsoft should be bound to Anascape's proposed construction. That sentence merely states that the '700 Patent claims do not recite the limitation "single input member." However, that is unavailing to Anascape's position since, as shown herein, the claims as properly construed must be limited to a single input 6DOF controller, and further since the Federal Circuit has held on numerous occasions that claims can be limited to the "invention" described in the specification even though the specific words do not appear in the claims. *Netword,* 242 F.3d at 1352 (where claims recited "one or more local computers" but not whether they cached aliases, Court limited the claims to local computers that cache aliases because the patent's claims cannot "enlarge what is patented beyond what the inventor has described as the invention"); *see also Andersen,* 474 F.3d at 1366 ("[w]hile nothing on the face of the asserted claims stated that the term 'composite composition' is limited to a mixture that is in pellet or linear extrudate form, the specifications make clear that the term . . . must be construed to be limited in that manner.")

But in any event, Anascape's "judicial estoppel" type argument in the context of a reexamination has been flatly rejected by the Federal Circuit. *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1462-1463 (Fed. Cir. 1998) ("Laitram's fourth argument, that KVP 'admitted' during reexamination that the claims were broad enough to encompass curved driving surfaces, is irrelevant to the construction of the claims. It is the *applicant's* representations during prosecution that potentially shed light on the construction of the claims[ ], not the

representations of a reexamination requester.") (citing *Vitronics Corp., v. Conceptronic Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).)

B.    **"Input Member," "First [Second] [Third] …Elements" . . .**

| TERM OR PHRASE | PROPOSED CONSTRUCTION |
|---|---|
| **input member**<br>('525 Patent, Claims 1, 5, 12) | A hand operable, single trackball or handle fit to be manipulated by a human hand in 6DOF. |
| **a first [second] [third] element**<br>('700 Patent, Claims 1, 3, 5-6, 9, 12-13, 15, 32) | The first, second and third elements are controlled by a hand operable, single input member moveable in 6DOF |
| **a [first, second, third, fourth] rotary potentiometer**<br>('700 Patent, Claim 9) | The first element, and the first, second, third and fourth rotary potentiometers are controlled or activated by a hand operable, single input member moveable in 6DOF. |
| **a first element**<br>('700 Patent, Claim 14) | The first element and the first, second, third and fourth bi-directional proportional sensors are controlled or activated by a hand operable, single input member moveable in 6DOF. |
| **a [first, second, third, fourth] bi-directional proportional sensor**<br>('700 Patent, Claim 14) | See "first element," above. |
| **[structure]; [second] [third] element**<br>('700 Patent, Claims 19, 26) | The structure, and the second and third elements are controlled by a hand operable, single input member moveable in 6DOF. |

1.    **"Input member" ('525 Patent, Claims 1, 5, 12)**

For the reasons set forth above, the "input member" disclosed in the '525 Patent is a single input trackball or joystick member manipulable in 6DOF relative to a reference member of the controller.  Thus, the appropriate construction for "input member" is "a hand operable, single trackball or handle fit to be manipulated by a human hand in 6DOF."[11]

2.    **"Elements," "bi-directional proportional sensors" and "rotary potentiometers" ('700 Patent)**

During prosecution of the '700 Patent, and after reviewing controllers from Nintendo and

---

[11]  In its opening brief, Anascape argues that input member should be defined solely as "a trackball or a joystick," citing language in the '525 Patent's Abstract which states that "[t]he input member can be" a "trackball-type" or a "joystick-type."  (Opening Brief, p. 19.)  Anascape omits the immediately preceding language which makes it clear that "***the*** input member" refers to "*a single input member operable in 6DOF* relative to a reference member of the controller."  ('525 Patent, Abstract.)

Microsoft, Armstrong amended his claims, cancelled his original claims, and added new claims which employed language referring to multiple "elements," or, in some cases, to multiple "rotary potentiomers" or "bi-directional proportional sensors."  (Ex. 6, '700 Patent file history, July 15, 2002 Preliminary Amendment.)  In describing these new claims, Armstrong stated that the term "element" has a specific meaning:

> In the claims the use of the word "element" is intended to mean or be defined as a ***singular structure, member, part, component or the like***, or a plurality of structures, members, parts, components or the like, ***as disclosed in Applicant's disclosure*** and their equivalents.

(Ex. 7, '700 Patent file history, March 11, 2003 Amendment, p. 24.)

This definition by Armstrong is instructive because Anascape has claimed in its brief that the specifications for the '525 Patent and the '700 Patent are "nearly identical."  Armstrong made it clear in the '525 Patent and during prosecution of the '525 Patent that his invention was drawn towards a single input member 6DOF controller, as set forth in detail above.  Armstrong further stated that the modifications he made to the '700 Patent specification were not made to broaden its coverage beyond what was allegedly disclosed in the '525 Patent, a fact reflected in his claim of priority as a "continuation" application instead of a "continuation-in-part."

