# Exhibit 4

Dockets.Justia.com



Initial Review

## BOX AF

Commissioner of Patents and Trademarks
Washington, D. C. 20231
Box AF

### URGENT, RESPONSIVE TO FINAL ACTION

Attention Patent Examiner: A. Hill, GAU 2617

Re: Patent Application of      Brad A. Armstrong

Serial No.: 07/847,619         Filed: 03/05/92

Appl. Title:   6 DEGREES OF FREEDOM CONTROLLER WITH
               CAPABILITY OF TACTILE FEEDBACK

Applicant's Address:            Brad A. Armstrong
                                848 Inyo St.
                                Chico, CA. 95928

IN RESPONSE TO THE OFFICE ACTION OF 08/10/95, PAPER #17, MADE
FINAL

Sir:

REMARKS:

     This is responsive to the Outstanding Revised Office Action
of 08/10/95 and made final.  A **CERTIFICATE OF EXPRESS MAILING** is
on page 62 attached hereto.

     Included herewith is the small entity of $375.00 fee per
1.17(r) in accordance with 37 C.F.R. 1.129 (a) for a "Filing of a
First submission after final rejection".  This is Applicant's
first submission after final, and the above specified application
qualifies under 37 C.F.R. 1.129(a) to have the finality of the
Outstanding Office Action withdrawn and the herein amendments
entered and acted upon per 37 C.F.R. 1.129(a), and so it is
requested this response be treated per 37 C.F.R. 1.129(a).  There
are no prior amendments or responses that have not yet been
entered.

     After the entering of this amendment there will be four
independent claims and not more than 20 total claims, and thus a
fee in the amount of $39.00 is included for one independent claim

110 MG 01/18/96 07847619          1 246/     $75.00 CK
110 MG 01/18/96 07847619          1 202      39.00 CK

2

in excess of three independent claims.

A petition for a two month extension of time under 37 CFR 1.136 (a) and the $190.00 fee therefor is hereto attached for responding to the outstanding office action of 08/10/95.

A check in the amount of $604.00 is hereto attached for the 37 C.F.R. 1.129(a) fee, the 37 CFR 1.136 (a) fee, and the one independent claim in excess of three independent claims.

Would the Examiner please amend the application as herein requested, and read and consider the herein remarks. Reexamination of the application and claims after entering of this amendment, in view of the remarks is requested. Allowance of the claims is respectfully solicited, as the invention is believed to clearly advance the art in a patentable manner. "All" of the herein remarks are directed toward and only toward the "patentability" of the invention and the issues at hand surrounding the patentability of the invention. Applicant has made every attempt in this response to be brief, while still responding to each objection and grounds for rejection raised by the Examiner in the Revised Office Action of 08/10/95. The amendments and remarks of this response are the best effort of Applicant to place the application in condition for allowance, and any assistance the Examiner can offer toward this end would be deeply appreciated.

In the past, Applicant has made every attempt within his capabilities to put the application in condition for allowance, however the Examiner still objects to some terminology used in the claims. If after the entering of this amendment, objections to the specification or claims still exists, would the Examiner please give constructive assistance in all cases wherein the Examiner believes he could improve specific terms.

ANS0007477

3

Specifically regarding page 1 of the Office Action of
08/10/95:  It has been noted claims 12-22 are rejected yet
pending.

Specifically regarding the "Part III DETAILED ACTION"
beginning on page 2 of the Office Action of 08/10/95 with
"Response to Amendment" and the paragraphs under point "1.":  The
revised Office Action dated 08/10/95 has been carefully studied.
The withdrawal by Supervisory Examiner Peng of the finality of
the Office Action mailed 05/11/95 paper No. 13 as stated in paper
14 because the Office Action of 05/11/95 should have been more
detailed has been noted.  It is believed the revised Office
Action of 08/10/95 is intended to completely replace the Office
Action of 05/11/95, although this is not positively stated in any
Office paper, since only the finality of the Office Action of
05/11/95 has been withdrawn as stated in paper No. 14 and again
in paper No. 17.  In any case, the Office Action of 05/11/95
includes essentially all of the objections and grounds for
rejection which are stated in the revised Office Action of
08/10/95, only the Office Action of 08/10/95 is substantially
more detailed and lengthy, and additionally introduces 35 U.S.C.
102 grounds for rejection which were not stated as grounds for
rejection in the 05/11/95 Office Action even though the claims
12-22 have not been amended since their submission on 06/03/94.
Applicant is upset the 35 U.S.C 102 grounds of rejection were
applied "piecemeal" in the Office Action of 08/10/95, as such
grounds were not applied in the Office Action of 05/11/95 or the
earlier office action of 09/28/94 paper #8 when no amendments to
the claims were made between the initial submission of claims 12-
22 on 06/03/94 and the Office Action of 08/10/95.  However, this
response addressing the objections and grounds for rejection
stated in the highly detailed Office Action of 08/10/95 is
considered to fully address all of the objections and grounds for
rejection stated in the less detailed Office Action of 05/11/95,

ANS0007478

4

and to fully address all of the objections and grounds for
rejection stated in the Office Action of 08/10/95.

Henceforth unless otherwise specifically stated, the terms
"Office Action" used herein refers to the Office Action date
mailed 08/10/95, paper No. 17.

