# Exhibit 4

Dockets.Justia.com



Initial Review

**BOX AF**

`)37535246 6P`
`39 202 2617`

Commissioner of Patents and Trademarks
Washington, D. C. 20231
Box AF

### URGENT, RESPONSIVE TO FINAL ACTION

Attention Patent Examiner: A. Hill, GAU 2617

Re: Patent Application of      Brad A. Armstrong

Serial No.: 07/847,619          Filed: 03/05/92

Appl. Title:   6 DEGREES OF FREEDOM CONTROLLER WITH
               CAPABILITY OF TACTILE FEEDBACK

Applicant's Address:            Brad A. Armstrong
                                848 Inyo St.
                                Chico, CA, 95928

IN RESPONSE TO THE OFFICE ACTION OF 08/10/95, PAPER #17, MADE
FINAL

Sir:

REMARKS:

     This is responsive to the Outstanding Revised Office Action
of 08/10/95 and made final.  A **CERTIFICATE OF EXPRESS MAILING** is
on page 62 attached hereto.

     Included herewith is the small entity of $375.00 fee per
1.17(r) in accordance with 37 C.F.R. 1.129 (a) for a "Filing of a
First submission after final rejection".  This is Applicant's
first submission after final, and the above specified application
qualifies under 37 C.F.R. 1.129(a) to have the finality of the
Outstanding Office Action withdrawn and the herein amendments
entered and acted upon per 37 C.F.R. 1.129(a), and so it is
requested this response be treated per 37 C.F.R. 1.129(a).  There
are no prior amendments or responses that have not yet been
entered.

     After the entering of this amendment there will be four
independent claims and not more than 20 total claims, and thus a
fee in the amount of $39.00 is included for one independent claim

110 MG 01/18/96 07847619          1 246      $375.00 CK
110 MG 01/18/96 07847619          1 202      $39.00 CK

ANS0007476

2

in excess of three independent claims.

A petition for a two month extension of time under 37 CFR 1.136 (a) and the $190.00 fee therefor is hereto attached for responding to the outstanding office action of 08/10/95.

A check in the amount of $604.00 is hereto attached for the 37 C.F.R. 1.129(a) fee, the 37 CFR 1.136 (a) fee, and the one independent claim in excess of three independent claims.

Would the Examiner please amend the application as herein requested, and read and consider the herein remarks. Reexamination of the application and claims after entering of this amendment, in view of the remarks is requested. Allowance of the claims is respectfully solicited, as the invention is believed to clearly advance the art in a patentable manner. "All" of the herein remarks are directed toward and only toward the "patentability" of the invention and the issues at hand surrounding the patentability of the invention. Applicant has made every attempt in this response to be brief, while still responding to each objection and grounds for rejection raised by the Examiner in the Revised Office Action of 08/10/95. The amendments and remarks of this response are the best effort of Applicant to place the application in condition for allowance, and any assistance the Examiner can offer toward this end would be deeply appreciated.

In the past, Applicant has made every attempt within his capabilities to put the application in condition for allowance, however the Examiner still objects to some terminology used in the claims. If after the entering of this amendment, objections to the specification or claims still exists, would the Examiner please give constructive assistance in all cases wherein the Examiner believes he could improve specific terms.

ANS0007477

3

Specifically regarding page 1 of the Office Action of 08/10/95: It has been noted claims 12-22 are rejected yet pending.

Specifically regarding the "Part III DETAILED ACTION" beginning on page 2 of the Office Action of 08/10/95 with "Response to Amendment" and the paragraphs under point "1.": The revised Office Action dated 08/10/95 has been carefully studied. The withdrawal by Supervisory Examiner Peng of the finality of the Office Action mailed 05/11/95 paper No. 13 as stated in paper 14 because the Office Action of 05/11/95 should have been more detailed has been noted. It is believed the revised Office Action of 08/10/95 is intended to completely replace the Office Action of 05/11/95, although this is not positively stated in any Office paper, since only the finality of the Office Action of 05/11/95 has been withdrawn as stated in paper No. 14 and again in paper No. 17. In any case, the Office Action of 05/11/95 includes essentially all of the objections and grounds for rejection which are stated in the revised Office Action of 08/10/95, only the Office Action of 08/10/95 is substantially more detailed and lengthy, and additionally introduces 35 U.S.C. 102 grounds for rejection which were not stated as grounds for rejection in the 05/11/95 Office Action even though the claims 12-22 have not been amended since their submission on 06/03/94. Applicant is upset the 35 U.S.C 102 grounds of rejection were applied "piecemeal" in the Office Action of 08/10/95, as such grounds were not applied in the Office Action of 05/11/95 or the earlier office action of 09/28/94 paper #8 when no amendments to the claims were made between the initial submission of claims 12-22 on 06/03/94 and the Office Action of 08/10/95. However, this response addressing the objections and grounds for rejection stated in the highly detailed Office Action of 08/10/95 is considered to fully address all of the objections and grounds for rejection stated in the less detailed Office Action of 05/11/95,

ANS0007478

4

and to fully address all of the objections and grounds for
rejection stated in the Office Action of 08/10/95.

Henceforth unless otherwise specifically stated, the terms
"Office Action" used herein refers to the Office Action date
mailed 08/10/95, paper No. 17.

Specifically regarding page 2 of the Office Action, and the
paragraphs under point "2." "Specification" and bridging pages 3,
4 and 5:  The quotation of the first paragraph of 35 U.S.C 112
and the objection to the specification as not now supporting the
invention as claimed in claims 12-22 has been noted.  All of the
terms in the pending claims which the Examiner states are not
supported by the originally filed specification have been noted.
Applicant believes that the term "means" may be utilized in the
claims even when not used in the specification, thus Applicant
will continue to use means clauses in the claims where
appropriate.  The vast majority of the claim terms which the
Examiner objects to in the pending claims as not being supported
in the original specification are believed to be terms having the
addition of the allowable term "means", or are readily
ascertainable very slight variations or synonyms of words or word
strings from the originally filed specification, or terms which
are very strongly implied in the specification and supported in
the originally filed drawings and thus easily ascertained in
meaning in the original version of the application.  The Examiner
seems to be stating that the terms in the claims must in all
cases be found absolutely <u>precisely quoted</u> in the specification
in order to be "clearly ascertainable" in meaning in the claims.
Applicant strongly objects to being held to standards of claim
writing <u>which far exceed those required of patent attorneys by
other Patent Examiners</u>, and respectfully requests that the
Examiner grant a broader assumption of the "reader's"
capabilities as to readily ascertaining meanings of claim terms
which are not "precise quotes" from the specification.  Those

ANS0007479

5

skilled in the art do have significant knowledge in this field as
is evidenced by the prior art of record, as some concepts within
the scope of the present invention are known and understood by
those skilled in the art, and this is not an admission that
Applicant's invention is known to those skilled in the art.
Applicant believes those skilled in the art would be able to
clearly and readily ascertain the meaning of most of the words in
the claims that the Examiner states are unsupported in the
specification. The Examiner has repeatedly cited terms which he
has clearly read out of context and thus states the meanings of
the claim terms cannot be ascertained from the specification.
Clearly, many terms if isolated from the claims, taken out of
context, and placed in a vacuum absent any words before or after
the isolated term would be rendered meaningless in their
relationship to the claimed invention from which the term or
terms have been isolated. In addition and for example, on page 3
of the Office Action the Examiner states "exposed handle" as used
in the claims is unsupported in the originally filed
specification. This objection by the Examiner is not at all
appreciated by Applicant. It is abundantly clear that the
"exposed handle" is properly supported in the specification as
originally filed. Please see the drawing Figs. 1, 2, 3A, 3B, 6,
7 and 9 wherein each of these drawings clearly shows a handle,
the handle being called a "handle" in the written portion of the
original disclosure, and the handle not once being shown covered
or hidden in any of the drawings by anything, and thus clearly
exposed, and the handle by its very nature and as stated in the
writing being for grasping by the human hand and thus at least
exposed to the point of being graspable by the hand to allow hand
inputs in the balance of the controller. Thus, it is beyond
Applicant's comprehension as to how the Examiner is "honestly"
finding lack of support in the specification for the claim term
"exposed handle". Applicant grants the Examiner that the terms
"exposed handle" are not precisely quotable from the original
disclosure, but are readily and clearly ascertainable in meaning

ANS0007480

6

from the original disclosure.  Thus, again, Applicant objects to
being held to standards of claim writing which far exceed those
required of patent attorneys by other Patent Examiners, and
respectfully requests the Examiner grant a broader assumption of
those skilled in the art being able to readily and clearly
ascertaining meanings of claim terms which are not <u>precise quotes</u>
from the specification.  Applicant believes the "reader" would be
able to easily ascertain the meaning of most of the words in the
claims that the Examiner states are unsupported in the
specification, however, with Applicant always wishing to advance
the application in the quickest way possible toward patent
allowance, Applicant does not traverse the grounds of objection,
and has noted each and every claim term the Examiner states is
unsupported by the specification, and in amending the claims,
Applicant will diligently pursue utilizing terms more in line
with those words used in the specification, and will amend the
specification without adding any new material so that each and
every term of each and every claim will have what is hoped to be
clear antecedent basis to the Examiner.

     On page 4 of the Office Action immediately following the
extremely long list of claim terms said to not be supported in
the specification, and specifically regarding the statement in
the Office Action on page 4 starting with
          "And since applicant argues in the response filed
01/11/95 (e.g. on page 5, lines 11-13, 17-70 and 21-31 of said
response, at the least) that the invention embodies numerous
features which are clearly not set forth in and supported by the
specification as originally filed, such as the sensors being
radio wave sensors, optical sensors, etc.,..." (end quote);
     It is not at all appreciated that the Examiner is
misconstruing Applicant's remarks.  The following are quotations
from Applicant's response of 01/11/95 which show the Examiner is
taking Applicant's statement clearly out of context and
misconstruing them.  From Applicant's response of 01/11/95, page

ANS0007481

7

5, lines 8-31:      "Would the Examiner please read page 22 of
Applicant's specification describing a variety of sensors which
are clearly proportional sensors, not simply on/off switches.
These numerous known types of proportional sensors and others
commonly known and not cited, output variable signals indicating
positional information.  Many of these sensors manipulate or
provide varying resistance and or voltages.  Also please review
Applicant's drawings, and particularly Figs. 11c, 11d, 11e, 11f,
11g and 11h which show proportional sensors.  Additionally,
optical sensors and potentiometers of many types can also
function in Applicant's invention, as they are so well known and
common that those skilled in the art do not need to be told how
to apply sensors they commonly utilize.  There is a central off
or null position in Applicant's controller with some "play" about
this center off or null position so that the controller is not
excessively sensitive in view of the range of control of the
average or normal human hand, and this is where sensors "may" not
be activated.  Within this center off or null and "play" region,
is where sensors "may" not be activated.  If no sensors are
activated, then it would be indicated that the controller is
centered or in the central off or null position.  Outside of the
center null position or area, sensors will be outputting
positional information as to the current position of the
controller."  (end of quote)

    In the above quotation, please note the sentence
"Additionally, optical sensors and potentiometers of many types
can also function in Applicant's invention".  Please note "can
also function in Applicant's invention".  It is very clear from
Applicant's originally filed specification that the present
invention is not dependant upon any one type of sensor being
used, and in fact in the originally filed specification, it is
clearly stated, and Applicant quotes from page 4 second to last
line thereof bridging page 5 of the specification: "While the
prior art is dependant upon specific types of sensors, this
invention can be constructed with sensors as inexpensive as

ANS0007482

8

simple electrical contacts or as sophisticated as a manufacturer desires."

Applicant's pending claims utilize "sensor means" or the like because the invention was never intended to be dependant upon any one type of sensor, but in fact is structured to be able to utilize many types of sensors, and this is and continues to be but one major advantage of the present invention. Furthermore Applicant does describe many types of sensors in the specification, and the Examiner has identified seven types of sensors which the Examiner states are clearly supported by the originally filed specification, see page 6 of the Office Action and point "4" thereon wherein the Examiner lists seven sensor types (a) through (g). Applicant does not view his invention as limited to any one particular sensor type. The use of the claim terms "sensor means" and the like is fully supported in the originally filed disclosure.

Thus the Examiner statement in the Office Action on page 4 starting with

"And since applicant argues in the response filed 01/11/95 (e.g. on page 5, lines 11-13, 17-70 and 21-31 of said response, at the least) that the invention embodies numerous features which are clearly not set forth....." is wholly unsupported and inaccurate.

Regarding page 5 of the Office Action and point "3." thereon stating claims 12-22 are rejected under 35 U.S.C 112, second paragraph: This has been read and carefully considered.