Actually, the various elements, including rotary potentiometers and bi-directional sensors, claimed in the '700 Patent are part of a singular structure, namely the 6DOF single input member described in the '525 Patent.  While Anascape will argue that the above "definition" allows the various elements to be part of multiple six degrees of freedom structures, ***no such multiple input structures for providing 6DOF were ever disclosed***.  For this reason, the terms above (i.e., "first [second][third][fourth] elements . . . bi-directional proportional. . . sensors . . . rotary potentiometers"), if they are to find any support in Armstrong's specification at all, must be part of the 6DOF single input member structure Armstrong purported to describe in both the

'525 and '700 Patents as his "invention."  (*See, e.g.*, '525 Patent, Figs. 2-3, 12-21, and 45-47;

12:59 - 13:7; 19:1-10; and 31:11-47).

C.    **"Moveable On At Least Two Axes" ('525 Patent, Claims 1, 5, 12)**
       **"Moveable On Two Axes" ('700 Patent, Claim 14)**
       <u>**"Movable On Two Mutually Perpendicular Axes" ('700 Patent, Claims 19, 26)**</u>

| PROPOSED CONSTRUCTION |
| --- |
| Capable of linear movement along [at least] two [mutually perpendicular] axes relative to a reference member of the controller. |

Many of the asserted claims of the '525 and '700 Patents require an element or input

member to be "moveable on" two or more axes.  The dispute between the parties for these terms

is very simple.  Microsoft and Nintendo contend that "movement on an axis" means linear

movement along the axis.  Anascape asserts that movement on an axis can also include rotation

around an axis.

As students learn in basic geometry class, an axis is a line.  Common sense tells us that

movement "on" a line is linear movement along the line, not rotation around the line.  While this

distinction seems simple, it is not necessary for Microsoft's claim construction in this case.  The

'525 and '700 Patents make this distinction crystal clear by emphasizing over and over again that

there are two different types of travel for input member and elements:  movement on, in, or along

an axis (linear movement), and rotation about or around an axis (rotation).  Anascape today

wants to equate the two, but cannot do so in light of the clear distinction it made in the patents.

*See Bell Atlantic Network Servs., Inc. v. Covad Commns. Group, Inc.*, 262 F.3d 1258, 1271 (Fed.

Cir. 2001) (holding that claim term "mode" did not also encompass "rate" because the patent

consistently "refer[red] to the terms 'rate' and 'mode' as two separate and distinct concepts").

For example, in its Summary of the Invention, the '525 Patent contrasts these two types

of inputs that the controller can sense:

> information describing ***rotation or rotational force of the hand operable input
> member in either direction about three mutually perpendicular bi-directional
> axes*** herein referred to as yaw, pitch and roll, (or first, second and third) and
> information describing ***linear moment [sic – movement] of the hand operable
> input member along the axes*** …

('525 Patent, 4:57-64).  The same Summary section then twice describes how input members can be "linearly moved along and/or rotated about the three mutually perpendicular axes," again contrasting movement along an axis with rotation about an axis.  ('525 Patent, 7:5-6, 19-20).  Continuing with the distinction, the Summary thrice refers to "movements and/or rotations" of the input members.  ('525 Patent, 7:27, 30, 42-43; *see also* 8:52-56).  Throughout the remainder of the patents, rotation is consistently described as rotation, ***not*** as movement on or along an axis.  (*See*, *e.g.*, '525 Patent, 3:49-51, 12:65-67, 13:7, 16:44-49, 16:66, 17:17-19, 19:29-32, 19:65-67, 21:4-5, 21:31-32).

In sum, never once does the '525 or '700 Patent tell the reader that movement on or along an axis can encompass rotation.  Instead, rotation is clearly and unmistakably contrasted with movement along an axis.  This is not surprising given that common sense tells us that movement on an axis means movement along a line (the axis) not rotation around the line.  Anascape should not be heard today, when it becomes inconvenient for its infringement theories, to recant the distinction it taught the public in the patents.

### D.    "Flexible Membrane Sheet" ('525 Patent, Claims 1, 5, 12, 19) ('700 Patent, Claims 1, 3, 5-6, 9, 26)

| PROPOSED CONSTRUCTION |
|---|
| a flexible sheet which includes sensors and conductive traces. |

The '525 Patent states that the flexible membrane sheet is a flexible sheet "***having at least circuitry in the form of electrically conductive circuit traces which are stationary on the sheet member….***"  ('525 Patent, 12:12-14).  The flexible membrane sheet in the '525 and '700 Patents is therefore ***required*** to ***at least*** have circuitry in the form of electrically conductive

traces.[12]  Were that all that the patent required, Anascape's construction might be adequate.