Specifically regarding page 2 of the Office Action, and the
paragraphs under point "2." "Specification" and bridging pages 3,
4 and 5:  The quotation of the first paragraph of 35 U.S.C 112
and the objection to the specification as not now supporting the
invention as claimed in claims 12-22 has been noted.  All of the
terms in the pending claims which the Examiner states are not
supported by the originally filed specification have been noted.
Applicant believes that the term "means" may be utilized in the
claims even when not used in the specification, thus Applicant
will continue to use means clauses in the claims where
appropriate.  The vast majority of the claim terms which the
Examiner objects to in the pending claims as not being supported
in the original specification are believed to be terms having the
addition of the allowable term "means", or are readily
ascertainable very slight variations or synonyms of words or word
strings from the originally filed specification, or terms which
are very strongly implied in the specification and supported in
the originally filed drawings and thus easily ascertained in
meaning in the original version of the application.  The Examiner
seems to be stating that the terms in the claims must in all
cases be found absolutely <u>precisely quoted</u> in the specification
in order to be "clearly ascertainable" in meaning in the claims.
Applicant strongly objects to being held to standards of claim
writing <u>which far exceed those required of patent attorneys by
other Patent Examiners</u>, and respectfully requests that the
Examiner grant a broader assumption of the "reader's"
capabilities as to readily ascertaining meanings of claim terms
which are not "precise quotes" from the specification.  Those

5

skilled in the art do have significant knowledge in this field as
is evidenced by the prior art of record, as some concepts within
the scope of the present invention are known and understood by
those skilled in the art, and this is not an admission that
Applicant's invention is known to those skilled in the art.
Applicant believes those skilled in the art would be able to
clearly and readily ascertain the meaning of most of the words in
the claims that the Examiner states are unsupported in the
specification.  The Examiner has repeatedly cited terms which he
has clearly read out of context and thus states the meanings of
the claim terms cannot be ascertained from the specification.
Clearly, many terms if isolated from the claims, taken out of
context, and placed in a vacuum absent any words before or after
the isolated term would be rendered meaningless in their
relationship to the claimed invention from which the term or
terms have been isolated.  In addition and for example, on page 3
of the Office Action the Examiner states "exposed handle" as used
in the claims is unsupported in the originally filed
specification.  This objection by the Examiner is not at all
appreciated by Applicant.  It is abundantly clear that the
"exposed handle" is properly supported in the specification as
originally filed.  Please see the drawing Figs. 1, 2, 3A, 3B, 6,
7 and 9 wherein each of these drawings clearly shows a handle,
the handle being called a "handle" in the written portion of the
original disclosure, and the handle not once being shown covered
or hidden in any of the drawings by anything, and thus clearly
exposed, and the handle by its very nature and as stated in the
writing being for grasping by the human hand and thus at least
exposed to the point of being graspable by the hand to allow hand
inputs in the balance of the controller.  Thus, it is beyond
Applicant's comprehension as to how the Examiner is "honestly"
finding lack of support in the specification for the claim term
"exposed handle".  Applicant grants the Examiner that the terms
"exposed handle" are not precisely quotable from the original
disclosure, but are readily and clearly ascertainable in meaning

ANS0007480

6

from the original disclosure.  Thus, again, Applicant objects to
being held to standards of claim writing which far exceed those
required of patent attorneys by other Patent Examiners, and
respectfully requests the Examiner grant a broader assumption of
those skilled in the art being able to readily and clearly
ascertaining meanings of claim terms which are not precise quotes
from the specification.  Applicant believes the "reader" would be
able to easily ascertain the meaning of most of the words in the
claims that the Examiner states are unsupported in the
specification, however, with Applicant always wishing to advance
the application in the quickest way possible toward patent
allowance, Applicant does not traverse the grounds of objection,
and has noted each and every claim term the Examiner states is
unsupported by the specification, and in amending the claims,
Applicant will diligently pursue utilizing terms more in line
with those words used in the specification, and will amend the
specification without adding any new material so that each and
every term of each and every claim will have what is hoped to be
clear antecedent basis to the Examiner.

On page 4 of the Office Action immediately following the
extremely long list of claim terms said to not be supported in
the specification, and specifically regarding the statement in
the Office Action on page 4 starting with
        "And since applicant argues in the response filed
01/11/95 (e.g. on page 5, lines 11-13, 17-70 and 21-31 of said
response, at the least) that the invention embodies numerous
features which are clearly not set forth in and supported by the
specification as originally filed, such as the sensors being
radio wave sensors, optical sensors, etc.,..." (end quote);
        It is not at all appreciated that the Examiner is
misconstruing Applicant's remarks.  The following are quotations
from Applicant's response of 01/11/95 which show the Examiner is
taking Applicant's statement clearly out of context and
misconstruing them.  From Applicant's response of 01/11/95, page

ANS0007481

7

5, lines 8-31:    "Would the Examiner please read page 22 of
Applicant's specification describing a variety of sensors which
are clearly proportional sensors, not simply on/off switches.
These numerous known types of proportional sensors and others
commonly known and not cited, output variable signals indicating
positional information.  Many of these sensors manipulate or
provide varying resistance and or voltages.  Also please review
Applicant's drawings, and particularly Figs. 11c, 11d, 11e, 11f,
11g and 11h which show proportional sensors.  Additionally,
optical sensors and potentiometers of many types can also
function in Applicant's invention, as they are so well known and
common that those skilled in the art do not need to be told how
to apply sensors they commonly utilize.  There is a central off
or null position in Applicant's controller with some "play" about
this center off or null position so that the controller is not
excessively sensitive in view of the range of control of the
average or normal human hand, and this is where sensors "may" not
be activated.  Within this center off or null and "play" region,
is where sensors "may" not be activated.  If no sensors are
activated, then it would be indicated that the controller is
centered or in the central off or null position.  Outside of the
center null position or area, sensors will be outputting
positional information as to the current position of the
controller."  (end of quote)