Regarding page 6 of the Office Action and point "4." thereon stating claims 12-22 are rejected under 35 U.S.C 112, second paragraph: This has been read and carefully considered. As addressed briefly above, Applicant's pending claims utilize "sensor means" because the invention was never intended to be dependant upon any one type of sensor, but in fact is structured to be able to utilize many types of sensors.

ANS0007483

9

It is hoped that the Examiner is not telling Applicant that Applicant cannot use the term "sensor means" or "means for sensing" and the like in Applicants claims because Applicant has only specifically described <u>seven different types of sensors</u> in the specification. If this is what the Examiner is trying to tell Applicant in point "4" of the Office Action, Applicant is extremely upset, as no other patent applicants are held to such strict standards by other Patent Examiners.

Question: Is the Examiner stating that Applicant cannot use the term "sensor means" or "means for sensing" and the like in Applicant's claims, unless Applicant wishes a sure rejection of those claims, due to Applicant having only specifically described <u>seven</u> different types of sensors in the original specification ? Applicant needs to know the answer to the above question so that during the continued prosecution of this application in the future, if Applicant desires to use "sensor means" or "means for sensing" and the like in his claims, whether such terms are likely to be acceptable or objected to the Examiner. Applicant is sincerely concerned about this issue and requests clarification. Thank you.

Regarding page 7 bridging pages 8, 9, 10, 11, 12 and 13 of the Office Action and point "5." thereon stating claims 12-22 are rejected under 35 U.S.C 112, second paragraph: This has been read and carefully considered. Applicant respectfully and strongly disagrees with the Examiner's definition of the phrase "in communication with" as requiring information such as language, or computer bit streams or electrical information to be sent such as by a radio transmitter or the like, however, in amending the claims all occurrences in all applicable claims of "in communication with" will be deleted and replaced with some other phrase in order to advance the application and claims toward allowability.

Regarding page 8 of the Office Action part of point "5."

ANS0007484

10

wherein the Examiner asks about "said member" in lines 8 and 11
of claim 12:  The term "said member" is believed to be most clear
in claim 12.  It is clearly the "movably retained member", since
no other "member" has been introduced into the claim prior to the
next two uses of "said member" in lines 4-5 following the
introduction of "movably retained member".  Clearly, based on the
lack of complaint on the part of the Examiner regarding the two
occurrences of "said member" in line 4-5 of the claim, the
Examiner must know "said member" in the claim means "movably
retained member".  "linkage member" is introduced in line 7 of
the claim, and then thereafter always referred to as "said
linkage member".  After the introduction of "movably retained
member" in lines 2-3 of the claim, it is always thereafter
referred to as "said member".  The introduction of the terms in
question appears proper in claim 12, and the use thereof
thereafter is consistent, although after the introduction of
"movable retained member" it is further used in a slightly
shorten version as "said member" as an attempt to keep the claim
short and thus easily readable.  Thus Applicant is frustrated
with the Examiner's apparent inability to make such distinctions
in the clearly written claims.  However, Applicant does not wish
to traverse the grounds for rejection since Applicant believes
the application and claims will be advanced toward allowance more
quickly simply by amending the claims in an attempt to overcome
this grounds for rejection.  The claims will be appropriately
amended to overcome the rejection.

     Additionally, on page 8 of the Office Action, Applicant has
noted the Examiner's statement pertaining the Examiner having in
the past not requested "permission" to amend the claims.
Applicant is and was very much aware of the Examiner not
requesting "permission" to amend the claims.  Applicant has in
past responses simply been trying to get the Examiner to not
simply stop at critiquing terms in the claims, but to critique
the terms and then provide constructive suggestions in all case

ANS0007485

11

when the Examiner believes he knows of improved terminology per
the requests of the M.P.E.P. of patent examiners. Such
constructive assistance from the Examiner following a critiquing
of a term is believed to be requested by the PTO in the M.P.E.P.
whenever possible and <u>without</u> regard as to whether the Examiner
sees patentable material in the application or not. Otherwise
Applicant is believed to be allowed to use his own terms provided
they are reasonable and ascertainable in their meaning.
Applicant requests specific constructive assistance from the
Examiner whenever possible.

Regarding page 8 bridging page 9 of the Office Action
wherein "support means" of claim 12 line 13 of the claim is
addressed relative to "linkage support means" set forth in line 9
of the claim: Clearly "linkage support means" is introduced into
claim 12 in line 9 of the claim (note the lack of a "the" or
"said" in front of "linkage support means"), and then thereafter
"linkage support means" is consistently recited as "said linkage
support means". The lack of a "said" or of a "the" in front of a
means clause or any feature being introduced for the first time
into a claim is believed normally an indication the means clause
or feature is being introduced into the claim. After
introduction of the means clause or feature into the claim,
normally a "said" or a "the" is inserted in front of additional
uses of the same means clause or feature in the given claim to
allow the reader to distinguish that which is being introduced
from that which has already been introduced. Thus, clearly
"support means" is introduced into claim 12 in line 13, and then
thereafter is consistently recited as "said support means".

Question: Is Applicant wrong about the use of "said" or
"the" in claims as stated above ? An answer to this question
would be helpful to Applicant in future prosecution of this
application.

ANS0007486

12

Applicant is not traversing the 35 U.S.C. 112 grounds for rejection as this might slow movement of the application and claims toward allowance, but is clearly having a difficult time in writing claims which the Examiner is able to understand, and desires the Examiner understand Applicant's logic behind the style or format of Applicant's claims so that once the Examiner understands the claims, then the Examiner will be able to see that the claims patentably distinguish over the prior art. Appropriate amendment to all appropriate claims to overcome this rejection will be herein made.

Regarding page 9 of the Office Action and the claim 12 line 14 occurrence of "a theoretical point": this has been read and carefully considered. All occurrences in all appropriate claims regarding the "theoretical point" will be appropriately amended to overcome the rejection.

Regarding page 9 of the Office Action and the claim 12 lines 20-21 and "said support means": this has been considered and the claims will be appropriately amended in all appropriate cases to overcome the rejection.

Regarding page 9 of the Office Action and the claim 12 line 23 occurrence of "said member": this has been considered and all appropriate claims will be appropriately amended to overcome the rejection.

Regarding page 9 of the Office Action and the claim 12 lines 25-26 and specifically the use of "said linkage support means for rendering said linkage member substantially non-tiltable relative to said member": this has been considered and all applicable claims will be appropriately amended to overcome the rejection. The Examiner has started his quotation of "said linkage support means for rendering" in the middle of a recitation, and thus that which is quoted by the Examiner is quoted out of context, and

ANS0007487

13

apparently has been read out of context by the Examiner.
Applicant believes that if "said linkage support means for
rendering said linkage member substantially non-tiltable relative
to said member" were read in context with the wording occurring
before and after that which has been quoted, that such langauge
would be quite clear.  However, Applicant does not wish to
traverse the grounds for rejection since Applicant believes the
application will be advanced toward allowance more quickly simply
by amending the claims to overcome this grounds for rejection.

Regarding page 10 of the Office Action and the claim 12 line
26 and specifically "said member":  this has been considered and
all applicable claims will be appropriately amended to overcome
the rejection.

Regarding page 10 of the Office Action and the claim 12 line
29 and specifically "said member":  this has been considered and
all applicable claims will be appropriately amended to overcome
the rejection.

Regarding page 10 of the Office Action and the claim 12
lines 33-35 and specifically "base means, sensor means":
Applicant had intended "sensor means" to have been on the next
line down and substantially indented to clearly separate it from
"base means".  Applicant apparently failed to install a hard
right command in word processing between "base means" and "sensor
means", and thus the terms were mistakenly ran together on the
same line.  The Examiner is thanked for his pointing to this
error.  This will be appropriately amended in all applicable
claims to overcome the rejection.

Regarding page 10 of the Office Action and the claim 13 line
2 and specifically "in communication with": as mentioned above,
this will be appropriately amended to overcome the rejection.

ANS0007488

14

Regarding page 10 of the Office Action and the claim 13 lines 2-3 and specifically "said member": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 11 of the Office Action and the claim 13 line 3 and specifically "said member": as mentioned above, this will be appropriately amended in all appropriate claims to overcome the rejection.

Regarding page 11 of the Office Action and the claim 14 lines 2-3 and specifically "in communication with": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 11 of the Office Action and the claim 14 line 3 and specifically "said member": as mentioned above, this will be appropriately amended in all appropriate claims to overcome the rejection.

Regarding page 11 of the Office Action and the claim 17 line 5 and specifically "in communication with": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 11 of the Office Action and the claim 17 line 8 and specifically "in communication with": as mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 11 of the Office Action and the claim 17 line 12 and specifically the occurrence of "a theoretical point": this has been read and considered. All occurrences in all appropriate claims regarding the theoretical point will be appropriately amended to overcome the rejection.

Regarding page 11 bridging page 12 of the Office Action and

ANS0007489

15

the claim 17 lines 20-22 and specifically the occurrence of
"said shaft support means....relative to said member": The
comments by the Examiner have been considered, and appropriate
amendments to the claims in which this occurs will be made to
overcome the rejection.

Regarding page 12 of the Office Action and the claim 17 line
28 regarding "base means, sensor means": This will be
appropriately amended in all applicable claims to overcome the
rejection.

Regarding page 12 of the Office Action and the claim 20 line
10 and specifically "in communication with": as mentioned above,
this will be appropriately amended to overcome the rejection.

Regarding page 12 of the Office Action and the claim 20 line
13 and specifically "in communication with": as mentioned above,
this will be appropriately amended to overcome the rejection.

Regarding page 12 of the Office Action and the claim 20 line
17 and specifically "in communication with": as mentioned above,
this will be appropriately amended to overcome the rejection.

Regarding page 12 of the Office Action and the claim 20 line
20 and specifically "in communication with": as mentioned above,
this will be appropriately amended to overcome the rejection.

Regarding page 12 of the Office Action and the claim 20 line
25 and specifically the occurrence of "a theoretical point": this
has been read and considered. All occurrences in all appropriate
claims regarding the theoretical point will be appropriately
amended to overcome the rejection.

Regarding page 13 of the Office Action and the claim 20
lines 34-35 and specifically "in communication with": as

ANS0007490

16

mentioned above, this will be appropriately amended to overcome the rejection.

Regarding page 13 of the Office Action and the claim 20 lines 37-39 and the lack of antecedent basis for "said shaft support means....relative to said plate member": The comments by the Examiner have been considered, and appropriate amendments to the claims in which this occurs will be made to overcome the rejection.

Regarding page 13 of the Office Action and the point "6." thereon regarding the 35 U.S.C. 112 deficiencies set forth, and the statement that the claims are accorded their most reasonable interpretation consistent with the specification for evaluation with respect to the prior art. The entire point "6." and been carefully read and considered. Applicant strongly disagrees that the claims 12-22 are "grossly indefinite" as stated by the Examiner, however under amendment herein, Applicant will amend the claims to the best of his abilities in an attempt to satisfy the Examiner.

Regarding page 14 of the Office Action and the point "7." quoting the appropriate paragraphs of 35 U.S.C. 102: This has been read and carefully considered.

Regarding page 14 bridging pages 15, 16 and 17 of the Office Action and the point "8." regarding the 35 U.S.C. 102 (b) rejection applied to non-amended claims 12-14 and 17 for the first time since the claims were entered on 06/03/95 as being anticipated by Dzholdasbekov et al (GB 2,240,614), henceforth Dzholdasbekov; the Examiner's comments have all been carefully read and considered. Most addressing of the prior art will be made after amendment of the claims, however, the rejection of claims 12-14 and 17 under 35 U.S.C. 102(b) as being anticipated by Dzholdasbekov is inappropriate and should not have been

ANS0007491

17

applied. Clearly the handle 2 of Dzholdasbekov is not resolvable
into positions about "said three axes", the three axes being
mutually perpendicular to one another, and intersecting one
another within the handle, with the three degrees of freedom of
rotation which is detected by "pick-ups" being about these three
axes.

The Dzholdasbekov handle 2 is resolvable in three degrees of
freedom, but not by being detected or tracked by "pick-ups" about
three axes defining a point defined by the three axes being
mutually perpendicular to one another and intersecting one
another within the handle of Dzholdasbekov. And so the
Dzholdasbekov structure is completely different than that claimed
in Applicant's claims 12-14 and 17. The Dzholdasbekov handle 2
includes a thumbwheel for one degree of rotational freedom, and
thus this aspect of a separate thumbwheel proves that the
Dzholdasbekov handle 2 is not resolvable about three sensed
axes,(sensed by "pick-ups") but rather handle 2 is only
resolvable about two axes.