However, the flexible membrane sheet is specifically set forth as containing both sensors

and conductive traces:

> Another failure in prior art 6DOF controllers of the type having a hand operable single input member is the failure to use or anticipate use of inexpensive, ***flexible membrane sensor sheets,*** which are initially flat when manufactured, and which ***include sensors <u>and</u> conductive traces applied to the flat sheet structure***.  [*Id.*, 2:16-21.]



**Fig. 18** – Flexible Membrane Sheet With Sensors and Conductive Traces

As shown in Fig. 18 above, the sensors are connected by conductive circuit traces.  (The

inner layer of the sheet has apertures to allow the corresponding sensors to contact one another.)

Armstrong distinguished prior art for failing to recognize the use of flexible sheets with sensors

and conductive traces:

> King also fails to anticipate the use of ***flexible membrane sensor sheets which include sensors <u>and</u> printed conductive traces*** which can be manufactured inexpensively in a flat sheet form, and used in flat sheet form, or alternatively, bent into three dimensionally formed shapes to position the sensors in three dimensional constellations.  [*Id.*, 2:61-66.]

Armstrong further described the invention as solving existing prior art problems by

---

[12] Additionally, during prosecution of the '700 Patent, Armstrong distinguished the prior art Namco controller in part because "[t]he Namco controller does not have a flexible membrane bearing circuitry."  (Ex. 8, '700 Patent file

applying circuitry to a sheet which is initially flat while sensors and circuit traces are applied:

> The present 6DOF controller solves these problems primarily with *sheet supported sensor structuring and most associated circuitry on the sheet which is at least initially flat when the sensors and conductive circuit traces are applied….* [*Id.*, 5:62-66.]

Additionally, it would be inappropriate to construe a flexible membrane sheet in such a way that it does not require both conductive traces and sensors, because within the scope of Armstrong's purported invention, placing an input member and finger depressible buttons on a flexible sheet necessarily requires placing sensors on that sheet.  This is significant because placing the input member and finger depressible buttons on the flexible sheet was also the basis upon which the Examiner said Armstrong could obtain his claims in the '525 Patent:

> *The prior art of record does not teach or suggest placing an input member movable in at least two axes and finger depressible buttons of Claim 43/41/40/39/38 or claim 51/50/49/48 onto a flexible sheet.*

(Ex. 9, '525 Patent file history, August 31, 2000 Office Action, p. 6.)  Again, the only flexible membrane sheet described in the '525 Patent is a flexible sheet with sensors and conductive traces.

The '525 Patent proposed to overcome alleged deficiencies with prior single input member 6DOF controllers by providing that the associated sensors utilized to provide 6DOF control be positioned on a substantially flat, flexible membrane sheet containing circuitry in the form of conductive traces:

> A primary object of the invention is to provide a 6DOF image controller (physical-to-electrical converter), which includes a single input member being hand operable relative to a reference member of the controller, and the controller providing structure with the advantage of mounting the sensors in a generally single area or on at least one planar area, such as on a generally *flat flexible membrane sensor sheet or circuit board sheet, so that the controller can be highly reliable and relatively inexpensive to manufacture*. ['525 Patent, 7:49-57];

history, December 4, 2003 Information Disclosure Statement, p. 6-7.)

The utilization of *flat sheet substratum supporting the sensors, and preferably sensor circuitry in conductive fixed-place trace form*, provides many advantages, with one being the allowance of a short or low profile 6DOF controller, and another, as previously mentioned, lower cost in manufacturing. [*Id.*, 5:29-35.]

The '525 Patent describes a flexible membrane sensor sheet as having three layers with sensors and traces (see Fig. 18 above).

Flexible membrane sensor sheets are currently being manufactured by way of utilizing *non-conductive flexible plastics sheets, and printing thereon with electrically conductive ink when the sheets are laying flat, to define circuit conductors and contact switches (sensors).* Usually, and this is believed well known, printed contact switches on flexible membranes utilizes [SIC] three layers of plastic sheets for normal contact pair separation, with a first contact on one outer sheet, and a second contact of the pair on the opposite outer sheet, and a third inner sheet separating the aligned contact pair, but with a small hole in the inner sheet allowing one contact to be pressed inward through the hole to contact the other aligned contact of the pair, thus closing the circuit. *A conductor trace of printed conductive ink is printed on each of the outer sheets and connects to the contact [i.e., sensor] of that sheet.* The contacts are also normally defined with conductive ink. Although this flexible membrane sensor structure in formed of multiple sheets stacked upon one another, it will herein generally be referred to as a membrane sensor sheet since it functions as a single unit. ['525 Patent, 6:24-44.]