    In the above quotation, please note the sentence
"Additionally, optical sensors and potentiometers of many types
can also function in Applicant's invention".  Please note "can
also function in Applicant's invention".  It is very clear from
Applicant's originally filed specification that the present
invention is not dependant upon any one type of sensor being
used, and in fact in the originally filed specification, it is
clearly stated, and Applicant quotes from page 4 second to last
line thereof bridging page 5 of the specification: "While the
prior art is dependant upon specific types of sensors, this
invention can be constructed with sensors as inexpensive as

ANS0007482

8

simple electrical contacts or as sophisticated as a manufacturer desires."

Applicant's pending claims utilize "sensor means" or the like because the invention was never intended to be dependant upon any one type of sensor, but in fact is structured to be able to utilize many types of sensors, and this is and continues to be but one major advantage of the present invention. Furthermore Applicant does describe many types of sensors in the specification, and the Examiner has identified seven types of sensors which the Examiner states are clearly supported by the originally filed specification, see page 6 of the Office Action and point "4" thereon wherein the Examiner lists seven sensor types (a) through (g). Applicant does not view his invention as limited to any one particular sensor type. The use of the claim terms "sensor means" and the like is fully supported in the originally filed disclosure.

Thus the Examiner statement in the Office Action on page 4 starting with

"And since applicant argues in the response filed 01/11/95 (e.g. on page 5, lines 11-13, 17-70 and 21-31 of said response, at the least) that the invention embodies numerous features which are clearly not set forth....."   is wholly unsupported and inaccurate.

Regarding page 5 of the Office Action and point "3." thereon stating claims 12-22 are rejected under 35 U.S.C 112, second paragraph:  This has been read and carefully considered.

Regarding page 6 of the Office Action and point "4." thereon stating claims 12-22 are rejected under 35 U.S.C 112, second paragraph:  This has been read and carefully considered. As addressed briefly above, Applicant's pending claims utilize "sensor means" because the invention was never intended to be dependant upon any one type of sensor, but in fact is structured to be able to utilize many types of sensors.

ANS0007483

9

It is hoped that the Examiner is not telling Applicant that Applicant cannot use the term "sensor means" or "means for sensing" and the like in Applicants claims because Applicant has only specifically described <u>seven different types of sensors</u> in the specification. If this is what the Examiner is trying to tell Applicant in point "4" of the Office Action, Applicant is extremely upset, as no other patent applicants are held to such strict standards by other Patent Examiners.

Question: Is the Examiner stating that Applicant cannot use the term "sensor means" or "means for sensing" and the like in Applicant's claims, unless Applicant wishes a sure rejection of those claims, due to Applicant having only specifically described <u>seven</u> different types of sensors in the original specification ? Applicant needs to know the answer to the above question so that during the continued prosecution of this application in the future, if Applicant desires to use "sensor means" or "means for sensing" and the like in his claims, whether such terms are likely to be acceptable or objected to the Examiner. Applicant is sincerely concerned about this issue and requests clarification. Thank you.

Regarding page 7 bridging pages 8, 9, 10, 11, 12 and 13 of the Office Action and point "5." thereon stating claims 12-22 are rejected under 35 U.S.C 112, second paragraph: This has been read and carefully considered. Applicant respectfully and strongly disagrees with the Examiner's definition of the phrase "in communication with" as requiring information such as language, or computer bit streams or electrical information to be sent such as by a radio transmitter or the like, however, in amending the claims all occurrences in all applicable claims of "in communication with" will be deleted and replaced with some other phrase in order to advance the application and claims toward allowability.

Regarding page 8 of the Office Action part of point "5."

ANS0007484

10

wherein the Examiner asks about "said member" in lines 8 and 11
of claim 12: The term "said member" is believed to be most clear
in claim 12. It is clearly the "movably retained member", since
no other "member" has been introduced into the claim prior to the
next two uses of "said member" in lines 4-5 following the
introduction of "movably retained member". Clearly, based on the
lack of complaint on the part of the Examiner regarding the two
occurrences of "said member" in line 4-5 of the claim, the
Examiner must know "said member" in the claim means "movably
retained member". "linkage member" is introduced in line 7 of
the claim, and then thereafter always referred to as "said
linkage member". After the introduction of "movably retained
member" in lines 2-3 of the claim, it is always thereafter
referred to as "said member". The introduction of the terms in
question appears proper in claim 12, and the use thereof
thereafter is consistent, although after the introduction of
"movable retained member" it is further used in a slightly
shorten version as "said member" as an attempt to keep the claim
short and thus easily readable. Thus Applicant is frustrated
with the Examiner's apparent inability to make such distinctions
in the clearly written claims. However, Applicant does not wish
to traverse the grounds for rejection since Applicant believes
the application and claims will be advanced toward allowance more
quickly simply by amending the claims in an attempt to overcome
this grounds for rejection. The claims will be appropriately
amended to overcome the rejection.