    Regarding page 17 bridging pages 18, 19 and 20 of the Office
Action and the point "9." regarding the 35 U.S.C. 102 (b)
rejection of claims 12-14 and 17 as being anticipated by King (US
4,555,960), henceforth King: the Examiner's comments have all
been carefully read and considered. Most addressing of the prior
art will be made after amendment of the claims, however, the 35
U.S.C. 102(b) rejection of claims 12-14 and 17 as being
anticipated by King is inappropriate and should not have been
made, in that Applicant's claims 12-14 and 17 specify a handle
support shaft as being non-tiltable, and the shaft of King which
supports the spherical handle of King tilts and must tilt in
order for the KIng controller to operate. The tilting shaft of
King is a major and significant structurally different
arrangement than that of Applicant's claims 12-14 and 17, thus
the 35 U.S.C. 102(b) rejection of claims 12-14 and 17 in view of
King is inappropriate because King does not describe or

ANS0007492

18

anticipate that which Applicant claims in claims 12-14 and 17.
Additionally, although the Examiner has gone to great lengths
attempting to show that King includes horizontally moving members
which move in the first and second horizontal linear degrees of
freedom somewhat correlating with the arching handle movements of
King on the first and second horizontal linear degrees of
freedom, the Examiner is reaching, as these aspects do not exist
in the King device or in the King disclosure.  King includes
nothing similar to Applicant's sliding-plate-linear-conversion
structure or means.

Regarding page 20 of the Office Action and the point "10."
quoting the appropriate paragraphs of 35 U.S.C. 103 which forms
the basis for all obviousness rejections set forth in the Office
Action:  This has been read and carefully considered by
Applicant.  Applicant strongly disagrees the present invention is
obvious as claimed in claims 12-22 or in the new or amended
claims presented in this response.

Regarding page 20 bridging page 21 of the Office Action and
the point "11" regarding the 35 U.S.C. 103 rejection of claims 15
and 18 as being unpatentable over Dzholdasbekov as applied to
claims 12-14 and 17 previously, and further in view of IBM
Technical Disclosure Bulletin Vol. 32, No. 9B, henceforth IBM:
the Examiner's comments have all been carefully read and
considered.  Applicant strongly disagrees the present invention
is obvious, as neither of these prior art references include a
handle resolvable and sensed as it is resolved about three axes
intersecting one another mutually perpendicular at a point within
a handle to provided three degrees of freedom of "sensed"
rotation about these three axes.  Addressing of the prior art
will be made after amendment of the claims.

Regarding page 22 bridging page 23 of the Office Action and
the point "12" regarding the 35 U.S.C. 103 rejection of claims

ANS0007493

19

15-16 and 18-19 as being unpatentable over King as applied to
claims 12-14 and 17 previously, and further in view of IBM: the
Examiner's comments have all been carefully read and considered.
Applicant strongly disagrees the present invention is obvious, as
neither of these references includes anything similar in
structure to Applicant's sliding-plate-linear-conversion means.
Addressing of the prior art will be made after amendment of the
claims.

Regarding page 23 of the Office Action and the point "13"
regarding the "alternative" of the discussion of Dzholdasbekov
and King with reference to claims 12-19:  The Examiner's comments
have all been carefully read and considered, and it is apparent
from the Examiner's comments on page 24 that the Examiner is for
some reason unable to precisely determine the structure of
Dzholdasbekov regarding handle rotations, and this brings to
question as to why the Examiner made the 35 U.S.C. 102(b)
rejection of Applicant's claims over Dzholdasbekov as addressed
above.  The Dzholdasbekov device appears clearly detailed in the
Dzholdasbekov disclosure, and does not describe Applicant's
invention of claims 12-14 and 17 as stated earlier in the Office
Action.  King's device is also clearly detailed in the King
disclosure, and does not include anything similar to Applicant's
sliding-plate-linear-conversion means as alleged in point 9 on
page 17 of the Office Action.  The Examiner is however correct
that King's handle is resolvable in three degrees of rotation
about a point within the King spherical handle.  Applicant
strongly disagrees the present invention is obvious as speculated
in points 13 and 14 of the Office Action..  Addressing of the
prior art will be made after amendment of the claims.

Regarding page 24 bridging pages 25, 26 and 27 of the Office
Action and the point "14":  Point 14 has been carefully read and
considered, and has at least in part been addressed above in
regards to point 13 of the Office Action. Applicant would like to

ANS0007494

20

state that Dzholdasbekov clearly does not provide three
rotational signals for rotations about three axes which meet at a
theoretical point in the handle.  In point 14 of the Office
Action it is clear that the Examiner is picking and choosing
features at random simply based on whether the features exist or
do not exist in the art, and clearly the Examiner is acting a
though the mere existence of some feature in the art suggests its
combination with other features which can be shown to merely
exist in the art, without any suggestion to combine the shown
features more than their mere existence.  Applicant's agrees some
features of Applicant's invention may be individually shown to
exist within the prior art, but the suggestion that the features
of the prior art be combined precisely along the teachings of
Applicant's disclosure in order to receive the many benefits
provided by the claimed combination is not suggested and is not
obvious.  Comparison of the prior art will be made after
amendments to the claims so that the amended claims may be
compared to the prior art.

    Regarding page 28 bridging page 29 of the Office Action and
the point "15":  Point 15 has been carefully read and considered.
Applicant strongly disagrees the present invention is obvious,
however comparison of the prior art will be made after amendments
to the claims so that the amended claims may be compared to the
prior art.

    Regarding page 29 bridging pages 30 and 31 of the Office
Action and the point "16":  Point 16 has been carefully read and
considered.  Applicant strongly disagrees the present invention
is obvious.  Comparison of the prior art will be made after
amendments to the claims so that the amended claims may be
compared to the prior art.

    Regarding page 31 bridging page 32 of the Office Action and
the point "17":  Point 17 has been carefully read and considered.

ANS0007495

21

Comparison of the prior art will be made after amendments to the claims so that the amended claims may be compared to the prior art.

Regarding page 32 bridging pages 33, 34, 35, 36, 37, 38 and 39 of the Office Action and the point "18": Point 18 has been carefully read and very carefully considered. Applicant has read the statement that Applicant is encouraged to place greater emphasis on the particular issues raised in the Office action when formulating any future responses. Applicant has never intended to ever raise or address any issue that in Applicant's opinion was not directly related to issues raised by the Patent Office or issues which directly focused on the patentability of the invention and movement of the application and claims toward allowance. All of the Examiner's remarks regarding said 01/11/95 response have been read and carefully considered. Although Applicant does not agree with many of the remarks and grounds for rejection made by the Examiner, Applicant does deeply appreciate the Examiner taking the time and effort to respond in detail to Applicant's 01/11/95 response.

On page 33 of the Office Action the Examiner states "the application has been processed in a timely manner". Question: Does this mean that the Examiner did not process a first office action on any non-special application that had a filing date later than the present application filing date during the 27 plus month wait from the filing date to the first office action of the present application ?

On page 33 the Examiner states "the application contains no allowable subject matter". Applicant does not understand why the Examiner makes this statement, when in an earlier telephone interview that was not made of record by the Examiner or by Applicant, the Examiner stated the application did contain allowable subject matter, and the subject matter if incorporated

ANS0007496

22

into a claim would be held allowable. The Examiner stated
Applicant should incorporate one particular type of sensor into a
claim to overcome the grounds of rejection pertaining to prior
art, in order to have at least one claim allowed. Applicant told
the Examiner that the invention was not dependant upon any one
particular type of sensor. Does this statement by Applicant
regarding the fact that his invention is not dependant upon any
one particular type of sensor make the allowable subject matter
disappear? Applicant's originally filed specification stated the
invention was not dependant upon one particular sensor, and thus
it must be assumed the Examiner understood this when he made his
statement pertaining to allowable subject matter. What is going
on here?

On page 39 of the Office Action the Examiner states
"Applicant's amendments necessitated the new grounds of
rejection": Applicant questions what amendments the Examiner is
speaking about. Claims 12-22 were submitted 06/03/94 and were
rejected over the prior art ONLY under 35 U.S.C. 103 and not 35
U.S.C. 102 in the Office Action of paper 8. Again in the now
withdrawn paper #13, claims 12-22 were rejected relative to the
prior art only under 35 U.S.C. 103. Claims 12-22 were not
amended since their submission, were not amended in Applicant's
response filed 01/11/95, and were not amended in any telephone
interview between the Examiner and Applicant as stated by the
Examiner on page 33 of the present Office Action paper #17 where
the Examiner states Applicant's response of 01/11/95 contained no
"amendatory material", and NOW all of a sudden, the claims 12-22
are rejected under 35 U.S.C 102. What is going on here?
What "amendments" necessitated the "new ground for rejection"
stated in the present Office Action of 08/10/95 ?? Applicant
does not understand how by the Examiner's admission no amendments
were made to claims 12-22, and yet these "amendments" which were
not made, and thus do not exist, have necessitated moving the
ground for rejection from 35 U.S.C. 103 ONLY relative to the

ANS0007497

23

prior art, to now being rejected under 35 U.S.C. 102 over <u>the</u>
<u>same prior art that was of record and known to the Examiner when</u>
<u>he first rejected the claims 12-22 only under 35 U.S.C. 103</u>
<u>relative to the prior art.</u>

Is the Examiner angry with Applicant and trying to take-out
aggression to the harm of Applicant and Applicant's application ?
If the Examiner cannot honestly say this is not the case, would
the Examiner please be so kind as to withdraw from this
application in the name of fairness ?.  Thank you.

Specifically in reference to page 40 of the Office Action
and the point "21." information regarding Applicant's right to
Appeal to the Board of Patent Appeals:  Applicant appreciates
this information but does not intend to Appeal because Applicant
believes that once the claims are clearly understandable to the
Examiner, and the Examiner fully understands the prior art, that
the claims will be found patentable.  Again, any constructive
assistance from the Examiner that the Examiner can and is willing
to lend would be deeply appreciated.  As the Examiner will see
with continued reading, rights to Applicant's invention has been
eagerly sought by at least one of the largest computer input
device manufacturing and sales companies in the world, and with
offers exceeding <u>one million dollars.</u>  Thus this application is
very important to Applicant, and the novel invention that
advances the art is perceived as having great value by those
skilled in the art working for the at least one of the largest
computer input device manufacturing and sales companies in the
world.

Regarding the Examiner's comment in the Office Action
referring to Applicant as being unfamiliar with the patent
process:  Applicant has not in the past, and does not now claim
to be an "expert" in the very complex process of patenting.
Applicant is reasonably sure that very few human beings, if any,

ANS0007498

24

know and understand "all" laws and rules, and court decisions
defining the laws and rules pertaining to the patenting process,
since codes 35 and 37, and the M.P.E.P constitute thousands of
pages, not to mention the many court decisions pertaining to
interpretations and the application of the laws.  Applicant
apologizes for any hardships Applicant's lack of being a patent
law expert may have caused the Examiner.  Applicant is doing the
best he can, and believes that considering the application was
examined after filing indicates that the application must have
met all of the requirements for a proper patent application
filing at the U.S. Patent and Trademark Office, thus indicating a
degree of familarity with the patenting process.

     Comparison of the prior art will be made after amendments to
the claims so that the amended and new claims may be compared to
the prior art.


AMENDMENTS
Amendments in the claims:
     Cancel claims 12-22; and insert in the appropriate location
the following new claims presented for examination.


     23.  A hand-operated controller allowing six degrees of
freedom of hand input force into a single handle for conversion
of the hand input force into electrical output signals, said
controller comprising;
     stationary base means including a first portion of said base
means and a horizontally positioned second portion of said base
means for supporting
     sliding-plate-linear-conversion means for moving within a
horizontal first linear degree of freedom and a horizontal second
linear degree of freedom of said six degrees of freedom and for
actuating
     linear sensor means for sensing positions of said sliding-

ANS0007499

25

plate-linear-conversion means within the horizontal first and
second linear degrees of freedom and for producing electrical
output signals related to sensed positions of said sliding-plate-
linear-conversion means;

said sliding-plate-linear-conversion means sandwiched
between said first portion of said base means and said
horizontally positioned second portion of said base means and
thereby restrained against upward and downward movement;

a shaft coupled to said sliding-plate-linear-conversion
means to move with said sliding-plate-linear-conversion means at
least in the horizontal first and second linear degrees of
freedom;

said shaft having

said single handle on an upper end of said shaft to allow
all of said six degrees of freedom of hand input force to be
applied to said controller through said single handle;

means for transferring horizontal linear hand input force
applied to said single handle directionally correspondingly to
the horizontal first and second linear degrees of freedom into
directionally corresponding horizontal linear force against said
shaft,   whereby with said shaft being coupled at least in the
horizontal first and second linear degrees of freedom to said
sliding-plate-linear-conversion means, the shaft can transfer
horizontal linear force applied to said single handle into said
sliding-plate-linear-conversion means so as to move said sliding-
plate-linear-conversion means in the horizontal first and second
linear degrees of freedom in a substantially identical direction
as the direction of the horizontal linear hand input force
applied to said single handle;

means for allowing said single handle to be rotatable in
three separate degrees of rotational freedom about a single point
defined by an intersection of three mutually perpendicular axes
within said single handle,    whereby three degrees of rotational
freedom of said six degrees of freedom are provided;

rotational force sensor means for sensing rotational force

ANS0007500

26

against said single handle in any of said three degrees of
rotational freedom, and for producing electrical output signals
related to sensed rotational force against said single handle,

means for allowing said single handle to be moved vertically
upward and downward in a third linear degree of freedom of said
six degrees of freedom by vertical hand input force against said
single handle,

up and down movement sensor means for sensing upward and
downward movement of said single handle in said third linear
degree of freedom and for producing electrical output signals
related to sensed upward and downward movement of said single
handle.