In its construction of flexible membrane sheet, Anascape seeks to read out the requirement of both sensors and circuitry included on the flexible membrane sheet, stating that it need only be "a flexible sheet that includes sensors *and/or* circuitry" (Opening Brief, p. 23).[13] As set forth above, this is a naked attempt to broaden claims beyond what was actually disclosed. For these reasons, the term flexible membrane sheet should be construed to mean "a flexible sheet which includes sensors and conductive traces."

---

[13] In its brief, Anascape points to Fig. 38, characterizing it as a "*stand-alone* sensor that could be connected to and used in conjunction with a sensor-less flexible membrane sheet." (Opening Brief, p. 23.) This is fiction. The cited patent language describes a pressure-sensitive variable conductance button sensor. Nowhere is this sensor described as a "stand-alone sensor," nor is it shown or described to be used with a "sensor-less membrane sheet," which itself is also neither described nor shown.

E.    **"At Least One Sheet" ('525 Patent, Claims 1,
5, 12, 19) ('700 Patent, Claims 1, 3, 5-6, 8-10, 20, 26)**

| PROPOSED CONSTRUCTION |
|---|
| at least one flexible membrane sheet |

As stated in discussing the "flexible membrane sheet" above, Armstrong amended his claims in response to the Examiner's statement that the prior art did not teach or suggest placing an input member and buttons onto a flexible sheet.

In rejecting certain of Armstrong's then-pending claims, the Examiner found that merely connecting an input member and buttons to at least one sheet, such as a circuit board, was anticipated by the prior art. Armstrong's then-pending Claim 38 read as follows:

> "38.    An image controller comprising:
> **. . . .**
> *at least one sheet structurally connecting, at least in part, to the sensors of said input member, and said at least one sheet structurally connecting, at least in part, to the sensors of said finger depressible buttons;* said at least one sheet having
>
> electrically conductive traces located on said at least one sheet, said electrically conductive traces electrically connecting with the sensors of said input member, and said electrically conductive traces electrically connecting with the sensors of said finger depressible buttons."

(Ex. 10, '525 Patent file history, August 4, 2000 Response to Office Action, p. 3.)

The Examiner rejected the above claim, because it left open the possibility that the input member and button sensors were simply being attached to a regular circuit board sheet, which was anticipated by the prior art:

> 7.    Claims 38, 39, 48, and 49 are rejected under 35 U.S.C. 102(e) as being anticipated by Brandenburg et al., U.S. Patent No. 5,231,386, of record.  Base plate 654 (column 9 lines 43 and 44) *is a PC board for supporting the pointing device and keyboard keys and it is well known that PC boards has [sic] electrical conductive traces.  A PC board is a sheet.*
>
> 8.    Claims 38, 39, 48, and 49 are rejected under 35 U.S.C. 102(e) as being anticipated by Sekine, U.S. Patent No. 5,898,525, newly cited.  Column 4 lines 60-62 and column 5 lines 30-33 describes *a sheet with conductive traces which are connected to the keyboard and the pointing stick.  These claims are written*

***broadly and cover that which has been made before applicants [sic] filing date.***

(Ex. 9, '525 Patent file history, August 31, 2000 Office Action, p. 4.)

Instead, the Examiner stated that if Armstrong amended his claims to add additional elements, including attaching the input member and finger depressible buttons to a ***flexible*** sheet, the claims would likely be allowable over the prior art.  (*Id.*, p. 6.)  Thus, the "at least one sheet" connected to the sensors of the single input 6DOF member and finger depressible buttons must be ***at least one flexible membrane sheet***.

Anascape's proposed construction of "at least one sheet" as "one or more circuit boards, flexible membrane sheets, or rigid membrane support structures connected together" demonstrates the perils of ignoring the specification and prosecution history in favor of an approach looking only at a claim term's purported "plain meaning."  Under Anascape's construction, the input member and finger depressible buttons could be connected to a rigid circuit board, which the examiner specifically stated was already taught in the prior art.[14]

Thus, Microsoft's construction should be adopted.

---

[14]  Anascape asserts that because there are dependent claims which recite "at least one sheet" comprising a flexible membrane sheet connected to other types of sheets, such as a circuit board, these other types of sheets must form part of the construction of at least one sheet.  However, this construction yields the paradoxical result of giving Applicant exactly the claim scope that Examiner said was anticipated by the prior art, namely, an input member and button sensors connected to a conventional circuit board sheet.  Anascape cannot gain through claim construction what Armstrong was forced to disclaim during prosecution.  *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir.1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation.  *See Jonsson v. The Stanley Works*, 903 F.2d 812, 817-818, 14 USPQ2d 1863, 1868-69 (Fed.Cir.1990) (holding that when two patents issued from continuation-in-part applications derived from one original application, the prosecution history of a claim limitation in the first patent to issue was properly applied to the same claim limitation in the second patent to issue.")) Further, the term "at least one sheet" should be construed consistently throughout the asserted claims since the patents and prosecution histories do not provide any reason to construe it differently in different claims.  Importantly, as discussed herein, during prosecution of the '700 Patent, the Examiner construed the term "at least one sheet" to mean the flexible membrane sheet.