Additionally, on page 8 of the Office Action, Applicant has
noted the Examiner's statement pertaining the Examiner having in
the past not requested "permission" to amend the claims.
Applicant is and was very much aware of the Examiner not
requesting "permission" to amend the claims. Applicant has in
past responses simply been trying to get the Examiner to not
simply stop at critiquing terms in the claims, but to critique
the terms and then provide constructive suggestions in all case

ANS0007485

11

when the Examiner believes he knows of improved terminology per
the requests of the M.P.E.P. of patent examiners. Such
constructive assistance from the Examiner following a critiquing
of a term is believed to be requested by the PTO in the M.P.E.P.
whenever possible and without regard as to whether the Examiner
sees patentable material in the application or not. Otherwise
Applicant is believed to be allowed to use his own terms provided
they are reasonable and ascertainable in their meaning.
Applicant requests specific constructive assistance from the
Examiner whenever possible.

Regarding page 8 bridging page 9 of the Office Action
wherein "support means" of claim 12 line 13 of the claim is
addressed relative to "linkage support means" set forth in line 9
of the claim: Clearly "linkage support means" is introduced into
claim 12 in line 9 of the claim (note the lack of a "the" or
"said" in front of "linkage support means"), and then thereafter
"linkage support means" is consistently recited as "said linkage
support means". The lack of a "said" or of a "the" in front of
a means clause or any feature being introduced for the first time
into a claim is believed normally an indication the means clause
or feature is being introduced into the claim. After
introduction of the means clause or feature into the claim,
normally a "said" or a "the" is inserted in front of additional
uses of the same means clause or feature in the given claim to
allow the reader to distinguish that which is being introduced
from that which has already been introduced. Thus, clearly
"support means" is introduced into claim 12 in line 13, and then
thereafter is consistently recited as "said support means".

Question: Is Applicant wrong about the use of "said" or
"the" in claims as stated above ? An answer to this question
would be helpful to Applicant in future prosecution of this
application.

ANS0007486

12

Applicant is not traversing the 35 U.S.C. 112 grounds for rejection as this might slow movement of the application and claims toward allowance, but is clearly having a difficult time in writing claims which the Examiner is able to understand, and desires the Examiner understand Applicant's logic behind the style or format of Applicant's claims so that once the Examiner understands the claims, then the Examiner will be able to see that the claims patentably distinguish over the prior art. Appropriate amendment to all appropriate claims to overcome this rejection will be herein made.

Regarding page 9 of the Office Action and the claim 12 line 14 occurrence of "a theoretical point": this has been read and carefully considered. All occurrences in all appropriate claims regarding the "theoretical point" will be appropriately amended to overcome the rejection.

Regarding page 9 of the Office Action and the claim 12 lines 20-21 and "said support means": this has been considered and the claims will be appropriately amended in all appropriate cases to overcome the rejection.

Regarding page 9 of the Office Action and the claim 12 line 23 occurrence of "said member": this has been considered and all appropriate claims will be appropriately amended to overcome the rejection.

Regarding page 9 of the Office Action and the claim 12 lines 25-26 and specifically the use of "said linkage support means for rendering said linkage member substantially non-tiltable relative to said member": this has been considered and all applicable claims will be appropriately amended to overcome the rejection. The Examiner has started his quotation of "said linkage support means for rendering" in the middle of a recitation, and thus that which is quoted by the Examiner is quoted out of context, and

ANS0007487

13

apparently has been read out of context by the Examiner.
Applicant believes that if "said linkage support means for
rendering said linkage member substantially non-tiltable relative
to said member" were read in context with the wording occurring
before and after that which has been quoted, that such langauge
would be quite clear.  However, Applicant does not wish to
traverse the grounds for rejection since Applicant believes the
application will be advanced toward allowance more quickly simply
by amending the claims to overcome this grounds for rejection.

Regarding page 10 of the Office Action and the claim 12 line
26 and specifically "said member":  this has been considered and
all applicable claims will be appropriately amended to overcome
the rejection.

Regarding page 10 of the Office Action and the claim 12 line
29 and specifically "said member":  this has been considered and
all applicable claims will be appropriately amended to overcome
the rejection.

Regarding page 10 of the Office Action and the claim 12
lines 33-35 and specifically "base means, sensor means":
Applicant had intended "sensor means" to have been on the next
line down and substantially indented to clearly separate it from
"base means".  Applicant apparently failed to install a hard
right command in word processing between "base means" and "sensor
means", and thus the terms were mistakenly ran together on the
same line.  The Examiner is thanked for his pointing to this
error.  This will be appropriately amended in all applicable
claims to overcome the rejection.

Regarding page 10 of the Office Action and the claim 13 line
2 and specifically "in communication with": as mentioned above,
this will be appropriately amended to overcome the rejection.

ANS0007488

14

Regarding page 10 of the Office Action and the claim 13 lines 2-3 and specifically "said member": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 11 of the Office Action and the claim 13 line 3 and specifically "said member": as mentioned above, this will be appropriately amended in all appropriate claims to overcome the rejection.

Regarding page 11 of the Office Action and the claim 14 lines 2-3 and specifically "in communication with": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 11 of the Office Action and the claim 14 line 3 and specifically "said member": as mentioned above, this will be appropriately amended in all appropriate claims to overcome the rejection.

Regarding page 11 of the Office Action and the claim 17 line 5 and specifically "in communication with": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 11 of the Office Action and the claim 17 line 8 and specifically "in communication with": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 11 of the Office Action and the claim 17 line 12 and specifically the occurrence of "a theoretical point": this has been read and considered. All occurrences in all appropriate claims regarding the theoretical point will be appropriately amended to overcome the rejection.

Regarding page 11 bridging page 12 of the Office Action and

ANS0007489

15

the claim 17 lines 20-22 and specifically the occurrence of "said shaft support means....relative to said member": The comments by the Examiner have been considered, and appropriate amendments to the claims in which this occurs will be made to overcome the rejection.