24. A controller in accordance with claim 16 further
including

spatial isolation means in association with said linear
sensor means, said rotational force sensor means and said up and
down movement sensor means.

25. A controller in accordance with claim 24 wherein said
linear sensor means is more narrowly defined as

an independent first sensor and an independent second sensor
each associated with the horizontal first linear degree of
freedom;

and further,

an independent third sensor and an independent fourth sensor
each associated with the horizontal second linear degree of
freedom;

the independent first through fourth sensors each being
separate and distinct from one another.

46. A controller in accordance with claim 25 wherein said
rotational force sensor means is more narrowly defined as

six independent sensors each separate and distinct from one
another, and each separate and distinct from said independent

ANS0007501

27

first through fourth sensors.

27. A controller in accordance with claim 4 wherein said
up and down movement sensor means is more narrowly defined as
two independent sensors each separate and distinct from one
another, separate and distinct from said six independent sensors,
and separate and distinct from said independent first through
fourth sensors.

28. A controller in accordance with claim 5 wherein said
independent first through fourth sensors, and said six
independent sensors and said two independent sensors all jointly
comprise twelve sensors each being separate and distinct from one
another;
    each separate and distinct sensor of said twelve sensors is
an electricity manipulating sensor each capable of manipulating
electricity independently of the other sensors of said twelve
sensors.

29. A controller in accordance with claim 6 wherein said
twelve sensors are each electrical contact switches.

30. A controller in accordance with claim 7 wherein each
switch of the twelve electrical contact switches is an open
switch closeable with force applied thereto.

31. A controller in accordance with claim 8 further
including tactile feedback means for providing vibration which
can be felt through said single handle.

32. A hand-operated controller allowing six degrees of
freedom of hand inputs for conversion of the hand inputs into
twelve orthogonal outputs each dependant upon hand inputs, with
the twelve orthogonal outputs each represented by an electrical
output signal each produced by one of twelve separate sensors

ANS0007502

28

attached to said controller, with each of said sensors associated
one said sensor per each orthogonal output of said twelve
orthogonal outputs,  said controller comprising;

a stationary base for supporting
sliding-plate-linear-conversion means movably sandwiched
between a first portion and a second portion of said base; said
sliding-plate-linear-conversion means movable in a first linear
degree of freedom and in a second linear degree of freedom of
said six degrees of freedom for actuating

a first four sensors of said twelve separate sensors;
said first four sensors mounted within said base;.
said first four sensors including a move-forward sensor
associated with

a first output of said twelve orthogonal outputs;
said first four sensors including a move-back sensor
associated with

a second output of said twelve orthogonal outputs;
said first four sensors including a move-right sensor
associated with

a third output of said twelve orthogonal outputs;
said first four sensors including a move-left sensor
associated with

a fourth output of said twelve orthogonal outputs;
said sliding-plate-linear-conversion means sandwiched
between said first portion and said second portion of said base
so that said sliding-plate-linear-conversion means is moveable
exclusively horizontally to and from actuation of each of the
sensors of said first four sensors;

a shaft; said shaft having a lower end and an upper end;
the lower end of said shaft coupled to said sliding-plate-
linear-conversion means so that said shaft is coupled with said
sliding-plate-linear-conversion means to move in the first and
second linear degrees of freedom so that linear horizontal
movements of said shaft can be translated into linear horizontal
movements of said sliding-plate-linear-conversion means to move

30

29

said sliding-plate-linear-conversion means to and from actuation of each of the sensors of said first four sensors;

a handle on said upper end of said shaft, said handle manipulable by human hand inputs for applying all of said six degrees of freedom of hand inputs into said controller;

means for allowing said handle to be rotatable in three degrees of rotational freedom about a single point defined by an intersection of three mutually perpendicular axes within said handle, whereby three degrees of rotational freedom of said six degrees of freedom are provided;

a second four sensors of said twelve separate sensors, said second four sensors mounted within said handle and associated with at least two rotational degrees of freedom of said three degrees of rotational freedom;

said second four sensors including a turn-up sensor associated with

a fifth output of said twelve orthogonal outputs;

said second four sensors including a turn-down sensor associated with

a sixth output of said twelve orthogonal outputs;

said second four sensors including a turn clockwise sensor associated with

a seventh output of said twelve orthogonal outputs;

said second four sensors including a turn counter-clockwise sensor associated with

an eighth output of said twelve orthogonal outputs;

said controller including a turn-right sensor associated with

a ninth output of said twelve orthogonal outputs; said ninth output associated with a third degree of rotational freedom separate from said two rotational degrees of freedom;

said controller including a turn-left sensor associated with

a tenth output of said twelve orthogonal outputs; said tenth output associated with said third degree of rotational freedom;

means for allowing said handle to be moved vertically up and

ANS0007504

30

down in a third linear degree of freedom separate from the first
and second linear degrees of freedom of said six degrees of
freedom;

said controller including a move down sensor and a move up
sensor each associated with said third linear degree of freedom
of said six degrees of freedom;

said move down sensor associated with

an eleventh output of said twelve orthogonal outputs;

said move up sensor associated with

a twelfth output of said twelve orthogonal outputs.

11. A controller in accordance with claim 10 wherein each
sensor of said twelve separate sensors is an electrical contact
switch with the contacts in an open position and being closeable
with force.

12. A controller in accordance with claim 11 further
including

spatial isolation means in association with each switch of
the twelve switches.

13. A controller in accordance with claim 12 further
including tactile feedback means for providing vibration which
can be felt through said handle.

14. A hand-operated controller allowing six bi-directional
degrees of freedom of hand input force into a single handle, said
controller comprising;

said single handle movably supported by

means for converting hand input force applied in any
direction to said single handle into movement of said single
handle in a direction substantially identical to the hand input
force direction and relative to

a stationary support base of said controller; whereby linear
hand input force against said single handle absent rotational

32

ANS0007505

31

force can move said single handle purely linearly, and rotational
hand input force against said single handle absent linear force
can move said single handle purely rotationally;

linear sensor means for sensing only linear movement of said
single handle and producing electrical output signals indicative
of linear hand input force direction against said single handle;

rotational sensor means for sensing only rotational movement
of said single handle and producing electrical output signals
indicative of rotational hand input force direction against said
single handle.

37. An improved hand operated controller of the type
allowing six degrees of bi-directional freedom of hand inputs for
conversion of the hand inputs into electrical outputs;

wherein the improvement comprises the use of a separate and
distinct sensor for each direction of each bi-directional degree
of freedom of said six degrees of freedom; whereby twelve
separate and distinct sensors are utilized for converting hand
inputs into said electrical outputs.

38. An improved six degree of freedom controller in
accordance with claim 37 wherein each sensor of the twelve
sensors is an electrical contact switch.

39. An improved six degree of freedom controller in
accordance with claim 38 further including tactile feedback means
for providing vibration to be felt by a hand operating said
controller.

40. A controller in accordance with claim 39 further
including
spatial isolation means in association with each switch of
the twelve switches.

32

Amendments to the specification:

On page 3 of the specification, under the heading "Objects and Advantages", line 24 following "Virtual "action".", please insert the following as sentences:

As will become appreciated with reading detailed descriptions explaining structures in accordance with the present invention and with an examination of the drawings, in order to ideally intuitively manipulate objects and/or navigate a viewpoint such as within a three-dimensional Virtual Reality display or like computer display using a hand-input full six degrees of freedom controller, it is desireable to use a hand input controller which allows all of the six degrees of freedom to all be input directly into the controller through a single handle.  Additionally, a truly intuitive 6-DOF controller having all inputs through the single handle is one which allows the hand inputs against the handle to move the controller handle and also preferably the object (or viewpoint) on the display only (exclusively or purely) in the direction of the hand input force against the handle.  For example, if the user viewing a selected object wishes to rotate the object clockwise, then the user would ideally need only apply clockwise rotational force to the handle, and ideally the handle and preferably the object would both only rotate clockwise, not moving linearly or about another axis in some direction not intended by the user which would be confusing to the user.  Such a relationship of the handle and preferably also the object of the display moving only in the direction of hand input force against the handle would ideally be true for all of the six degrees of freedom.  To be truly intuitive, i.e., not confusing to the user, the direction of the hand input force against the handle moves the handle and preferably also the object of the display only in the direction of the force applied to the handle, and to provide such a controller is an object of the present invention.  A truly intuitive full six degrees of freedom controller essentially, at least from one view point, allows a

33

direct link between the user's mind, hand, 6-DOF controller and object or viewpoint in the display.

On page 4, line 12 between "eliminates" and "error" please insert --potential--.

On page 4, line 15 between "signals" and the "." (period), please insert --which might otherwise be caused by the vibration of the tactile feedback falsely triggering sensors--.

On page 4, line 20 between "outputs" and the "."(period), please insert --or electrical output signals--

On page 4, line 21 between "orthogonal" and "outputs", please insert --mechanical--.

On page 4, line 21 after "outputs,", please insert --wherein twelve sensors are preferably used, one sensor per each of the twelve orthogonal mechanical outputs,--.

On page 4, line 22 after "components.", please insert the sentences --The twelve orthogonal mechanical outputs equal a first, a second, a third, a fourth on up through a twelfth mechanical output, with these representing and corresponding to the twelve orthogonal movements of true and full six degrees of freedom bidirectionally of three mutually perpendicular axes. The advantages of mechanically translating full 6-DOF into twelve orthogonal mechanical outputs of the controller are numerous, and include ease in applying a separate sensor to each of the twelve outputs, and applying spatial sensor isolation means to each of the twelve sensors, which in turn provides forgiveness for human hand inaccuracies and further allows ease in effective use of substantial vibration as tactile feedback without falsely triggering sensors. Another advantage of mechanically

ANS0007508

34

translating full 6-DOF into twelve orthogonal mechanical outputs
is that it allows for a much wider range of sensor types to be
utilized, including very inexpensive open/close contact switches
or many other types of more sophisticated sensors.--

On page 6, line 4 between "movement" and the "." (period), please
insert --of the handle relative to a stationary base or support
base--.

On page 6, line 16 following "three dimensions.", please insert
the following sentences: --As those skilled in the art
understand, true full six degrees of freedom inherently includes
three linear degrees of freedom and three rotational degrees of
freedom, with these being simplistically described as two
horizontal linear degrees of freedom perpendicular to one
another, and a third linear degree of freedom being a vertical
linear degree of freedom wherein the horizontal first and second
linear degrees of freedom are mutually perpendicular to the third
linear degree of freedom, and with the first, second and third
linear degrees of freedom being describable in terms of three
axes all mutually perpendicular to one another and intersecting
one another at a point.  The three rotational degrees of freedom
inherent to true full 6-DOF are rotations about or within these
three mutually perpendicular axes.  Also inherent to true full 6-
DOF is the ability to move along linearly (translationally) and
about (rotationally) these three mutually perpendicular axes
bidirectionally and orthogonally.  In the above simplistic
description using the terms "horizontal" and "vertical" axes of
the 6-DOF, the horizontal and vertical hypothetical positioning
would be most commonly used and assumed here on Earth when
manipulating an object or viewpoint of a display, however these
three mutually perpendicular axes may of course be tilted from
horizontal and vertical as would be the case in outer space.--

On page 6, line 25, between "embodiment" and the ".", please

ANS0007509

35

insert --and showing one single handle above the base--.

On page 10, line 18 between "sensor" and "is", please insert
--, being a separate and distinct sensor,--.  The amended
sentence should read:  "Each sensor, being a separate and
distinct sensor, is distinctly associated with.....".

On page 10, line 19 between "orthogonal" and "output", please
insert --mechanical--.

On page 11, line 3, after "sensor 184.", please insert the
sentences --The move forward, move back, move right, and move
left sensors may singularly or jointly be referred to as linear
sensors, linear force sensors, linear sensing means, linear force
sensing means, or linear position sensors or linear position
sensor means, as these first four sensors are used to sense the
positions, and with some types of useful sensors, the force
against also, of sliding-plate-linear-conversion means as it
moves in a horizontal first linear degree of freedom, and in a
horizontal second linear degree of freedom of the six degrees of
freedom.  Sliding-plate-linear-conversion means moves exclusively
horizontally as determined by it being sandwiched between first
and second portions of the base assembly 214 as will become more
appreciated with continued reading.--

On page 11, line 5 after "shelf 216", please insert
--, preventing downward movement,--.