**F.**     **"At Least One Sheet…Connecting…To The Sensors…"**
       **('525 Patent, Claims 1, 5, 12) "[The Sensors …] Connected [To]**
       **[By] At Least One Sheet…" ('700 Patent, Claims 1, 3, 5-6, 8-10, 20, 26)**

| PROPOSED CONSTRUCTION |
|---|
| The at least one sheet is the flexible membrane sheet (see "at least one sheet," "flexible membrane sheet," above). The electrically conductive circuit traces on the flexible membrane sheet contact the sensors of both the six degree of freedom ("6DOF") hand operated single input member (see "3-D graphics controller," above) and the buttons. |

This construction is proper for at least in part the reasons set forth in Sections IV D and

E, above.  Additionally, during the examination of the '525 Patent, the Examiner required

Armstrong to narrow his claims to recite all sensors connected to the ***flexible membrane sheet*** to

overcome the prior art:

> The examiner stated that Hoyt and Yoshida do not teach the integrated membrane
> shown in Applicant's figure 18 where ***the membrane for the alpha-numeric keys***
> ***and the 6DOF joystick are the same membrane***,  The examiner also stated that
> ***the claims need to be narrowed (such as with the integrated membrane shown***
> ***in applicants figure 18 [i.e., the flexible membrane sheet figure.])…."***

(Ex. 11, '525 Patent file history, July 31, 2000 Interview Summary).

The Examiner for the '700 Patent interpreted the "at least one sheet" claims similarly to the

Examiner for the '525 Patent, namely, requiring that all the sensors be connected to the flexible

membrane sheet.

> For instance, Claim 26 [Application Claim 70] reads as follows:

> 26.  A hand operated controller comprising . . .
> **. . . the sensors are connected by at least one sheet**, said at least one sheet
> comprises
>      a flexible membrane sheet connected to
>      a circuit board sheet.

('700 Patent, 37:55 – 38:12.)  The Examiner stated that this meant that ***"[a]ll of the***

***sensors are contained on one sheet that is flexible membrane***."  (Ex. 12, '700 Patent file

history, December 17, 2002 Notice of Allowability, p. 5.)[15]  In other words, the Examiner

properly equated the term "at least one sheet" to mean the flexible membrane sheet.  The

Examiner further stated that the claims were allowable over the prior art because the prior

art references do not teach "buttons being pivotal and/or **connected to the one sheet that**

**is a flexible membrane** and circuit board."  (*Id.*, p. 6.)

Thus, Microsoft's construction should be adopted.

G.      **"Said At Least One Sheet Comprises A Flexible Membrane
        Sheet Connected To A [Rigid Circuit Board] [Second Sheet]"
        ('525 Patent, Claims 1, 5, 19) "A Circuit Board Sheet Connected
        To A Flexible Membrane Sheet" ('700 Patent, Claims 1, 3, 5-6, 9, 26)**

| PROPOSED CONSTRUCTION |
|---|
| The flexible membrane sheet (see "flexible membrane sheet," above) is attached to a [rigid circuit board][rigid circuit board or flexible membrane sheet] by electrically conductive traces (e.g., a membrane "tail") which structurally and electrically connect the flexible membrane sheet to the [rigid circuit board][rigid circuit board or flexible membrane sheet]. |

As set forth above, the flexible membrane sheet includes both conductive traces and

sensors.  (See Section IV.D, above.)  In order to connect the flexible membrane sheet to a second

sheet in a manner that provides function to both, there is an inherent requirement that electrical

current flow between the sheets.  To accomplish this, it is logical that the conductive traces

present on the flexible sheet would extend out from the edge of the flexible membrane to connect

to the second sheet.  In fact, that is exactly what the patents disclose, for example:

> Membrane sheet 330 [see Fig. 31] is shown connected to a circuit board sensor
> sheet 250 that commonly is positioned under the normal input keys and also
> contains electronic circuitry.  **Membrane tail 224 connects from sheet 250 to
> the greater body of membrane 330** which in this case is shown as a two planar
> type as shown in FIGS. 20-28.  ['525 Patent, 26:43-50; Fig. 31.]