Regarding page 12 of the Office Action and the claim 17 line 28 regarding "base means, sensor means": This will be appropriately amended in all applicable claims to overcome the rejection.

Regarding page 12 of the Office Action and the claim 20 line 10 and specifically "in communication with": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 12 of the Office Action and the claim 20 line 13 and specifically "in communication with": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 12 of the Office Action and the claim 20 line 17 and specifically "in communication with": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 12 of the Office Action and the claim 20 line 20 and specifically "in communication with": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 12 of the Office Action and the claim 20 line 25 and specifically the occurrence of "a theoretical point": this has been read and considered. All occurrences in all appropriate claims regarding the theoretical point will be appropriately amended to overcome the rejection.

Regarding page 13 of the Office Action and the claim 20 lines 34-35 and specifically "in communication with": as

ANS0007490

16

mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 13 of the Office Action and the claim 20 lines 37-39 and the lack of antecedent basis for "said shaft support means....relative to said plate member": The comments by the Examiner have been considered, and appropriate amendments to the claims in which this occurs will be made to overcome the rejection.

Regarding page 13 of the Office Action and the point "6." thereon regarding the 35 U.S.C. 112 deficiencies set forth, and the statement that the claims are accorded their most reasonable interpretation consistent with the specification for evaluation with respect to the prior art. The entire point "6." and been carefully read and considered. Applicant strongly disagrees that the claims 12-22 are "grossly indefinite" as stated by the Examiner, however under amendment herein, Applicant will amend the claims to the best of his abilities in an attempt to satisfy the Examiner.

Regarding page 14 of the Office Action and the point "7." quoting the appropriate paragraphs of 35 U.S.C. 102: This has been read and carefully considered.

Regarding page 14 bridging pages 15, 16 and 17 of the Office Action and the point "8." regarding the 35 U.S.C. 102 (b) rejection applied to non-amended claims 12-14 and 17 for the first time since the claims were entered on 06/03/95 as being anticipated by Dzholdasbekov et al (GB 2,240,614), henceforth Dzholdasbekov; the Examiner's comments have all been carefully read and considered. Most addressing of the prior art will be made after amendment of the claims, however, the rejection of claims 12-14 and 17 under 35 U.S.C. 102(b) as being anticipated by Dzholdasbekov is inappropriate and should not have been

ANS0007491

17

applied. Clearly the handle 2 of Dzholdasbekov is not resolvable into positions about "said three axes", the three axes being mutually perpendicular to one another, and intersecting one another within the handle, with the three degrees of freedom of rotation which is detected by "pick-ups" being about these three axes.

The Dzholdasbekov handle 2 is resolvable in three degrees of freedom, but not by being detected or tracked by "pick-ups" about three axes defining a point defined by the three axes being mutually perpendicular to one another and intersecting one another within the handle of Dzholdasbekov. And so the Dzholdasbekov structure is completely different than that claimed in Applicant's claims 12-14 and 17. The Dzholdasbekov handle 2 includes a thumbwheel for one degree of rotational freedom, and thus this aspect of a separate thumbwheel proves that the Dzholdasbekov handle 2 is not resolvable about three sensed axes,(sensed by "pick-ups") but rather handle 2 is only resolvable about two axes.

Regarding page 17 bridging pages 18, 19 and 20 of the Office Action and the point "9." regarding the 35 U.S.C. 102 (b) rejection of claims 12-14 and 17 as being anticipated by King (US 4,555,960), henceforth King: the Examiner's comments have all been carefully read and considered. Most addressing of the prior art will be made after amendment of the claims, however, the 35 U.S.C. 102(b) rejection of claims 12-14 and 17 as being anticipated by King is inappropriate and should not have been made, in that Applicant's claims 12-14 and 17 specify a handle support shaft as being non-tiltable, and the shaft of King which supports the spherical handle of King tilts and <u>must tilt</u> in order for the KIng controller to operate. The tilting shaft of King is a major and significant structurally different arrangement than that of Applicant's claims 12-14 and 17, thus the 35 U.S.C. 102(b) rejection of claims 12-14 and 17 in view of King is inappropriate because King does not describe or

ANS0007492

18

anticipate that which Applicant claims in claims 12-14 and 17.
Additionally, although the Examiner has gone to great lengths
attempting to show that King includes horizontally moving members
which move in the first and second horizontal linear degrees of
freedom somewhat correlating with the arching handle movements of
King on the first and second horizontal linear degrees of
freedom, the Examiner is reaching, as these aspects do not exist
in the King device or in the King disclosure.  King includes
nothing similar to Applicant's sliding-plate-linear-conversion
structure or means.

Regarding page 20 of the Office Action and the point "10."
quoting the appropriate paragraphs of 35 U.S.C. 103 which forms
the basis for all obviousness rejections set forth in the Office
Action:  This has been read and carefully considered by
Applicant.  Applicant strongly disagrees the present invention is
obvious as claimed in claims 12-22 or in the new or amended
claims presented in this response.

Regarding page 20 bridging page 21 of the Office Action and
the point "11" regarding the 35 U.S.C. 103 rejection of claims 15
and 18 as being unpatentable over Dzholdasbekov as applied to
claims 12-14 and 17 previously, and further in view of IBM
Technical Disclosure Bulletin Vol. 32, No. 9B, henceforth IBM:
the Examiner's comments have all been carefully read and
considered.  Applicant strongly disagrees the present invention
is obvious, as neither of these prior art references include a
handle resolvable and sensed as it is resolved about three axes
intersecting one another mutually perpendicular at a point within
a handle to provided three degrees of freedom of "sensed"
rotation about these three axes.  Addressing of the prior art
will be made after amendment of the claims.