On page 11, line 8 following "actuator 352.", please insert
--The top 215e and retaining shelf 216 of base assembly 214 may
be called or referred to as first and second portions
respectively, and in figure 2 it can be seen that top 215e is
parallel to horizontal retaining shelf 216 and is thus horizontal
also.  Thus it can be ascertained from the drawings and the
additional descriptions that sliding-plate-linear-conversion

ANS0007510

36

means is sandwiched horizontally and that plates 350 and 352
exclusively slide or move horizontally within the first and
second horizontal linear degrees of freedom to actuate the first
four linear sensors 178, 180, 182 and 184.--

On page 11, line 24, between "Shaft 102" and "extends", please
insert --, or at least a lower end thereof,--.

On page 11, line 27 (last line), between "224," and "a move up
sensor", please insert --two independent sensors 186, 188,--

On page 12, line 2, after "sensor 188.", please insert --From
drawing figures 1 and 2, and from this disclosure as a whole, it
can be appreciated that shaft 102 is coupled to sliding-plate-
linear-conversion means or the sliding actuator plates assembly
348 to move with sliding-plate-linear-conversion means at least
in the horizontal first and second linear degrees of freedom.  It
can also be ascertained from the drawings and from these writings
that shaft 102 is not operably tiltable, or in other words is not
significantly or substantially tiltable since such tilting in
this particular embodiment is not needed to actuate any of the
twelve sensors, and would lead to a far less intuitive six degree
of freedom controller as will become more appreciated with
continued reading.  In Fig. 2, shaft 102 is shown non-tiltably
supported by an engagement of significant length with lower shaft
guide 224 and with lesser sliding plate actuator 352 of sliding-
plate-linear-conversion means for example, and both of these
engagements allow vertical sliding of shaft 102 in this example,
and thus some clearance between the parts is required for the
sliding, and the clearance theoretically might allow an
insignificant amount of tilting of shaft 102, being undetectable
by the eye and hand, but such clearance should be maintained very
small to eliminate any detectable or operable tilting of shaft
102 for all practical purposes.  In other words, significant
tilting of shaft 102 in this embodiment is highly undesirable.--

ANS0007511

37

On page 13, line 13, between "four" and "sensors", insert
--rotational or rotational force--.

On page 13, line 14 following "actuator 354.", insert --In this
embodiment it can be appreciated from the previous descriptions
and the drawings that six independent rotational force or
movement sensors are used to sense rotations or rotational force
within the three, i.e. first, second and third rotational degrees
of freedom of movement or force against the single handle 100,
the single handle 100 being shown in drawing figures 1 and 2.  It
can also be appreciated six independent linear force or linear
position sensors are used to sense linear movement or force of or
against the single handle 100, i.e., first and second linear
sensors for the first horizontal linear degree of freedom which
the handle 100 and sliding-plate-linear-conversions means moves
within; a third and fourth linear sensor for the second
horizontal linear degree of freedom which the handle 100 and
sliding-plate-linear-conversions means moves within, and a fifth
and sixth sensor for the vertical or third linear degree of
freedom along which handle 100 can move relative to base assembly
214.--

On page 14, line 8 between "along" and "the", please insert --or
about--.

On page 14, line 17 between "directly" and "to", please insert --
and correspondingly--.

On page 14, line 23 between "184." and "If", please insert --It
is clear in the drawing figures 1 and 2, and from the above
descriptions that shaft 102 is coupled to move with sliding-
plate-linear-conversion means at least in the first and second
horizontal linear degrees of freedom, and thus hand input force
applied linearly against handle 100 corresponding to the first

ANS0007512

38

and second horizontal linear degree of freedom is transferred
into shaft 102 and into said sliding-plate-linear-conversion
means to move sliding-plate-linear-conversion means in the
direction of the force applied by hand to handle 100.--

On page 16, line 4, change "gooves" to --grooves--.

On page 20, line 15, change "form" to --from--.

On page 21, line 11, between "sensor" and "was", insert --which
is a normally open snap switch closeable with force applied
thereto as indicated in the drawings,--.

REMARKS

In the above amendments to the claims and specification, no

ANS0007513

39

new material has been added. No information has been added which
was not in or very strongly and clearly implied in the writing or
clearly shown in the drawings in the originally filed disclosure.
No new physical properties, new uses, etc., have been added, thus
no new matter has been added.

With the cancellation of claims 12-22, and the careful
writing of the new claims 23-40, and with the amendments to the
specification, the objection to the specification and claims
under 35 U.S.C. 112 first paragraph is respectfully solicited to
be withdrawn.

The new claims 23-40 are directed toward the embodiments
essentially of drawing Figs. 1-8, 10 and 11; mostly toward the
embodiment of Figs. 1-5, and not toward the inferior embodiment
shown in Fig. 9.

The rejection of claims under 35 U.S.C. 102 over
Dzholdasbekov is respectfully requested to be withdrawn and not
applied or re-applied in view of the new claims 23-40, because
Dzholdasbekov does not describe the invention per 35 U.S.C. 102
as currently claimed in any of the claims 23-40, and for the
following specific reasons:  There is no "point" within the
Dzholdasbekov handle wherein three mutually perpendicular axes
intersect one another, with sensors being applied to detect
handle movement about each of these three axes as recited in
independent claims 23, 32 and the claims which depend thereon
whether directly or indirectly.  The Examiner's comments
pertaining to Dzholdasbekov and the theoretical point on page 15
part (d) of the Office Action has been considered, however is it
clear from the Dzholdasbekov disclosure that there is no "point",
real or theoretical, in the Dzholdasbekov handle wherein the
three rotational axes which are monitored with pick-ups intersect
one another mutually perpendicular to one another.  The
Dzholdasbekov shaft supporting the handle clearly is structured

ANS0007514

40

to orbit about axis 23. Additionally, the thumbwheel 25 of
Dzholdasbekov constitutes a second component other than a "single
handle" as recited in the present claim 36 which must be
manipulated to achieve three rotational degrees of freedom. With
the Dzholdasbekov device, it is clear that the handle 2 is not
resolvable in three "picked-up" or detected or sensed degrees of
rotational freedom about a single point defined by three mutually
perpendicular axes which intersect one another within the handle
2. Thus, the Dzholdasbekov disclosure does not describe the
present claimed invention of claims 23-32, and thus the claims
should not be rejected under 35 102 (b) over Dzholdasbekov based
on the handle rotational aspects (in the least) as discussed
above.

Additionally, the Dzholdasbekov device, as may best be
understood from drawing figure 3 in conjunction with the writing
of Dzholdasbekov, has an inherent design flaw due to the
eccentric attachment of the shaft which supports and connects
handle 2 to the rotary module 4. The shaft is shown cross
sectioned in Fig. 3. It can be ascertained that if a
translational move was desired straight toward the top of the
drawing page, one would push on handle 2 and thus the shaft
toward the top of the page. But in doing so, if the rotary
module 4 rotated easily enough, before any translational motion
or force could be applied to one of the lower translational
module, the handle and shaft would "swing" toward the top of the
page, rotating module 4 about axis 23, and the unintended
rotation would be picked-up by rotary pick-up 24 and thus
unwanted output signals would be sent to the "manipulator".
Conversely and still with reference to the Dzholdasbekov Fig. 3,
if one wanted to input counter-clockwise rotation within axis 23
to be picked-up through module 4 by pick-24, and the module 4 did
not rotate easily, as in the first scenario, then if handle 2 and
the supporting shaft were pushed to the forward and counter-
clockwise direction, then since module 4 in this case does not
rotate freely, then translational motion will be input, and

ANS0007515

41

undesirably so, into the top translational module 5 which will be
detected by the linear pick-up and sent to the "manipulator".
Either way, with the Dzholdasbekov module 4 rotating easily or
not so easily, the off-center placement of the support shaft for
the handle on the rotary module 4 renders the controller
inherently inaccurate and subject to either sending unwanted
signal to the "manipulator" or to requiring two hands to operate,
i.e., one hand on the handle 2, and the other hand grasping
translational modules or rotary module 4 to prevent the unwanted
movement and signals which would otherwise be caused during
certain manipulations of the controller handle. The
Dzholdasbekov handle 2 does not rotate in axis 23, it orbits or
"swings" about the axis 23, and this is an entirely different
arrangement than the present claimed design.

The use of a separate handle or thumbwheel 25 in
Dzholdasbekov for one of the degrees of rotational freedom is an
entirely different structural arrangement than that of the
present claimed invention. Thus, the Dzholdasbekov device is
significantly structurally different than the claimed invention,
thereby rendering a 35 U.S.C. 102 rejection of the present claims
in view of Dzholdasbekov inappropriate. Likewise, Dzholdasbekov
does not anticipate structuring a single handle to be resolvable
about three mutually perpendicular axes intersecting one another
within the handle, said three mutually perpendicular axes being
the three "sensed" or detected axes, thus Dzholdasbekov does not
anticipate the structure of the present claims, and thus a 35
U.S.C. 103 obvious rejection of the present claims in view of
Dzholdasbekov alone would be inappropriate. Dzholdasbekov does
not provide a "single handle" through which all of six bi-
directional degrees of hand input are applied to the 6-DOF
controller, and for this reason, in the least, the claims should
not be rejection over Dzholdasbekov under 35 U.S.C. 102 or 103.

Claims 26-30, 32-35, 37-40 are patentable over Dzholdasbekov
because Dzholdasbekov neither uses or anticipates the use of 12

ANS0007516

42

separate and distinct sensors as claimed. Dzholdasbekov does not
suggest the many benefits to be gained by the use of 12 separate
and distinct sensors in a 6-DOF controller. The very narrow
claims of 30-31, 33-35, 38-40 all describe structuring not shown
or anticipated by Dzholdasbekov or any other prior art reference
for that matter, and thus these claims should be found allowable.
It should be noted Dzholdasbekov does not use or anticipate a
single 6-DOF handle, twelve orthogonal mechanical outputs, twelve
separate sensors, tactile feedback means, and spatial isolation
means in a 6-DOF controller.

It should be noted that the Dzholdasbekov disclosure clearly
teaches that "this is the way to build a 6-DOF controller", not
indicating to those skilled in the art that the Dzholdasbekov
structuring for achieving the three degrees of rotational freedom
has significant shortcomings as described above, and thus
Dzholdasbekov provides no reason or incentive for those skilled
in the art to change the handle rotational arrangement along the
lines as is presently claimed. This teaching away in
Dzholdasbekov from using a single handle rotatable about a single
point within the handle defined by the intersection of three
mutually perpendicular axes, and sensing the rotations of the
single handle about the three axes is a significant teaching away
from the present claimed structural combination of claims 23 and
32, and teaches away from suggesting that a handle such as in
King or Menahem should be applied to the sliding plate structure
of Dzholdasbekov or Frank et al for that matter. Thus a
combination of the teachings of Dzholdasbekov in view of King,
Frank et al and Menahem would not render claims 23 and 32 obvious
under 35 U.S.C. 103.

Claims 23-35 are patentable over King because King does not
utilize or anticipate anything similar to the sliding-plate-
linear-conversion means of the present claims, (in the least).
There is simply no support for the Examiner's contention that

ANS0007517

43

King includes something similar to a sliding-plate-linear-
conversion means, and thus claims 23-35 should not be rejected
under 35 U.S.C. 102 in view of King, because King clearly does
not describe the claimed structural combination per 35 U.S.C 102.
Something similar to Applicant's sliding-plate-linear-conversion
means is shown in the Frank et al patent and in the Dzholdasbekov
disclosure, but is clearly not used or anticipated by King, and
so claims 23-35 are not described in King or rendered obvious by
King alone because King does not use or anticipate sliding-plate-
linear-conversion means, in the least, and does not anticipate
the claimed structural combination and the benefits to be gained
thereby.  The Examiner's comments directed toward trying to show
that King includes something similar to sliding-plate-linear-
conversion means has been noted, but pivotally connected and
restrained, and rotatably moving members, clearly moving in
arcing rotations by no means constitutes "sliding-plate-linear-
conversion means" which is limited to only linear movement and
that linear movement is only within a horizontal plane with no
vertical movement allowed.  In contrast, the King member -48-
cannot move or slide horizontally, as it is secured at stationary
block -46- with pivot point -110- so that member -48- cannot move
or slide horizontally, but can only move vertically pivoting
about pivot point -110- in an arch or radius.  This structuring
in King is entirely different and completely unrelated to
Applicant's "sliding-plate-linear-conversion means".