---

[15]  The Examiner made this statement in approving of Application Claims 63-69, which later issued as Claims 19-25.  The Examiner further stated that Application Claims 70-75, which later issued as Claims 26-31, "encompass the same explanation as above."

The "membrane tail" logically must have conductive traces connecting the flexible membrane sheet to another circuit board sheet. Otherwise, it would be merely a piece of flexible material or plastic which could not provide any electrical connection. The '525 and '700 Patents disclose only this one structure for making a connection between a flexible membrane sheet and a second sheet, namely, electrically conductive circuit traces in the form of a membrane tail. Therefore, Microsoft's construction should be adopted.

> ### H.    "Electrically Conductive Traces Located On Said At Least One Sheet" ('525 Patent, Claim 1) "Said At Least One Sheet Includes Electrically Conductive Traces, Said Traces Engaging The Sensors" ('525 Patent, Claim 5)

| PROPOSED CONSTRUCTION |
|---|
| Electrically conductive circuit traces on the at least one sheet (see "at least one sheet," above) contact the sensors of both the six degree of freedom ("6DOF") hand operable, single input member and the finger depressible buttons. |

Both of the claims at issue recite that electrically conductive traces are included on the at least one sheet. As set forth above, the "at least one sheet" referred to is the flexible membrane sheet, which includes both sensors and conductive traces. The '525 Patent states that the flexible membrane sheet is a flexible sheet "*having at least circuitry in the form of electrically conductive circuit traces which are stationary on the sheet member….*" ('525 Patent, 12:12-14). Therefore, the electrically conductive traces are logically and expressly part of the flexible membrane sheet. (*See* e.g., Sections IV.D and IV.E, above.)

The claims plainly recite that the "electrically conductive traces" are located on the at least one sheet (or flexible membrane sheet), and the "electrically conductive traces" must (logically) contact the sensors mounted thereon (as expressly stated in claim 5 and as required by the Examiner in granting Armstrong's claims).

That the conductive circuit traces actually contact the sensor "contacts" is shown in Figs.

18 and 29, which again show sensor contacts (logically) printed on conductive circuit traces.[16]

The relationship between the conductive circuit traces and the sensors is further described in the

specification:

> ***A conductor trace of printed conductive ink is printed on each of the outer
> sheets and connects to the*** [sensor] ***contact of that sheet.***  The [sensor] contacts
> are also normally defined with conductive ink.  ['525 Patent, 6:37-39.]

Thus, Microsoft's construction should be adopted.

### I.    "Navigating A Viewpoint" ('700 Patent, Claims 19, 26)

| PROPOSED CONSTRUCTION |
| --- |
| Positioning and orienting a user's view, as opposed to controlling an object. |

Microsoft agrees with the argument in Nintendo's Claim Construction Brief for this term,

and incorporates it by reference.

### J.    "Detectable By The User" ('700 Patent, Claims  1, 3, 6, 9, 12, 15, 19, 26)

| PROPOSED CONSTRUCTION |
| --- |
| Indefinite. |

Some of the claims of the '700 Patent require snap-through or vibration tactile feedback

that must be sufficient to be "detectable by the user."  The term "detectable by the user"

introduces a purely subjective limitation into the claims, because whether something is

detectable depends on the unique sensing abilities of any given user.

The fundamental purpose of patent claims is to delineate the scope of the invention.

---

[16] The Examiner cited Fig. 18's design for a flexible membrane in requiring Armstrong to narrow his claims in the
'525 Patent.  (Ex. 11, '525 Patent file history, July 31, 2000 Interview Summary, continuation sheet.)

*Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1379 (Fed. Cir. 2005). To this end, the law requires that the words of a patent claim be definite, *i.e.*, that they "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, e.g., competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002). Whether a patent claim is invalid for indefiniteness "is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Personalized Media Communs., LLC v. ITC,* 161 F.3d 696, 705 (Fed. Cir. 1998).

The Federal Circuit has established that a claim term that is purely subjective is indefinite unless the claim or patent provides an "objective anchor." In *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350-51 (Fed. Cir. 2005), the Court affirmed summary judgment that the subjective term "aesthetically pleasing" was indefinite as a matter of law.[17]

Just like "aesthetically pleasing," the term "detectable by a user" is a highly subjective

term that depends on the sensation of each different user.  However, nothing in the specification of the '700 Patent provides any "objective anchor" that would allow a competitor to know when the vibration or tactile feedback crosses the threshold of being "detectable by the user."[18]

As the patentee, Anascape had a universe of language from which to choose to define the alleged invention.  It also had the duty under § 112, ¶ 2 to choose language that would inform the public of the bounds of the claim in an objective, definite manner.  Having chosen to limit some claims to vibration and feedback that rose to the level of being "detectable by the user," it set the claims adrift to vary depending on the abilities of each specific user.  By choosing such subjective language and failing to provide a test in the patent for what amount of vibration was considered enough to be "detectable by the user," Anascape rendered these terms indefinite under § 112, ¶ 2.