Regarding page 22 bridging page 23 of the Office Action and
the point "12" regarding the 35 U.S.C. 103 rejection of claims

ANS0007493

19

15-16 and 18-19 as being unpatentable over King as applied to claims 12-14 and 17 previously, and further in view of IBM: the Examiner's comments have all been carefully read and considered. Applicant strongly disagrees the present invention is obvious, as neither of these references includes anything similar in structure to Applicant's sliding-plate-linear-conversion means. Addressing of the prior art will be made after amendment of the claims.

Regarding page 23 of the Office Action and the point "13" regarding the "alternative" of the discussion of Dzholdasbekov and King with reference to claims 12-19:  The Examiner's comments have all been carefully read and considered, and it is apparent from the Examiner's comments on page 24 that the Examiner is for some reason unable to precisely determine the structure of Dzholdasbekov regarding handle rotations, and this brings to question as to why the Examiner made the 35 U.S.C. 102(b) rejection of Applicant's claims over Dzholdasbekov as addressed above.  The Dzholdasbekov device appears clearly detailed in the Dzholdasbekov disclosure, and does not describe Applicant's invention of claims 12-14 and 17 as stated earlier in the Office Action.  King's device is also clearly detailed in the King disclosure, and does not include anything similar to Applicant's sliding-plate-linear-conversion means as alleged in point 9 on page 17 of the Office Action.  The Examiner is however correct that King's handle is resolvable in three degrees of rotation about a point within the King spherical handle.  Applicant strongly disagrees the present invention is obvious as speculated in points 13 and 14 of the Office Action..  Addressing of the prior art will be made after amendment of the claims.

Regarding page 24 bridging pages 25, 26 and 27 of the Office Action and the point "14":  Point 14 has been carefully read and considered, and has at least in part been addressed above in regards to point 13 of the Office Action. Applicant would like to

ANS0007494

20

state that Dzholdasbekov clearly does not provide three
rotational signals for rotations about three axes which meet at a
theoretical point in the handle.  In point 14 of the Office
Action it is clear that the Examiner is picking and choosing
features at random simply based on whether the features exist or
do not exist in the art, and clearly the Examiner is acting a
though the mere existence of some feature in the art suggests its
combination with other features which can be shown to merely
exist in the art, without any suggestion to combine the shown
features more than their mere existence.  Applicant's agrees some
features of Applicant's invention may be individually shown to
exist within the prior art, but the suggestion that the features
of the prior art be combined precisely along the teachings of
Applicant's disclosure in order to receive the many benefits
provided by the claimed combination is not suggested and is not
obvious.  Comparison of the prior art will be made after
amendments to the claims so that the amended claims may be
compared to the prior art.

Regarding page 28 bridging page 29 of the Office Action and
the point "15":  Point 15 has been carefully read and considered.
Applicant strongly disagrees the present invention is obvious,
however comparison of the prior art will be made after amendments
to the claims so that the amended claims may be compared to the
prior art.

Regarding page 29 bridging pages 30 and 31 of the Office
Action and the point "16":  Point 16 has been carefully read and
considered.  Applicant strongly disagrees the present invention
is obvious.  Comparison of the prior art will be made after
amendments to the claims so that the amended claims may be
compared to the prior art.

Regarding page 31 bridging page 32 of the Office Action and
the point "17":  Point 17 has been carefully read and considered.

ANS0007495

21

Comparison of the prior art will be made after amendments to the claims so that the amended claims may be compared to the prior art.

Regarding page 32 bridging pages 33, 34, 35, 36, 37, 38 and 39 of the Office Action and the point "18": Point 18 has been carefully read and very carefully considered. Applicant has read the statement that Applicant is encouraged to place greater emphasis on the particular issues raised in the Office action when formulating any future responses. Applicant has never intended to ever raise or address any issue that in Applicant's opinion was not directly related to issues raised by the Patent Office or issues which directly focused on the patentability of the invention and movement of the application and claims toward allowance. All of the Examiner's remarks regarding said 01/11/95 response have been read and carefully considered. Although Applicant does not agree with many of the remarks and grounds for rejection made by the Examiner, Applicant does deeply appreciate the Examiner taking the time and effort to respond in detail to Applicant's 01/11/95 response.

On page 33 of the Office Action the Examiner states "the application has been processed in a timely manner". Question: Does this mean that the Examiner did not process a first office action on any non-special application that had a filing date later than the present application filing date during the 27 plus month wait from the filing date to the first office action of the present application ?

On page 33 the Examiner states "the application contains no allowable subject matter". Applicant does not understand why the Examiner makes this statement, when in an earlier telephone interview that was not made of record by the Examiner or by Applicant, the Examiner stated the application did contain allowable subject matter, and the subject matter if incorporated

ANS0007496

22

into a claim would be held allowable.  The Examiner stated
Applicant should incorporate one particular type of sensor into a
claim to overcome the grounds of rejection pertaining to prior
art, in order to have at least one claim allowed.  Applicant told
the Examiner that the invention was not dependant upon any one
particular type of sensor.  Does this statement by Applicant
regarding the fact that his invention is not dependant upon any
one particular type of sensor make the allowable subject matter
disappear?  Applicant's originally filed specification stated the
invention was not dependant upon one particular sensor, and thus
it must be assumed the Examiner understood this when he made his
statement pertaining to allowable subject matter.  What is going
on here?