    It should be noted at this time that King, like
Dzholdasbekov, Frank et al, Kley, Menahem and IBM, and/or any of
the other prior art of record for that matter, does not use or
anticipate 12 sensors to sense the 12 orthogonal movements of bi-
directional six degrees of freedom; does not anticipate and
cannot use (by its structuring) tactile feedback vibration means,
and spatial isolation means on 12 sensors with tactile feedback
means in a 6-DOF controller.

ANS0007518

44

Claims 23-36 are patentable over King alone because, from
another view point, horizontal linear input force against the
King spherical handle causes King's handle to move in an arc, as
is discussed repeatedly and in detail in the King disclosure, no
matter how perfectly straight and horizontal the input force
against the handle.  This causes the King device to be confusing
and non-intuitive as the handle arcs (orbital rotation) with pure
linear horizontal input against the handle.  This arcing in the
King handle is due to the lack of anything similar to "sliding-
plate-linear-conversion means".  King does not suggest any
structure or structural combination to solve this problem in the
King controller, as King clearly states to those skilled in the
art that there is no problem with this arching of the handle, and
thereby not giving any reason for those skilled in the art to
modify the King device along the lines of that which is presently
claimed in claims 23 and 32.  Please see King column 4 lines 1-
17, and 55-62, and column 5 lines 32-34, and figure 1, 2 and 4.
King states clearly that the arcing of the King handle is not a
problem, and thus needs, by strong implication in the very least,
no changes to solve this problem, and thus King teaches away from
suggesting to those skilled in the art that sliding-plate-linear-
conversion means such as is shown in Dzholdasbekov and also in
Frank et al should be applied to a shaft supported handle
rotatable about a single point in three rotational degrees of
freedom in a 6-DOF controller.  This clear teaching away from
that of claims 23 and 32 in King renders a rejection of these
claims under 35 U.S.C. 103 over King alone, or King in view of
Dzholdasbekov, and further in view Frank et al and Menahem
inappropriate.

Menahem describes a handle which rotations about a center
point in three degrees of rotation, but does not teach or suggest
a 6-DOF controller having sliding-plate-linear-conversion means.

45

Frank et al (henceforth Frank) describes sliding-plate-
linear-conversion means absent a rotating handle.

Claims 37-40 is patentable over King because King does not
use or anticipate the use and benefits of 12 independent sensors
as presently claimed.  King does not suggest the many benefits to
be gained by the use of 12 separate and distinct sensors as
claimed.  Thus King does not describe the claimed structure of
these claims per 35 U.S.C 102, and King does not anticipate the
structuring and the benefits per 35 U.S.C 103, thus these claims
are allowable over King alone, and are also allowable over any
and all combinations of references of the prior art of record.

Dzholdasbekov alone is structured significantly different
than that which is claimed in all of the claims 23-40, and thus a
35 U.S.C. 102 rejection of any of these claims over Dzholdasbekov
alone would be inappropriate.
Dzholdasbekov alone is structured significantly different than
that which is claimed in all of the claims 23-40, and
Dzholdasbekov alone does not anticipate or suggest that which is
claimed in claims 23-40, and thus a 35 U.S.C. 103 rejection of
any of these claims over Dzholdasbekov alone would be
inappropriate.  If the Examiner sees a suggestion in
Dzholdasbekov suggesting the structural combination of any of the
present claims, would the Examiner please indicate precisely
which lines in Dzholdasbekov suggests the present claimed
structures.

King alone is structured significantly different than that
which is claimed in all of the claims 23-40, and thus a 35 U.S.C.
102 rejection of any of these claims over King alone would be
inappropriate.
King alone is structured significantly different than that which
is claimed in all of the claims 23-40, and King alone does not
anticipate or suggest that which is claimed in claims 23-40, and

ANS0007520

46

thus a 35 U.S.C. 103 rejection of any of these claims over King
alone would be inappropriate. If the Examiner sees a suggestion
in King suggesting the structural combination of any of the
present claims, would the Examiner please indicate precisely
which lines in King suggests the present claimed structures.

There is no suggestion in the combination of King and
Dzholdasbekov that a 6-DOF controller would be improved by
utilizing sliding-plate-linear-conversion means supporting a
shaft-supported single handle, the single handle being rotatable
about a single point within said handle, the point being defined
by the intersection of three mutually perpendicular axes, and
rotation of the single handle about these three axes being sensed
by sensors. Further, there is no suggestion in the combination
of King and Dzholdasbekov that a 6-DOF controller would be
improved by utilizing a separate and distinct sensor for each
direction of each of the bi-directional 6 degrees of freedom, and
that further improvements could be made by applying tactile
feedback means to such 6-DOF controller, and that even further
improvements and advantages could be made to such a 6-DOF
controller by the application of spatial isolation means all in
combination as is called for in some of the present narrower
dependant claims. The addition of IBM to the combination of King
and Dzholdasbekov still does not suggest this very advantageous
combination as recited in many of the narrower present dependant
claims. This use of 12 separate and distinct sensors in a 6-DOF
controller provides many benefits, and opens the door so to speak
to the application of several other substantially advantageous
and non-anticipated novel means in such a 6-DOF controller.

There is no suggestion in the combination of King and
Dzholdasbekov that a 6-DOF controller would be improved by
utilizing sliding-plate-linear-conversion means supporting a
shaft-supported handle, the handle being rotatable about a single
point within said handle, the point being defined by the

ANS0007521

47

intersection of three mutually perpendicular axes; and further,
that this 6-DOF controller would be improved by utilizing a
separate and distinct sensor for each direction of each of the
bi-directional 6 degrees of freedom, and even further as in the
present claims 30, 33, that such a 6-DOF controller would be even
further improved by the application of tactile feedback means,
and even further as in the claims 31, 35 with spatial isolation
means applied in association with each of the sensors.
In other words, there is no way that King alone, Dzholdasbekov
alone, or King in view of Dzholdasbekov describes or suggests the
invention of claims 23-40, and particularly many of the present
narrow dependant claims such as 25-31, 33-35, and 38-40, as the
benefits provided by the structuring of the present claims as
detailed in the present specification.

      The inventive structural combination recited in claim 23, is
essentially the combination of sliding-plate-linear-conversion
means within a stationary base, supporting a shaft-supported
single handle, the single handle being rotatable in three degrees
of rotational freedom about a single point within said handle,
the point being defined by the intersection of three mutually
perpendicular axes; with three linear degrees of freedom also
being provided, wherein all of the six degrees of freedom input
may be applied into the controller through said single handle.
This novel structure provides MAJOR significant useful
improvements and benefits in a 6-DOF controller.  To combine
these features as in claim 23 to obtain the clear and numerous
benefits of such a combination in a 6-DOF controller is not
suggested by King alone, Dzholdasbekov alone, by a combination of
King in view of Dzholdasbekov, or by any reasonable combination
of the related prior art of record.

An advantage of the structural combination of features of claim
23 is the inclusion of mechanically translating full 6-DOF into
twelve orthogonal mechanical outputs of the controller which

ANS0007522

48

leads to the further advantage of ease in applying a separate
sensor to each of the twelve outputs; the advantage of ease in
applying spatial sensor isolation means to each of the sensors,
which in turn provides the advantage of forgiveness for human
hand inaccuracies in all 6 degrees for freedom and which also
further allows the advantage of being able to use substantial
vibration as tactile feedback without falsely triggering sensors.
Another advantage of mechanically translating full 6-DOF into
twelve orthogonal mechanical outputs as in claim 23 is that it
allows for a much wider range of sensor types to be utilized,
including very inexpensive open/close contact switches or many
other types of more sophisticated sensors.

The invention of claim 23 achieves <u>far more than a combination
which any or all of the prior art references suggest, expressly
or by any reasonable implication.</u>

   The Examiner's attention is respectfully called to the
decision of In re Sernaker of the Court of Appeals for the
Federal Circuit, at 217 USPQ 1, 5, 6 (Fed. Cir. 1983):
                We may assume, for purposes of this
            decision, that all the prior art references in
            this case are sufficiently related to one
            another and to a related and common art, that
            the hypothetical person skilled in the art
            must be presumed to be familiar with all of
            them.  That being so, the next questions are
            (a) whether a combination of the teachings of
            all or any of the references would have
            suggested (expressly or by implication) the
            possibility of achieving further improvements
            by combining such teachings along the line of
            the invention in suit, and (b) whether the
            claimed invention achieved more than a
            combination which any or all of the prior art

49

references suggested, expressly or by
reasonable implication.


If the Examiner believes that such a structure as
recited in claim 23 is suggested, or the benefits thereof
are suggested within any of the prior art alone or in
combination, would the Examiner please quote the lines
which would suggest or lead one skilled in the art to want
to make such a combination in order to achieve such
benefits list above.


The Court of Appeals for the Federal Circuit has
reiterated the proscription of the Patent and Trademark
Office aggregating references in the absence of a teaching
or suggestion supporting the combination.  The Court of
Appeals for the Federal Circuit has specifically required
that teachings of references are properly combined only if
there is some suggestion or incentive in the prior art to
do so.  Thus, as brought out more specifically in ACS
Hospital Systems v. Montefiore Hospital, 221 USPQ 929,933:

> Obviousness cannot be established by
> combining the teachings of the prior art to
> produce the claimed invention, absent some
> teaching or suggestion supporting the
> combination.  Under Section 103, teachings of
> references can be combined only if there is
> some suggestion or incentive to do so.  The
> prior art of record fails to provide any such
> suggestion or incentive.  Accordingly, we hold
> that the court below erred as a matter of law
> in concluding that the claimed invention would
> have been obvious to one of ordinary skill in
> the art under section 103.

ANS0007524

Again, if the Examiner believes that such a structure as recited in claim 23 is suggested, or the benefits thereof are suggested within any of the prior art alone or in combination, would the Examiner please quote the lines which would suggest or lead one skilled in the art to want to make such a combination in order to achieve such benefits list above.

The inventive structure of claim 23 is not suggested in a combination of King in view of Dzholdabekov, and further in view of Menahem, Frank et al and Kley.

If the Examiner believes that such a structure as recited in claim 23 is suggested, or the benefits thereof are suggested within the combination of King in view of Dzholdabekov, and further in view of Menahem, Frank et al, Kley, and Colston, would the Examiner please direct Applicant to the particular lines within these disclosures which would direct one skilled in the art to want to make such a combination, and further wherein the suggestion is in such detail that one skilled in the art would not have to utilize inventive skill to structurally combine the structural features as claimed in the present claim 23.

Again, Applicant does not believe that the mere existence of features located scattered throughout the prior art references constitutes, by the mere existence of such scattered features, any suggestion to make combinations of the features. Applicant believes there must exist within the prior art references, and relatively clearly so, suggestions of significant benefits to be gained by making a combination of such features. The benefits gained by the combination of features in claim 23 are not within the references of the combination of King in view of Dzholdabekov, and further in view of Menahem, Frank et al, Kley, and Colston to support a 35 U.S.C. 103 obviousness rejection, and thus allowance of claim 23 and the claims dependant thereupon is solicited.


The combination of features of claim 32, and thus the claims 33-35 dependant thereon, is not described by any single prior art reference of record, and is not suggested by any reasonable combination of prior art references of record, and thus allowance of claims 32-35 is solicited, as claim 32 provides an almost equal number of unanticipated advantages as described above for claim 23.

The combination of features of claim 36 is not described by any single prior art reference of record, and is not suggested by any reasonable combination of prior art references of record, and thus allowance of claim 36 is solicited.

The combination of features of claim 37, and thus the claims 38-40 dependant thereon, is not described by any single prior art reference of record, and is not suggested by any reasonable combination of prior art references of record, and thus allowance of claims 37-40 is solicited.

From the above, it should now be clearly appreciated that the combination of King in view of Dzholdasbekov, and further in view of Menahem, and Frank et al, or Dzholdasbekov in view of King, and further in view of Menahem and Frank et al, does not suggest to those skilled in the art that which is presently claimed in claims 23 and 32(in the least), as the combination of the teachings of these two primary references is <u>away</u> from the structural combination as claimed in claims 23, 32, <u>not</u> toward such a structural combination.

Additionally, the Examiner is respectfully requested to view and examine the narrower dependant claims as if they are independent claims. Although Applicant strongly believes that each of the independent claims 23, 32, 36, 37 recites clearly novel structural combinations thus escaping any possible 35 U.S.C

)                                    )

52

102 and 103 rejection based on the prior art of record, the
narrower dependant claims when treated properly by the Examiner,
may be when appropriate, objected to but otherwise allowable
should the independent claim on which any of the dependant claims
depend, whether directly or indirectly be rejected.  Such
treatment of dependant claims is believed to be the normal
practice at the PTO, and there has in past been no clear
indication of the Examiner treating Applicant's dependant claims
as such, and thus again, the Examiner is requested to treat the
dependant claims properly, as some of them, such as claims 26-30,
33-35, 39-40 for example, are quite narrow and specific, and are
very clearly not suggested or anticipate by any reasonable
combination of the prior art of record.