---

[17]  The Court explained that "when faced with a purely subjective phrase like 'aesthetically pleasing,' a court must determine whether the patent's specification supplies some standard for measuring the scope of the phrase. *Datamize*, 417 F.3d at 1351.  While the specification contained a number of examples of aesthetically pleasing designs, the Court found that it did not "set forth an objective way to determine whether an interface screen is 'aesthetically pleasing.'"  Absent such an objective test in the specification, the Court held that the subjective term was indefinite:  "Simply put, the definition of 'aesthetically pleasing' cannot depend on an undefined standard."  Id at 1352. Other cases have likewise held subjective or comparative terms indefinite where the patent provides no objective test for determining whether the claim term is met or not.  *See, e.g.*, *Amgen Inc., v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003) (finding indefinite claim requiring comparison to moving target since the patent failed to direct those of ordinary skill in the art to a standard by which the appropriate comparison could be made); *Leggett & Platt, Inc. v. Vutek, Inc.*, 2006 WL 3813677 (E.D. Mo. Dec. 26, 2006) (holding that claim requirement of "acceptable print quality" was indefinite because it relied on a user's subjective determination) (attached hereto as Ex. 13); *cf. Rackable Sys., Inc. v. Super Micro Computer, Inc.*, 2006 WL 3065577, at *6-7 (N.D. Cal. Oct. 27, 2006) ("[R]eference to 'user' renders the term indefinite because its scope depends 'solely on the unrestrained subjective [purpose] of a particular individual purportedly practicing the invention.'") (quoting *Datamize*) (attached hereto as Ex. 14); *Halliburton Energy Servs., Inc. v. M-I, LLC*, 456 F. Supp. 2d 811, 817-19 (E.D. Tex. 2006 (Davis, J.) (granting summary judgment that "fragile gel" is indefinite because any construction would include subjective requirements such as "more liquid-like," which provides no objective boundary for the term).

[18]  For example, the specification merely mimics the subjectivity of the claim, stating, for example, that the vibration or feedback is:  "to be felt by a hand operating the controller"; "detectable by the user through the hand operating the input member of the controller"; "felt by the hand(s) operating the controller"; "transmitted through the connected parts to the user's hand, or as air vibrations perceived by the user's ear"; and "user perceivable tactile sensation indicating sensor activation."  ('700 Patent, Abstract; 2:4-5, 5:28-29, 26:18-25.)

### K.    "Economical Combination Of Elements" ('700 Patent, Claim 32)

| PROPOSED CONSTRUCTION |
|---|
| Indefinite. |

Claim 32 of the '700 Patent requires a controller that has "an economical combination of elements and buttons."

### 1.    The phrase is indefinite because it is subjective

As with "detectable by a user," the term "economical combination" is a subjective term that lacks any "objective anchor" in the patent by which a competitor can determine if its particular combination is "economical" or not.  For example, what makes a particular combination of elements "economical"?  Cheap materials?  Cheap labor?  Furthermore, whose opinion matters for whether something is economical?  The manufacturer?  The customer?  Does a 2% profit make the controller "economical"?  A 20% profit?

While the specification of the '700 Patent touts the "economical" nature as being an important aspect of the "invention," it fails to include any objective anchor to assist the public with determining the proper bounds of the term.  Instead, the specification merely states that the controller is "more affordable" and "low-cost," and with "lower manufacturing costs."  ('525 Patent, 4:45-50, 5:20-21, 5:28-34, 5:50, 17:28.)  While clearly touting the invention as being an improvement in part because of being low cost or more affordable, the patent provides no objective test for determining what is sufficiently low cost or sufficiently more affordable to make it "economical."  As with the claim language alone, the specification leaves the public to guess at where the line for "economical" might be drawn.

Once again, Anascape had a universe of language from which to choose to define the alleged invention of claim 32.  It chose to include the subjective term "economical," which fails

to provide the public with the proper guidance about the boundary of the claim. Nor did Anascape include any objective anchor in the patent itself to guide the public to a definite understanding of the term. Each member of the public is left to apply his or her own subjective understanding of what is and is not economical. As such, the term is indefinite under § 112, ¶ 2.

### 2.    The phrase is a claim limitation, even though it is in the preamble

In order to essentially erase this indefinite language it chose to include in claim 32, Anascape asks the Court to find that the term does not count because it is in the preamble. The Court should reject Anascape's efforts to avoid the consequences of its choice of language.