On page 39 of the Office Action the Examiner states
"Applicant's amendments necessitated the new grounds of
rejection":  Applicant questions what amendments the Examiner is
speaking about.  Claims 12-22 were submitted 06/03/94 and were
rejected over the prior art ONLY under 35 U.S.C. 103 and not 35
U.S.C. 102 in the Office Action of paper 8.  Again in the now
withdrawn paper #13, claims 12-22 were rejected relative to the
prior art only under 35 U.S.C. 103.  Claims 12-22 were not
amended since their submission, were not amended in Applicant's
response filed 01/11/95, and were not amended in any telephone
interview between the Examiner and Applicant as stated by the
Examiner on page 33 of the present Office Action paper #17 where
the Examiner states Applicant's response of 01/11/95 contained no
"amendatory material", and NOW all of a sudden, the claims 12-22
are rejected under 35 U.S.C 102.  What is going on here?
What "amendments" necessitated the "new ground for rejection"
stated in the present Office Action of 08/10/95 ??  Applicant
does not understand how by the Examiner's admission no amendments
were made to claims 12-22, and yet these "amendments" which were
not made, and thus do not exist, have necessitated moving the
ground for rejection from 35 U.S.C. 103 ONLY relative to the

ANS0007497

23

prior art, to now being rejected under 35 U.S.C. 102 over <u>the</u>
<u>same prior art that was of record and known to the Examiner when</u>
<u>he first rejected the claims 12-22 only under 35 U.S.C. 103</u>
<u>relative to the prior art.</u>

Is the Examiner angry with Applicant and trying to take-out
aggression to the harm of Applicant and Applicant's application ?
If the Examiner cannot honestly say this is not the case, would
the Examiner please be so kind as to withdraw from this
application in the name of fairness ?. Thank you.

Specifically in reference to page 40 of the Office Action
and the point "21." information regarding Applicant's right to
Appeal to the Board of Patent Appeals: Applicant appreciates
this information but does not intend to Appeal because Applicant
believes that once the claims are clearly understandable to the
Examiner, and the Examiner fully understands the prior art, that
the claims will be found patentable. Again, any constructive
assistance from the Examiner that the Examiner can and is willing
to lend would be deeply appreciated. As the Examiner will see
with continued reading, rights to Applicant's invention has been
eagerly sought by at least one of the largest computer input
device manufacturing and sales companies in the world, and with
offers exceeding <u>one million dollars.</u> Thus this application is
very important to Applicant, and the novel invention that
advances the art is perceived as having great value by those
skilled in the art working for the at least one of the largest
computer input device manufacturing and sales companies in the
world.

Regarding the Examiner's comment in the Office Action
referring to Applicant as being unfamiliar with the patent
process: Applicant has not in the past, and does not now claim
to be an "expert" in the very complex process of patenting.
Applicant is reasonably sure that very few human beings, if any,

ANS0007498

24

know and understand "all" laws and rules, and court decisions defining the laws and rules pertaining to the patenting process, since codes 35 and 37, and the M.P.E.P constitute thousands of pages, not to mention the many court decisions pertaining to interpretations and the application of the laws.  Applicant apologizes for any hardships Applicant's lack of being a patent law expert may have caused the Examiner.  Applicant is doing the best he can, and believes that considering the application was examined after filing indicates that the application must have met all of the requirements for a proper patent application filing at the U.S. Patent and Trademark Office, thus indicating a degree of familarity with the patenting process.

Comparison of the prior art will be made after amendments to the claims so that the amended and new claims may be compared to the prior art.

AMENDMENTS

Amendments in the claims:

Cancel claims 12-22; and insert in the appropriate location the following new claims presented for examination.

28. A hand-operated controller allowing six degrees of freedom of hand input force into a single handle for conversion of the hand input force into electrical output signals, said controller comprising;

stationary base means including a first portion of said base means and a horizontally positioned second portion of said base means for supporting

sliding-plate-linear-conversion means for moving within a horizontal first linear degree of freedom and a horizontal second linear degree of freedom of said six degrees of freedom and for actuating

linear sensor means for sensing positions of said sliding-

25

plate-linear-conversion means within the horizontal first and
second linear degrees of freedom and for producing electrical
output signals related to sensed positions of said sliding-plate-
linear-conversion means;

said sliding-plate-linear-conversion means sandwiched
between said first portion of said base means and said
horizontally positioned second portion of said base means and
thereby restrained against upward and downward movement;

a shaft coupled to said sliding-plate-linear-conversion
means to move with said sliding-plate-linear-conversion means at
least in the horizontal first and second linear degrees of
freedom;

said shaft having

said single handle on an upper end of said shaft to allow
all of said six degrees of freedom of hand input force to be
applied to said controller through said single handle;

means for transferring horizontal linear hand input force
applied to said single handle directionally correspondingly to
the horizontal first and second linear degrees of freedom into
directionally corresponding horizontal linear force against said
shaft,   whereby with said shaft being coupled at least in the
horizontal first and second linear degrees of freedom to said
sliding-plate-linear-conversion means, the shaft can transfer
horizontal linear force applied to said single handle into said
sliding-plate-linear-conversion means so as to move said sliding-
plate-linear-conversion means in the horizontal first and second
linear degrees of freedom in a substantially identical direction
as the direction of the horizontal linear hand input force
applied to said single handle;

means for allowing said single handle to be rotatable in
three separate degrees of rotational freedom about a single point
defined by an intersection of three mutually perpendicular axes
within said single handle,   whereby three degrees of rotational
freedom of said six degrees of freedom are provided;

rotational force sensor means for sensing rotational force

26

against said single handle in any of said three degrees of
rotational freedom, and for producing electrical output signals
related to sensed rotational force against said single handle,

means for allowing said single handle to be moved vertically
upward and downward in a third linear degree of freedom of said
six degrees of freedom by vertical hand input force against said
single handle,

up and down movement sensor means for sensing upward and
downward movement of said single handle in said third linear
degree of freedom and for producing electrical output signals
related to sensed upward and downward movement of said single
handle.