        The Examiner has in the past clearly been picking and
choosing from a number of prior art references in an effort to
aggregate different elements in an attempt to simulate
Applicant's claimed structure.  It is improper to do such picking
and choosing unless there is some suggestion within the
references themselves that they be so aggregated.  The Court of
Appeals for the Federal Circuit and the Patent Office's own Board
of Appeals have clearly indicated that such an aggregation of
references is improper.
        The Examiner's attention is respectfully called to the
decision of In re Sernaker of the Court of Appeals for the
Federal Circuit, at 217 USPQ 1, 5, 6 (Fed. Cir. 1983):

            We may assume, for purposes of this
            decision, that all the prior art references in
            this case are sufficiently related to one
            another and to a related and common art, that
            the hypothetical person skilled in the art
            must be presumed to be familiar with all of
            them.  That being so, the next questions are
            (a) whether a combination of the teachings of
            all or any of the references would have

ANS0007527

53

suggested (expressly or by implication) the
possibility of achieving further improvements
by combining such teachings along the line of
the invention in suit, and (b) whether the
claimed invention achieved more than a
combination which any or all of the prior art
references suggested, expressly or by
reasonable implication.

* * *

Certainly the board pointed to no prior
art that separately suggested expressly or by
implication a three-element combination made
up in this way.

...... Without some express or implied
suggestion, we cannot assume that one of
ordinary skill in the art would have found it
obvious to mate the transfer print with this
pattern...The lesson of this case appears to
be that prior art references in combination do
not make an invention obvious unless something
in the prior art references would suggest the
advantages to be derived from combining their
teachings.

Applicant's claimed invention of claims 23-40 clearly
achieves far more than a combination which any or all of the
prior art references suggest, expressly or by reasonable
implication.  Again, claims 23-40 clearly achieve far more than a
combination which any or all of the prior art references suggest,
expressly or by reasonable implication.  For but one example,
Applicant's structural combination clearly achieves "more than a
combination which any or all of the prior art references
suggested", as recited in claim 36 which provides novel
structuring in a 6 degree of freedom controller affording the
potential of pure and full separation of control along and about

ANS0007528

54

any of the three mutually perpendicular axes, wherein "pure
rotation" may be achieved absent any linear movement, and "pure
linear movement" may be achieved absent any rotation.

The Court of Appeals for the Federal Circuit has reiterated
the proscription of the Patent and Trademark Office aggregating
references in the absence of a teaching or suggestion supporting
the combination.  The Court of Appeals for the Federal Circuit
has specifically required that teachings of references are
properly combined only if there is some suggestion or incentive
in the prior art to do so.  Thus, as brought out more
specifically in ACS Hospital Systems v. Montefiore Hospital, 221
USPQ 929,933:

> Obviousness cannot be established by
> combining the teachings of the prior art to
> produce the claimed invention, absent some
> teaching or suggestion supporting the
> combination.  Under Section 103, teachings of
> references can be combined only if there is
> some suggestion or incentive to do so.  The
> prior art of record fails to provide any such
> suggestion or incentive.  Accordingly, we hold
> that the court below erred as a matter of law
> in concluding that the claimed invention would
> have been obvious to one of ordinary skill in
> the art under section 103.

The Court of Appeals for the Federal Circuit considered the
question of aggregation of references in connection with a court
appeal in Panduit Corporation v. Dennison Manufacturing Co., 227
U.S.P.Q. 337, and reiterated the requirement that the prior art
must provide either a teaching or a suggestion of the claimed
invention in order to provide a proper basis for rejection of
claims under 35 U.S.C. 103 by the Patent Office.

> "In the present case, for example, there

ANS0007529

55

is no way that one skilled in the art in 1961
and 1968 (necessarily unaided by knowledge of
the patents in suit and Caveney's testimony)
would find in the prior art either a teaching
or a suggestion of the claimed inventions."

There is no "teaching or suggestion of the claimed
inventions" in the prior art of King, Dzholdasbekov, Frank, Kley
and IBM or any reasonable combination of any of the prior art of
record.

The Court of Appeals for the Federal Circuit, in the Panduit
Corp. case, has specifically required that, in resolving the
question of nonobviousness, the Examiner must consider each and
all of the references in their entirety, including if the
references teach away from the claimed invention in determining
whether there is any suggestion therein of the combination
claimed.

" Three fundamental errors resulted from
a disregard of the decisional parameters
governing the proper evaluation of prior art.
The first, as above indicated, was the picking
and choosing of 'teeth,' 'ledges,' 'hinges,'
either absent from the prior art references or
there disclosed in entirely distinct form,
characteristics, and relationships. It must
be remembered that the Examiner is required to
consider references in their entireties, i.e.,
including those portions that would argue
against obviousness.

The Examiner has clearly neglected to consider the portions
of the references which argue against obviousness and teach away
from the present invention. In the prior art, particularly the
primary references of King and Dzholdasbekov, the Examiner must
consider each of the references in their entirety, including if

ANS0007530

56

the references teach away from the claimed invention in
determining whether there is any suggestion therein of the
combination claimed.  Clearly both King and Dzholdasbekov alone
and combined teach away from Applicant's invention rather than
suggesting Applicant's inventive combined structure, and by
failing to acknowledge such of King's teachings against the
combination, the Examiner is failing to follow the clear mandates
of the Court of Appeals for the Federal Circuit.

The Patent Office policy is clearly to follow these
mandates.  Thus, in the decision of the Patent and Trademark
Office Board of Patent Appeals and Interferences, Ex parte Clapp,
227 USPQ 972, that Honorable Board specifically followed the
mandate by requiring that either the references must expressly or
impliedly suggest the claimed combination, or the Examiner must
present a convincing line of reasoning as to why an artisan
(routineer) would have found the claimed combination to have been
obvious in light of the teachings of the references.  In the
present case, the Examiner repeatedly states that features shown
in the reference suggest particular intricate combinations along
the lines of Applicant's invention, and applicant simply does not
see such suggestion in these references.

The Patent Office Board of Appeals more particularly
concurred with the Court of Appeals for the Federal Circuit that
it is improper for an Examiner to selectively pick and choose
elements or concepts from various references to arrive at a
claimed invention by using hindsight gained from his knowledge of
Applicant's claims as a guide.  Thus, where, as in the present
case, the Examiner cites references respectively showing
different elements but barren of any teaching or suggestion in
the references that they be combined in the manner of the claims,
such aggregation of references does not properly support a
rejection of the claims.

The Board of Appeals further specifically negated the use of
simplicity and hindsight as criteria for resolving the issue of
obviousness under Sec. 103.  It is respectfully submitted that,

ANS0007531

57

in the present case, the Examiner is going directly contrary to
the Board's clear edict in this regard and is aggregating
references without any basis for such aggregation found or
suggested therein, and utilizing hindsight gained from his
knowledge of applicant's invention as the sole basis for such
aggregation, and, thus it is respectfully submitted that the
claims are clearly allowable over the most stringent requirements
of 35 USC 103.

It is respectfully requested that all claims 23-40 be held
allowable over the prior art of record.

SECONDARY CONSIDERATIONS

The Examiner is requested to consider the following as it is
believed very relevant because of the number of high dollar
offers to acquire rights to Applicant's invention, particularly
that which is claimed in claims 23, 32, 36 and 37.  The offers
exceed one million U.S. dollars and are from very large and well
known companies that have employees who are without question
skilled in this art.  Applicant's invention is perceived as being
very novel, advancing the art significantly, and of substantial
commercial value by those skilled in the art as will be herein
shown.

Since the inception of Court of Appeals for the Federal
Circuit in 1982, the court has clearly increased the evidentiary
importance of secondary considerations of nonobviousness.
Clearly commercial success, long felt need, failure of others,
etc., must be taken into account when the question of obviousness
versus nonobviouousness exists.  The CAFC has completely
abandoned the much earlier Supreme Court's view that such
evidence is useful merely to tip the balance in close cases; in
many Federal Circuit cases, secondary considerations are more
determinative of nonobviouousness than is prior art.

The Examiner's attention is directed to the Federal Circuit

ANS0007532

58

case of Alco Standard Corp. v. Tennessee, 808 F.2d 1490 (Fed.
Cir. 1986), cert. dismissed, 483 U.S. 1052 (1987), where the
patent at issue was for an apparatus and method of testing
turbine rotors in electrical generators for flaws or cracks.  The
district court had held the patent nonobvious, supporting its
prior art examination with evidence of commercial success, long-
felt need, and failure of others.  The Federal Circuit admitted
that the prior art indicated that the patent was obvious,
nonetheless, it affirmed the holding of validity, reasoning that
the strong evidence of secondary considerations was sufficient to
outweigh the prior art determination.  Thus, under the section
103 analysis, the Federal Circuit actually views secondary
considerations as more dispositive than the prior art
determination, at least when the secondary considerations
constitute especially persuasive evidence of nonobviousness.

    The Examiner's attention is additionally directed to the
Federal Circuit case of In W.L. Gore & Associates v. Garlock,
Inc., (721 F.2d. 1540 (Fed. Cir. 1983), cert. denied, 469 U.S.
851 (1984), where the court stated:
    "The objective evidence of nonobvious, i.e., the "indicia"
of Graham (Supreme Court "Graham v. John Deere")... may in a
given case be entitled to more weight or less, depending on its
nature and its relationship to the merits of the invention.  It
may be the most pertinent, probative, and revealing evidence
available to aid in reaching a conclusion on the
obvious/nonobvious issue.  It should when present always be
considered as an integral part of the analysis."

    The Federal Circuit has repeated these views in many
subsequent cases, emphasizing that secondary considerations, if
present, are always relevant under section 103, and must always
be given evidentiary weight before reaching a decision on the
obvious/nonobvious issue.  In several cases the Federal Circuit
has vacated or reversed district court holdings of invalidity for

ANS0007533

59

obviousness because the trial court failed to consider evidence
of secondary considerations.  Simmons Fastener Corp. v. Illinois
Tool Works, Inc. is illustrative.  (739 F.2d 1573 (Fed. Cir.
1984), cert. denied, 471 U.S. 1065 (1985).  In the district
court, Simmons brought a declaratory judgment action asking the
court to declare a patent for a screw anchor used to fasten
shelves to the inside of a refrigerator invalid.  The parties
stipulated that the invention had achieved substantial commercial
success.  In reaching its holding of obviousness, however, the
district court did not consider this evidence, reasoning that the
Graham prior art analysis produced a clear showing of
obviousness.  The Federal Circuit agreed that the prior art may
have indicated a conclusion of obviousness, but it nevertheless
reversed the district court, concluding that the strong evidence
of commercial success established nonobviousness despite the
prior art analysis.

    The above in no way constitutes an admission by Applicant
that the prior art of record indicates in any way that the
claimed invention is obvious, but rather this addressing of the
secondary considerations will just further support the fact that
the claimed invention is non-obvious, and that the claims should
all be held allowable.

    The foregoing discussion of secondary considerations such as
commercial success is particulary relevant in this case since
there have been a number of high dollar offers to acquire rights
to Applicant's invention each exceeding one million U.S. dollars
and from very large and well known companies that have employees
who are without question skilled in this art.  Those skilled in
this art judged Applicant's invention substantially as is
currently claimed as being very novel, advancing the art
significantly, and of substantial commercial value.
    The Examiner's attention is directed toward exhibit A which
is a NONDISCLOSURE AGREEMENT sign between Applicant and Logitech,

ANS0007534

60

a California company who has very large world wide sale of
computer controller.

The Examiner's attention is now directed toward exhibit B
which is a three page letter to Applicant and Applicant's
business associate "Steve". This three page letter is an offer
by Logitech to purchase rights to Applicant's invention. Please
read if carefully and note the "Scenario One" and "Scenario Two"
offers.

The two offers were never, as of yet, accepted by Applicant,
and during negotiations with Logitech, Logitech apparently
misunderstood and believed rights had been or would be acquired
to Applicant's invention, and took it upon themselves to build
and sell Applicant's invention substantially as claimed. This
product is called "Cyberman". A flyer on "Cyberman" was
submitted in Applicant's response of 06/03/94. Well over 70,000
units of "Cyberman" were sold in a very brief period of time for
approximately $100.00 per unit street price.
Applicant requested Logitech to no longer make and sell
Applicant's invention, and they complied with Applicant's wishes.
Applicant received a royalty check for $40,000.00 shown in
exhibit C.

Applicant is contractually bound against disclosing any
further details pertaining to the "Cyberman" product.