It is true that a term appearing in a preamble might not limit the claims if it "merely states the purpose or intended use of an invention." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952-53 (Fed. Cir. 2006). The phrase "economical combination of elements and buttons" in the preamble is a limitation of claim 32 for at least three reasons.

First, the phrase "economical combination of elements and buttons" refers to what the claimed controller *is*, not its purpose or intended use. Thus, the general rule that an "intended use or purpose" in the preamble will not limit the claims simply does not apply here. *See*, *e.g.*, *Bicon*, 441 F.3d at 952-53 (finding a preamble phrase was a limitation because it "is not limited to stating the purpose or intended use of the invention, but contains structural features of the abutment").

Second, the phrase "economical combination of elements and buttons" is a limitation because the preamble recites the overall combination and the body then refers back to and elaborates upon these elements and buttons. Specifically, the body of the claim expands on the "economical combination of elements and buttons" introduced in the preamble by describing in detail a first, second, and third "element" as well as two "independent button[s]." When, as here, the limitations in the body of the claim "rely upon and derive antecedent basis from the

preamble, then the preamble may act as a necessary component of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003). Likewise, when, as here, a preamble describes the overall combination of what follows in more detail in the body of the claim, the preamble should be considered a limitation. *See On Demand* at 442 F.3d at 1343-44 (where preamble recited a "method of high speed manufacture and the body then recited all the various steps, preamble was considered a limitation because "[t]he preamble embraces the totality of these limitations, and limits the claim to the subject matter of the preamble.").

Finally, the "economical combination" phrase is a limitation because it was "underscored as important by the specification." *Catalina Mktg.*, 289 F.3d at 808; *see also Karsten Mfg. Corp. v. Cleveland Golf Co.,* 242 F.3d 1376, 1379-80 (Fed. Cir. 2001) (holding that preamble phrase "correlated set of golf clubs" followed by more detailed structure in the body limited the claims "in view of Karsten's description of the invention in the specification as relating to a correlated set of irons"). In the "Summary of the Invention," the '700 Patent touts the economical nature of the controller as part of the alleged "improvement": "In order that hand input to electrical output controllers be ***more affordable***, … ***I have developed improved, low-cost hand operated controllers*** …" ('525 Patent, 4:45-50; *see also id*., 5:20-21, 5:28-34, 5:50, 17:28 (describing the controller as "very low cost" and having "lower manufacturing costs")). Given the patent's emphasis on the economics of the controller when summarizing the "invention," it is not surprising that Anascape chose to include an economics-related limitation in this claim. However, Anascape should not be allowed to erase the limitation from the claim when the language it chose is too subjective to allow the public to understand the bounds of the claim.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Microsoft respectfully requests that the court read the claim terms in light of the specifications of which they are a part and adopt its proposed constructions.

Respectfully submitted,

Dated:  May 21, 2007          By:     /s/ Joseph T. Jakubek
                                      J. Christopher Carraway (admitted *pro hac vice*)
                                      christopher.carraway@klarquist.com
                                      Joseph T. Jakubek (admitted *pro hac vice*)
                                      joseph.jakubek@klarquist.com
                                      Stephen J. Joncus (admitted *pro hac vice*)
                                      stephen.joncus@klarquist.com
                                      Richard D. Mc Leod (Bar No. 24026836)
                                      rick.mcleod@klarquist.com
                                      Derrick W. Toddy (admitted *pro hac vice*)
                                      derrick.toddy@klarquist.com
                                      KLARQUIST SPARKMAN, LLP
                                      121 S.W. Salmon Street, Suite 1600
                                      Portland, Oregon  97204
                                      Telephone:  503-595-5300

                                      J. Thad Heartfield (Bar No. 09346800)
                                      thad@jth-law.com
                                      Law Offices of J. Thad Heartfield
                                      2195 Dowlen Road
                                      Beaumont, Texas 77706
                                      Telephone: 409-866-3318
                                      Facsimile: 409-866-5789

                                      Clayton E Dark Jr. (Bar No. 05384500)
                                      clay.dark@yahoo.com
                                      Clayton E Dark Jr., Law Office
                                      207 E Frank Ave # 100
                                      Lufkin, TX 75901
                                      Telephone:  936-637-1733

                                      Stephen McGrath, Esq. (admitted *pro hac vice*)
                                      MICROSOFT CORPORATION
                                      One Microsoft Way, Building 8
                                      Redmond, Washington  98052-6399
                                      Telephone:  425-882-8080
                                      Facsimile:  425-706-7329

                                      *Attorneys for Defendant Microsoft Corporation*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing document and exhibits has been served on Plaintiff via filing with the Court's ECF system.


By:<u>/s/ Joseph T. Jakubek</u>
Joseph T. Jakubek