22. A controller in accordance with claim 16 further
including

spatial isolation means in association with said linear
sensor means, said rotational force sensor means and said up and
down movement sensor means.

23. A controller in accordance with claim 22 wherein said
linear sensor means is more narrowly defined as

an independent first sensor and an independent second sensor
each associated with the horizontal first linear degree of
freedom;

and further,

an independent third sensor and an independent fourth sensor
each associated with the horizontal second linear degree of
freedom;

the independent first through fourth sensors each being
separate and distinct from one another.

24. A controller in accordance with claim 23 wherein said
rotational force sensor means is more narrowly defined as

six independent sensors each separate and distinct from one
another, and each separate and distinct from said independent

ANS0007501

27

first through fourth sensors.

27. A controller in accordance with claim 26 wherein said up and down movement sensor means is more narrowly defined as

two independent sensors each separate and distinct from one another, separate and distinct from said six independent sensors, and separate and distinct from said independent first through fourth sensors.

28. A controller in accordance with claim 27 wherein said independent first through fourth sensors, and said six independent sensors and said two independent sensors all jointly comprise twelve sensors each being separate and distinct from one another;

each separate and distinct sensor of said twelve sensors is an electricity manipulating sensor each capable of manipulating electricity independently of the other sensors of said twelve sensors.

29. A controller in accordance with claim 28 wherein said twelve sensors are each electrical contact switches.

30. A controller in accordance with claim 29 wherein each switch of the twelve electrical contact switches is an open switch closeable with force applied thereto.

31. A controller in accordance with claim 30 further including tactile feedback means for providing vibration which can be felt through said single handle.

32. A hand-operated controller allowing six degrees of freedom of hand inputs for conversion of the hand inputs into twelve orthogonal outputs each dependant upon hand inputs, with the twelve orthogonal outputs each represented by an electrical output signal each produced by one of twelve separate sensors

ANS0007502

28

attached to said controller, with each of said sensors associated
one said sensor per each orthogonal output of said twelve
orthogonal outputs, said controller comprising;

a stationary base for supporting

sliding-plate-linear-conversion means movably sandwiched
between a first portion and a second portion of said base; said
sliding-plate-linear-conversion means movable in a first linear
degree of freedom and in a second linear degree of freedom of
said six degrees of freedom for actuating

a first four sensors of said twelve separate sensors;

said first four sensors mounted within said base;

said first four sensors including a move-forward sensor
associated with

a first output of said twelve orthogonal outputs;

said first four sensors including a move-back sensor
associated with

a second output of said twelve orthogonal outputs;

said first four sensors including a move-right sensor
associated with

a third output of said twelve orthogonal outputs;

said first four sensors including a move-left sensor
associated with

a fourth output of said twelve orthogonal outputs;

said sliding-plate-linear-conversion means sandwiched
between said first portion and said second portion of said base
so that said sliding-plate-linear-conversion means is moveable
exclusively horizontally to and from actuation of each of the
sensors of said first four sensors;

a shaft; said shaft having a lower end and an upper end;

the lower end of said shaft coupled to said sliding-plate-
linear-conversion means so that said shaft is coupled with said
sliding-plate-linear-conversion means to move in the first and
second linear degrees of freedom so that linear horizontal
movements of said shaft can be translated into linear horizontal
movements of said sliding-plate-linear-conversion means to move

29

said sliding-plate-linear-conversion means to and from actuation
of each of the sensors of said first four sensors;

a handle on said upper end of said shaft, said handle
manipulable by human hand inputs for applying all of said six
degrees of freedom of hand inputs into said controller;

means for allowing said handle to be rotatable in three
degrees of rotational freedom about a single point defined by an
intersection of three mutually perpendicular axes within said
handle, whereby three degrees of rotational freedom of said six
degrees of freedom are provided;

a second four sensors of said twelve separate sensors, said
second four sensors mounted within said handle and associated
with at least two rotational degrees of freedom of said three
degrees of rotational freedom;

said second four sensors including a turn-up sensor
associated with

a fifth output of said twelve orthogonal outputs;

said second four sensors including a turn-down sensor
associated with

a sixth output of said twelve orthogonal outputs;

said second four sensors including a turn clockwise sensor
associated with

a seventh output of said twelve orthogonal outputs;

said second four sensors including a turn counter-clockwise
sensor associated with

an eighth output of said twelve orthogonal outputs;

said controller including a turn-right sensor associated
with

a ninth output of said twelve orthogonal outputs; said ninth
output associated with a third degree of rotational freedom
separate from said two rotational degrees of freedom;

said controller including a turn-left sensor associated with

a tenth output of said twelve orthogonal outputs; said tenth
output associated with said third degree of rotational freedom;

means for allowing said handle to be moved vertically up and

ANS0007504