Clearly Logitech, and Logitech's counsel being Townsend and
Townsend, a major intellectual properties law firm comprised of
hundreds of patent lawyers, believed Applicant's invention was
novel, advanced the art significantly, and was or is of
substantial commercial value. The consumers who purchased the
Cyberman thought the product was of value.

The Examiner's attention is now directed toward the letter
marked exhibit D, which is directed to my business associate

ANS0007535

61

Steve Bowman from Key Tronic.  This letter is an offer to acquire
rights to Applicant's invention, with the anticipation of
Applicant receiving multi-millions of dollars annually for his
invention rights.  Please read this letter and consider it
carefully.  This is after review of the pending patent
application, after review by those skilled in the art at Key
Tronic, and professional review by the intellectual property law
firm of Wells, St. John of Spokane Washington.

Clearly, professional opinion was and/ or is that the
present invention is of substantial commercial value.

Due to a lack of a timely first office action on the present
application, Applicant was unable to come to a full agreement
with Key Tronic.

It is hereby requested the application and claims being
reexamined in view of this response, and that all claims be found
allowable.  Thank you.

I acknowledge the duty to disclose information which is
material to the examination of this application in accordance
with Title 37, Code of Federal Regulations, 1.56(a).

I hereby declare that all statements made herein of my own
knowledge are true and that all statements made on information
and belief are believed to be true; and further that these
statements were made with the knowledge that willful false
statements and the like so made are punishable by fine or
imprisonment, or both, under Section 1001 of Title 18 of the
United States Code and that such willful false statements may

ANS0007536

62

jeopardize the validity of the application or any patent issued
thereon.

Respectfully;

Date: January 10, 1996

Brad A. Armstrong, Inventor / Applicant

Applicant's current phone number is (916) 342-5342

### CERTIFICATE OF EXPRESS MAILING

Commissioner of Patents and Trademarks
Washington, D. C. 20231
I hereby certify that this complete response to the outstanding
Office Action of 08/10/95 is being deposited with the United
States Postal Service as **EXPRESS MAIL**, article number
EG313952649US with sufficient postage paid in an envelope
addressed to: Commissioner of Patents and Trademarks, Washington,

D. C. 20231, on this date: Jan. 10, 1996

Signature of one making deposit:

Brad A. Armstrong, Inventor / Applicant

ANS0007537

DEC 03 '92 18:12 510-795-7496 LOGITECH EXEC OFF                      P.2

*Exhibit A*

NONDISCLOSURE AGREEMENT

Logitech Inc. ("RECIPIENT"), a corporation organized under the laws of the State of California with an address at 6505 Kaiser Drive, Fremont, CA 94555, wishes to receive from Brad Armstrong, an individual having his principal place of business at 6630 Arabian Circle, Granite Bay, California 95661 ("DISCLOSER") and DISCLOSER wishes to furnish to RECIPIENT certain confidential and proprietary information contained in DISCLOSER's patent application entitled SIX DEGREE OF FREEDOM CONTROLLER WITH CAPABILITY OF TACTILE FEEDBACK. ("INFORMATION") for the sole purpose of allowing RECIPIENT to evaluate the INFORMATION and following such an evaluation, to evaluate RECIPIENT'S interest in pursuing a licensing relationship with DISCLOSER. RECIPIENT is not currently developing a mechanical 3D controller device; DISCLOSER acknowledges, however, that RECIPIENT is currently involved in the development and acquisition of technologies similar to those embodied in the INFORMATION and that RECIPIENT shall not, by the execution of this Agreement, be prevented or otherwise hindered in the continued development and acquisition of such technologies. In consideration of receiving the INFORMATION, RECIPIENT agrees to be bound by the terms of this Agreement.

RECIPIENT agrees to maintain the INFORMATION in confidence, will use at least the same degree of care to maintain the INFORMATION secret as it uses in maintaining as secret its own proprietary, confidential and trade secret information, but always at least a reasonable degree of care, will use the INFORMATION only for the above purpose unless hereafter agreed to in writing by the parties hereto. However, RECIPIENT will have no obligation with respect to any portion of the INFORMATION which (1) was known to it prior to receipt, directly or indirectly, of such portion from RECIPIENT, (2) is lawfully obtained by it from a third party under no obligation of confidentiality, direct or indirect, or (3) is or becomes known or available without any act or failure to act by it.

RECIPIENT will not disclose any portion of the INFORMATION to any person except those of its employees having a need to know such portion in order to accomplish the sole purpose stated above.

This Agreement is effective as of the date first written below, under the laws of the State of California and will terminate two (2) years thereafter.

DISCLOSER:
Brad Armstrong

By _Brad Armstrong_

Name _Brad Armstrong_

Title _An Individual_

Date _12/4/92_

LOGITECH:
Logitech, Inc.

By _[signature]_

Name _HANK MORGAN_

Title _CHIEF OPERATING OFFICER_

Date _12/3/92_

ANS0007538



**LOGITECH**

December 17, 1992

*Exhibit B*

By Facsimile

Mr. Brad Armstrong
Director of Research and Development

Mr. Steven Bowman
President
Global Devices
6630 Arabian Circle
Granite Bay, CA 95746

Dear Brad and Steve:

It is with pleasure that I write to you to set forth the outline of what I hope will be an agreement between you (individually and as Global Devices) and Logitech.   Obviously, the final agreement between us will depend on our being able to agree upon the wording in the final written contract and upon approval and consent by the Logitech Board.  This letter is but the first, albeit important, step in that process.

We at Logitech have been favorably impressed by your technology, both the global controller and the concept of the global navigator, as I hope you know by now.  We feel that, although the market is young, the future is bright, and many opportunities will open in the future for both of us if we can reach agreement satisfactory to both of us, and go forward to commercialize the technology.

However, as you also know, here at Logitech we have in place an extensive period of product development and testing, tied to phases controlled by our Product Approval Committee (PAC).  Therefore, our ability to offer commitment at this stage is tied to PAC approval at the various phases.

In addition, the level of commitment we are willing to offer is tied to the issue of whether we obtain exclusive rights to commercialize your product.  I understand that you may not wish Logitech to have these rights, and therefore I have prepared two different scenarios for your consideration, depending on whether we obtain exclusive rights to the technology or not.

But before I get to the numbers, I would like to set forth some general terms that would apply regardless of whether we obtain exclusive rights.

*General Terms*

- The products that we have discussed, and that Logitech desires to market, are the global controller and the global navigator, as covered in your patent application.

- Logitech will have worldwide rights to develop, manufacture, market and sell these products under our own label.

- Logitech will pay Global Devices a royalty per unit, outlined below.

- Logitech plans to spend significant resources (within our discretion) developing these products. Logitech then will manufacture and market them in various markets, including the entertainment and workstation markets.  Global Devices will further develop the concept of the global navigator.

- Logitech will own everything that it develops in its development process, and Global Devices will continue to own the base technology licensed to Logitech under the agreement.

Logitech Inc.
6505 Kaiser Drive
Fremont, CA 94555
Phone 510-795-8500
Telex 757411
Fx 510-792-8901

- Global Devices will do software development and deliver software meeting specifications that I provide. This development will occur in the month after we enter into the agreement, and no additional moneys will be paid by Logitech for this. I don't anticipate that you will find the work I have in mind to be a problem.

- Global Devices will deliver 10 to 50 prototypes to Logitech, for which Logitech will pay $100 per unit, to be delivered according to the schedule to be set forth in the agreement.

- Global Devices will give patent and other proprietary rights representations and indemnifications. Logitech will control the patent process, including decisions on where to patent the technology abroad. Logitech will undertake the costs of the patent prosecution process, but will offset the amounts spent for patent prosecution against future royalty amounts owing by Logitech to Global Devices.

- If the patent application is denied, or if third parties have proprietary rights or patents that supersede the rights that Global Devices is granting Logitech in the agreement, with the result that Logitech's rights are limited or Logitech must pay royalties to the third party, then Logitech's royalty obligation will terminate.

- Even if Logitech's rights are non-exclusive, Global Devices will agree not to license the technology to Microsoft, and possibly other competitors to be further specified, during the term of the contract.

- The term of the contract will be five years (unless earlier terminated as provided in the agreement).

- The contract will contain standard terms and provisions for licenses, including a "most favored customer" pricing provision limiting your ability to sell rights in the future on more favorable terms than those in our agreement. In addition, the contract will contain standard confidentiality provisions.

- Global Devices will have its attorneys work with Margaret Wynne, Logitech's General Counsel, to come to an agreement satisfactory to both parties, setting forth in better detail the terms discussed here.

Now, to the numbers. Obviously, these numbers are interrelated, so if one were to change, then all may change.

### Scenario One -- Logitech acquires Exclusive Rights to the Technology

| | |
|---|---|
| Royalty Rate per Unit | 4% of price to Logitech's customer |
| Cap on Royalties | $1,250,000 |
| Upfront Royalty | $150,000, to be paid as provided below under "Allocation". This amount will be offset in the future against the initial royalties owing by Logitech to Global Devices at that time. |
| Allocation of Upfront Royalty | Tied to signing of agreement and to PAC phases*: |

| | |
|---|---|
| $25,000 | Signing of Agreement |
| $50,000 | Entry into Development Phase |
| $75,000 | Entry into Qualification Phase |

ANS0007540

_Scenario Two — Logitech acquires Non -exclusive Rights to the Technology_

| | |
|---|---|
| Royalty Rate per Unit | 2.5% of price to Logitech's customer |
| Cap on Royalties | $1,000,000 |
| Upfront Royalty | $100,000, to be paid as provided below under "Allocation". This amount will be offset in the future against the initial royalties owing by Logitech to Global Devices at that time. |
| Allocation of Upfront Royalty | Tied to signing of agreement and to PAC phases*: |

| | |
|---|---|
| $15,000 | Signing of Agreement |
| $35,000 | Entry into Development Phase |
| $50,000 | Entry into Qualification Phase |

*The PAC phases are part of Logitech's internal process. The decision to enter into the next PAC phase is entirely within Logitech's discretion. In the event Logitech decides not to enter into the next PAC phase, it will so notify Global Devices. In such event, Logitech's rights, if exclusive, will immediately become non-exclusive.

As we discussed, the next step is for you to evaluate the terms suggested here. Then, let's get together tomorrow, as we have planned, to discuss how I arrived at these numbers. I believe that, when you have heard my thoughts on this, you will agree that this is the foundation of a good agreement for both of us.

In closing, let me say that I have enjoyed our various meetings and discussions, and I look forward to a long and successful relationship with Global Devices.

Very truly yours,

James Barnes
3D Business Unit Manager

cc:     Pierluigi Zappacosta, Logitech
        Margaret Wynne, Logitech

ANS0007541

**LOGITECH, INC.** 6505 Kaiser Drive, Fremont, CA 94555   (510) 795-8500

105457

| VOUCHER I.D. | TYPE | INVOICE NO. ORIG. INVOICE NO./REF. | DATE | GROSS | DISCOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|
| DATE: | | VENDOR NO. | VENDOR Brad Armstrong | | | |
| | | 101494    101494 | | 40,000.00 | 0.00 | 40,000.00 |
| | | | | | | |
| | TOTALS | | | | | 40,000.00 |

Exhibit C

ANS0007542

**◼ Key Tronic**

*Exhibit D*

P.O. Box 14687
Spokane, WA 99214-0687
USA

Telephone 509/928-8000
Facsimile 509/927-5248

January 8, 1993

Mr. Steven Bowman
President
Global Devices
6630 Arabian Circle
Granite Bay, CA  95661

Dear Steven:

   Further to our conversation in Spokane this last Wednesday, you will find attached:

   1.   Outline of Joint Venture structure
   2.   Proforma earning statement for joint venture company

We have given a great deal of thought to ownership of NEWCO, and percentage of profit participation for you and Key Tronic Corporation.  It should be noted that all of the funds for this undertaking are being entirely provided by Key Tronic. Additionally, the Company will be committing substantial organization and some facilities to this project.  It is a risk which will be borne by Key Tronic.  For these and other reasons, I would like to discuss with you personally, we propose ownership in NEWCO be divided 30% to you and 70% to Key Tronic.  If the attached proforma statement, which incorporated your thoughts on market opportunity is achieved, the third year return as a 30% owner of our joint company would be running approximately $3 million annually.  Looking at the opportunities we reviewed at our meeting, it seems to us at KT that a considerably sharper ramp-up is possible.  There is a window of opportunity that we should take advantage of, including incorporating the three-dimensional control in keyboards.  In respect to assisting you financially, we would certainly consider some immediate capital to you on an agreement possibly along the lines you suggested in Spokane.

   Steve, I will look forward to hearing your comments and hopefully, to proceed on a project which will provide substantial return to both you and ourselves.

Best personal regards,

Stanley Hiller
Chief Executive Officer

ANS0007543