IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| ANASCAPE, LTD. | § | |
| | § | Hon. Ron Clark |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 9:06-CV-00158-RC |
| | § | |
| MICROSOFT CORPORATION, and | § | JURY TRIAL DEMANDED |
| NINTENDO OF AMERICA, INC., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT MICROSOFT CORPORATION'S
FIRST AMENDED ANSWER, DEFENSES AND
COUNTERCLAIMS TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant Microsoft Corporation ("Microsoft") submits this Amended Answer in

response to the First Amended Complaint ("Amended Complaint") filed in this action by

Anascape, Ltd. ("Plaintiff"). For its Amended Answer, Microsoft states as follows:

1.      Microsoft is without information or knowledge sufficient to form a belief as to the

truth of the allegations of paragraph 1 of the Amended Complaint, and as such denies the same.

2.      Microsoft admits that it is a corporation organized and existing under the laws of

Washington. Microsoft denies that it manufactures for sale video game consoles and video game

controllers. Microsoft admits the remaining allegations of paragraph 2 of the Amended

Complaint.

3.      Microsoft is without information or knowledge sufficient to form a belief as to the

truth of the allegations of paragraph 3 of the Amended Complaint, and as such denies the same.

4.      Microsoft admits that Plaintiff's Amended Complaint refers to Microsoft and

Defendant Nintendo of America, Inc. ("Nintendo") collectively as "Defendants."

Dockets.Justia.com

5.     Microsoft admits that Plaintiff's action purports to be one for alleged patent infringement arising under the cited patent laws of the United States.

6.     Microsoft admits, for purposes of this action only, that it is subject to venue in the Eastern District of Texas.

7.     Microsoft admits, for purposes of this action only, that it has done business in the State of Texas, and that this Court has personal jurisdiction over Microsoft.  Microsoft is without information or knowledge sufficient to form a belief as to the truth of the allegations against Nintendo in paragraph 7 of the Amended Complaint, and as such denies the same.  Microsoft denies any and all remaining allegations of paragraph 7, and specifically denies that it has infringed or now infringes the patents asserted against Microsoft in the Amended Complaint.

8.     Microsoft incorporates by reference its responses to paragraphs 1-7 as if fully set forth herein.

9.     Microsoft admits that Exhibit A of the Complaint, on its face, purports to be a copy of U.S. Patent No. 5,999,084 ("the '084 patent"), which is titled "Variable-Conductance Sensor" and lists Brad A. Armstrong as the named inventor.  Microsoft denies that the '084 patent was duly and legally issued.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 9 of the Amended Complaint, and as such denies the same.

10.     Microsoft admits that Exhibit B of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,102,802 ("the '802 patent"), which is titled "Game Controller with Analog Pressure Sensor(s)" and lists Brad A. Armstrong as the named inventor.  Microsoft denies that the '802 patent was duly and legally issued.  Microsoft is without knowledge or

information sufficient to form a belief as to the truth of any remaining allegations of paragraph 10 of the Amended Complaint, and as such denies the same.

11.    Microsoft admits that Exhibit C of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,135,886 ("the '886 patent"), which is titled "Variable-Conductance Sensor with Elastomeric Dome-Cap" and lists Brad A. Armstrong as the named inventor. Microsoft denies that the '886 patent was duly and legally issued.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 11 of the Amended Complaint, and as such denies the same.

12.    Microsoft admits that Exhibit D of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,208,271 ("the '271 patent"), which is titled "Remote Controller with Analog Button(s)" and lists Brad A. Armstrong as the named inventor.  Microsoft denies that the '271 patent was duly and legally issued.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 12 of the Amended Complaint, and as such denies the same.

13.    Microsoft admits that Exhibit E of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,222,525 ("the '525 patent"), which is titled "Image Controllers with Sheet Connected Sensors" and lists Brad A. Armstrong as the named inventor.  Microsoft denies that the '525 patent was duly and legally issued.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 13 of the Amended Complaint, and as such denies the same.

14.    Microsoft admits that Exhibit F of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,343,991 ("the '991 patent"), which is titled "Game Controller with Analog Pressure Sensor" and lists Brad A. Armstrong as the named inventor.  Microsoft denies

that the '991 patent was duly and legally issued.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 14 of the Amended Complaint, and as such denies the same.

15.     Microsoft admits that Exhibit G of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,344,791 ("the '791 patent"), which is titled "Variable Sensor with Tactile Feedback" and lists Brad A. Armstrong as the named inventor.  Microsoft denies that the '791 patent was duly and legally issued.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 15 of the Amended Complaint, and as such denies the same.

16.     Microsoft admits that Exhibit H of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,347,997 ("the '997 patent"), which is titled "Analog Controls Housed with Electronic Displays" and lists Brad A. Armstrong as the named inventor.  Microsoft denies that the '997 patent was duly and legally issued.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 16 of the Amended Complaint, and as such denies the same.

17.     Microsoft admits that Exhibit I of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,351,205 ("the '205 patent"), which is titled "Variable-Conductance Sensor" and lists Brad A. Armstrong as the named inventor.  Microsoft denies that the '205 patent was duly and legally issued.  Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 17 of the Amended Complaint, and as such denies the same.

18.     Microsoft admits that Exhibit J of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,400,303 ("the '303 patent"), which is titled "Remote Controller with

Analog Pressure Sensor (s)" and lists Brad A. Armstrong as the named inventor. Microsoft denies that the '303 patent was duly and legally issued. Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 18 of the Amended Complaint, and as such denies the same.

19.    Microsoft admits that Exhibit K of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,563,415 ("the '415 patent"), which is titled "Analog Sensor(s) with Snap-Through Tactile Feedback" and lists Brad A. Armstrong as the named inventor. Microsoft denies that the '415 patent was duly and legally issued. Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 19 of the Amended Complaint, and as such denies the same.

20.    Microsoft admits that Exhibit L of the Complaint, on its face, purports to be a copy of U.S. Patent No. 6,906,700 ("the '700 patent"), which is titled "3D Controller with Vibration" and lists Brad A. Armstrong as the named inventor. Microsoft denies that the '700 patent was duly and legally issued. Microsoft is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of paragraph 19 of the Amended Complaint, and as such denies the same.

21.    Microsoft admits that Plaintiff's Amended Complaint refers to the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents as the "Patents-in-Suit."

22.    Microsoft denies that it has infringed or is presently infringing the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, or '700 patents in any way. Microsoft denies any remaining allegations of paragraph 22 of the Amended Complaint.

23.    Microsoft is without information or knowledge sufficient to form a belief as to the truth of the allegations of paragraph 23 of the Amended Complaint, and as such denies the same.

24.     Microsoft denies the allegations against Microsoft in paragraph 24 of the Amended Complaint, and specifically denies that it has infringed or now infringes the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, or '700 patents in any way.  Microsoft is without information or knowledge sufficient to form a belief as to the truth of the allegations against Nintendo in paragraph 24 of the Amended Complaint, and as such denies the same. Microsoft denies any remaining allegations of paragraph 24 of the Amended Complaint.

25.     Microsoft is without information or knowledge sufficient to form a belief as to the truth of the allegations against Nintendo in paragraph 25 of the Amended Complaint, and as such denies the same.  Microsoft admits that the Amended Complaint provides Microsoft with actual notice of allegations of infringement of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents.  Microsoft denies that Plaintiff provided notice to Microsoft of its allegations of infringement prior to the filing of this lawsuit.  Microsoft admits that prior to the filing of the lawsuit, Microsoft was aware of some allegations of infringement made by a different entity with respect to some, but not all, of the patents now asserted against Microsoft in the Amended Complaint.  Microsoft denies any remaining allegations of paragraph 25 of the Amended Complaint.

26.     Microsoft denies the allegations of paragraph 26 of the Amended Complaint, and specifically denies that it has infringed or now infringes the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, or '700 patents in any way.  Microsoft is without information or knowledge sufficient to form a belief as to the truth of the allegations against Nintendo in paragraph 26 of the Amended Complaint, and as such denies the same.  Microsoft denies any remaining allegations of paragraph 26 of the Amended Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

Further answering the Amended Complaint, Defendant Microsoft asserts the following defenses without assuming any burden that it would not otherwise have.  Microsoft reserves the right to amend its answer with additional defenses as further information is obtained.

### First Defense:  Noninfringement of the Asserted Patents

1.      Microsoft has not in any manner infringed any claim of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, or '700 patents, and is not liable for infringement thereof.

### Second Defense:  Invalidity of the Asserted Patents

2.      The claims of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents are invalid for failing to comply with the provisions of Title 35 U.S.C., including without limitation one or more of 35 U.S.C. §§ 101, 102, 103, 112 and 135(b).

### Third Defense:  Double Patenting

3.      Claims of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and/or '700 patents are invalid for double patenting.

### Fourth Defense:  Use/Manufacture By/For United States Government

4.      To the extent that Microsoft's accused products have been used or manufactured by or for the United States, Plaintiff's claims and demands for relief are barred by 28 U.S.C. § 1498.

### Fifth Defense:  Dedication to the Public

5.      Plaintiff has dedicated to the public any method or apparatus disclosed in the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, or '700 patents but not literally

claimed therein, and is estopped from claiming infringement by any such public domain method or apparatus.

### Sixth Defense:  Unavailability of Relief (Enhanced Damages)

6.    On information and belief, Plaintiff has failed to plead and meet the requirements for enhanced damages.

### Seventh Defense:  Indispensable Parties

7.    Those parties retaining rights in the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, or '700 patents are indispensable parties who must be joined.

### Eighth Defense:  Failure to Provide Notice

8.    Pursuant to the requirements of 35 U.S.C. § 287, Plaintiff is not entitled to recover any damages for actions occurring prior to its providing actual or constructive notice.

### Ninth Defense:  Laches

9.    This lawsuit was filed over six years after issuance of the '084 patent, almost six years after issuance of the '802 patent, almost six years after issuance of the '886 patent, over five years after issuance of the '271 patent, over five years after issuance of the '525 patent, over four years after issuance of the '991 patent, over four years after issuance of the '791 patent, over four years after issuance of the '997 patent, over four years after issuance of the '205 patent, over four years after issuance of the '303 patent, over three years after issuance of the '415 patent, and over a year after issuance of the '700 patent.  On information and belief, Plaintiff had knowledge of Microsoft and Microsoft's conduct that is accused of infringement in the Amended Complaint long before this lawsuit was filed.  The delay in filing this lawsuit has prejudiced Microsoft. Thus, Plaintiff's claims are barred by the equitable doctrine of laches.

## Tenth Defense:  Prosecution Laches

10.     The claims of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents are unenforceable under the equitable doctrine of prosecution laches.

## Eleventh Defense:  Prosecution History Estoppel

11.     On information and belief, Plaintiff's allegations of patent infringement are barred under the doctrine of prosecution history estoppel, and Plaintiff is estopped from claiming that the claims of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, or '700 patents cover or include Microsoft's products.

## Twelfth Defense:  Patent Unenforceability Due to Inequitable Conduct

12.     At least the '700, '525, '084, '802, '991, and '886 patents are unenforceable due to inequitable conduct in its prosecution before the United States Patent and Trademark Office (the "PTO"), as more particularly alleged below.

### *Unenforceability of the '700 Patent:*

13.     The application which led to the '700 patent, U.S. Patent Application No. 09/715,532 (the "'700 application"), was filed on November 16, 2000.  Brad A. Armstrong, the alleged inventor, appears to have filed and prosecuted the '700 application himself.  Mr. Armstrong originally filed the '700 application on November 16, 2000 with claims 1-38 claiming his alleged invention.

14.     On information and belief, after filing the '700 application, Mr. Armstrong obtained and/or otherwise learned of the structure comprising one or more video game controllers, such as those available from Microsoft, Nintendo Corporation, and/or Sony Corporation.

15.     On information and belief, after learning of the structure of available video game controllers, and during prosecution of the '700 application, Mr. Armstrong amended his '700 patent application in a July 15, 2002 Preliminary Amendment to cancel all original claims 1-38 and substitute new claims 39-77.

16.     On information and belief, Mr. Armstrong added various of the new substitute claims 39-77 in an attempt to obtain a claim scope that would cover one or more of the available video game controllers, rather than cover any of the disclosed embodiments contained within the '700 application as originally filed. As a result, Mr. Armstrong, through his July 15, 2002 Preliminary Amendment, intentionally added new matter by introducing new claims 39-77 in a manner that is prohibited by 35 U.S.C. § 112.

17.     At least new claims 54 and 55 (corresponding to issued claims 16 and 17, respectively, in the '700 patent) are not supported by the '700 application as originally filed. By way of example, there is no support in the '700 application as originally filed for a 3-D graphics controller having the specific combination of elements defined in claims 54 and 55 being connected to the first sheet as claimed. More specifically, the '700 application lacks support for the combination of the claimed first element structured to activate four unidirectional sensors and the claimed second element structured to activate a first two bi-directional proportional sensors, wherein both the first element and second element are connected to the claimed first sheet present in a 3-D graphics controller, as required by claims 54 and 55. For at least this reason, issued claims 16 and 17 of the '700 patent contain new matter.

18.     Mr. Armstrong provided the following sworn statement (the "July 15 Sworn Statement") in the Preliminary Amendment:

I, Brad A. Armstrong, believe I am the original, first and sole inventor of the subject matter which is now claimed and for which a patent is sought in the

instant application. I hereby declare that **no new matter has been added** by amendment and that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the Unites States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

(Emphasis added).

19.    The July 15 Sworn Statement made by Mr. Armstrong was false. On information and belief, Mr. Armstrong knew that the July 15 Sworn Statement was false and made the statement with the intent to mislead the examiner handling the '700 application. On information and belief, Mr. Armstrong knew at the time he made the July 15 Sworn Statement that he was, in fact, adding new matter to at least new claims 54 and 55, and that he was not, in fact, the inventor of the alleged invention defined by at least these claims.

20.    Mr. Armstrong's false sworn statement was highly material to the patentability of the new claims. Section 112 of Title 35 of the United States Code states, in pertinent part:

The specification shall contain a written description of the invention, and the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor for carrying out his invention.

Section 2163.06 (I) of the PTO's Manual of Patent Examining Procedure (MPEP) states, in pertinent part:

If new matter is added to the claims, the examiner should reject the claims under 35 U.S.C. 112, first paragraph – written description requirement. *In re Rasmussen*, 650 F.2d 1212, 211 USPQ 323 (CCPA 1981).

21.    If Mr. Armstrong had been truthful with the PTO and properly advised the PTO that the new claims included new matter, the examiner handling the application would have rejected the claims as failing to satisfy the written description requirement of 35 U.S.C. § 112, as

required by Section 2163.06(I) of the MPEP. Instead, Mr. Armstrong's sworn statement falsely advised the examiner that no new matter was being added, and the PTO relied on Mr. Armstrong's representation. In allowing the claims, the PTO also relied on Mr. Armstrong's false sworn statement that he was the inventor of the subject matter added by the amendment.

22.     Mr. Armstrong's false sworn statement constitutes inequitable conduct in the procurement of the '700 patent which renders at least the '700 patent unenforceable.

### *Unenforceability of the '525 Patent:*

23.     Two of Anascape's patents that are not asserted in this litigation are U.S. Patent No. 5,589,828 ("the '828 patent) and U.S. Patent No. 5,565,891 ("the '891 patent"). These two patents are in a chain of related patents that starts with the '828 patent, continues to the '891 patent, continues to the asserted '525 patent, and continues to the asserted '700 patent. The application which issued as the '828 patent was U.S. Patent Application No. 07/847,619 ("the '828 application"), filed on March 5, 1992. After filing the '828 application, Mr. Armstrong filed on February 23, 1995 the application that issued as the '891 patent, U.S. Patent Application No. 08/393,495 ("the '891 application).

24.     During the prosecution of the '828 application, Mr. Armstrong disclosed a six-degree-of-freedom controller sold by Logitech called the CyberMan to the PTO Examiners reviewing that application. Specifically, on June 3, 1994, Mr. Armstrong filed with the PTO an Amendment in the '828 application to which he attached a flyer for the CyberMan controller. In that Amendment, Mr. Armstrong stated that he was disclosing the CyberMan controller because he believed that the Cyberman controllers were "precise copies of my invention in the instant application" and that he wanted the PTO to help him by expediting the examination process. (Amendment of June 3, 1994, at 2-3).

25.     In the next application in the chain, the '891 application, the Examiner rejected a number of claims based on the CyberMan.  (Office Action of July 5, 1995).  However, Mr. Armstrong met with the Examiner and convinced him that the CyberMan controller was not prior art by arguing that the '891 application was a "continuation" of its parent, the '828 application, because no new matter had been added to the '891 application.  (Interview Summary of October 2, 1995).  Because the flyer for the CyberMan controller was dated 1993, after the filing of the parent '828 application and because the Examiner believed the '891 application was a continuation application entitled to claim the benefit of the '828 application's filing date, the Examiner withdrew the rejection based on CyberMan.  (*Id.*).

26.     The next application in this chain was the application that led to the asserted '525 patent, U.S. Patent Application No. 08/677,378 ("the '525 application"), filed on July 5, 1996.  The '525 application was not, however, a "continuation" of the previous applications in the chain.  Instead, in the '525 application as filed, Mr. Armstrong specifically stated that the application only included "in part" material from his previous applications.  In an Amendment dated September 23, 1996, Mr. Armstrong even directed the Examiner to withdraw the claim that the '525 application contained "in part" the material from previous applications.

27.     The '525 application was very different from the previous two applications in the chain.  One key element that Mr. Armstrong first added in the '525 application was the idea of using a flexible membrane sheet connected to a circuit board.  Mr. Armstrong did not disclose such a membrane element in his previous two applications, the '828 and '891 applications.  In fact, a search through the '828 and '891 patents will not find even a mention of a membrane.  Thus, for any claims in the '525 application that were directed to the membrane element that first

appeared in the '525 application filed on July 5, 1996, Mr. Armstrong would not have been able to rely on his previous two applications to leapfrog behind the 1993 CyberMan controller.

28.    The claims of the '525 patent are in fact directed to the membrane element that first appeared in Mr. Armstrong's '525 application filed in 1996.  For example claims 1 and 5 of the '525 patent are directed to an "image controller" that includes, among other elements, a "flexible membrane sheet connected to a rigid circuit board sheet."  Likewise, claim 12 of the '525 patent is directed to an "image controller" that includes, among other elements, a "flexible membrane sheet."

29.    The '525 patent issued on April 24, 2001.  However, throughout the entire time the '525 application was pending, from July 5, 1996 until April 24, 2001, Mr. Armstrong never disclosed the existence of the CyberMan controller to the PTO Examiners reviewing the '525 application.

30.    On November 16, 2000, just before the '525 patent issued, Mr. Armstrong filed the next application in this chain, the '700 patent application.  During the prosecution of the later-filed '700 application, Mr. Armstrong disclosed the CyberMan to the PTO Examiner reviewing that application.  Specifically, on December 4, 2003, Mr. Armstrong filed with the PTO an Information Disclosure Statement ("the December 4, 2003 IDS") that brought a number of prior art references to the attention of the Examiner in the '700 application, including the CyberMan controller.

31.    In the December 4, 2003 IDS of the '700 application, Mr. Armstrong admitted that the CyberMan controller had been "first sold in 1993 in the USA by Logitech Inc. …"  Mr. Armstrong also submitted with this IDS the same flyer he had submitted in the '828 application,

as well as photographs of the CyberMan, both in assembled and disassembled states, with annotations apparently added to the photographs by Mr. Armstrong.

32.    In the December 4, 2003 IDS of the '700 application, Mr. Armstrong also admitted that the 1993 CyberMan controller included a "membrane element" connected to a circuit board:

> Photograph 2 shows a portion of the CyberMan in a disassembled state and showing the handle, three buttons, a microswitch for one of the buttons, a wiring harness spanning between a membrane located in the handle and a circuit board located in the base. … The membrane is located in the handle and the circuit board is located in the base. The expensive conventional wiring harness spans between the membrane in the handle and the circuit board in the base.

33.    In describing the CyberMan in the December 4, 2003 IDS of the '700 application, Mr. Armstrong further admitted that such a "membrane element" was included in his '525 application but had not appeared in his earlier application, the '828 application. Thus, Mr. Armstrong confirmed in the December 4, 2003 IDS of the '700 application what is plain from a review of the chain of applications: Mr. Armstrong did not disclose the flexible membrane element in his earlier '828 and '891 applications, that he first added that element in the '525 application filed in 1996, and that the 1993 Cyberman controller included such a flexible membrane element.

34.    In sum, while Mr. Armstrong knew about the CyberMan controller and had disclosed it to the PTO in the two applications (the '828 and '891 application) for which he could claim a priority date of 1992, prior to CyberMan's 1993 date, he did *not* disclose CyberMan to the PTO Examiners reviewing the '525 application that added the new flexible membrane element, an element that the CyberMan controller had included three years before that '525 application.

35.     The timeline below illustrates the knowledge by Mr. Armstrong of the CyberMan controller and how he selectively disclosed it in earlier application in which he believed he could claim a filing date earlier than the CyberMan but failed to disclose it during the prosecution of the later-filed '525 application that could not claim priority back to his earlier applications because of the newly added membrane element:



36.     There was no reason for Mr. Armstrong to expect the Examiners in the '525 application to know anything about the CyberMan controller because they were not the same Examiners who had worked on the earlier '828 and '891 applications in which the CyberMan controller had been disclosed.  The Examiners in the '525 application included John Suraci, Steven Saras, and Jeffrey Brier, all in Technology Center 2700.  In contrast, the Examiners who had been involved with the earlier '828 and '891 applications were other Examiners and all were in Technology Centers 2600 or 2400.

37.     Mr. Armstrong never disclosed the CyberMan controller to the PTO Examiners who were examining the '525 application.  Nor is there any indication in the PTO records that

any of the PTO Examiners who examined the '525 application saw or considered the CyberMan controller as part of their examination of this application.

38.     Mr. Armstrong, the alleged inventor, appears to have filed and prosecuted the '828, '891, '525, and '700 applications himself.  At all times during the prosecution of the '525 application, Mr. Armstrong had a duty to disclose information material to patentability under 37 C.F.R. § 1.56 ("Rule 56") and understood the duty of disclosure.  Rule 56 reads in part:

§ 1.56  Duty to disclose information material to patentability.

(a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a *duty of candor and good faith* in dealing with the Office, which includes a *duty to disclose* to the Office all information known to that individual to be material to patentability as defined in this section.
…
(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

(1) *Each inventor named in the application*;
….

(Rule 56, emphasis added).

39.     By Mr. Armstrong's own admissions in the December 4, 2003 IDS, the CyberMan controller was on sale in the United States in 1993, more than one year prior to the filing date of the '525 application.  Thus, the CyberMan controller was prima facie prior art to the '525 application under 35 U.S.C. § 102(b).  Furthermore, the CyberMan controller included elements that Mr. Armstrong admitted in the December 4, 2003 IDS were first added in the '525 application and were not disclosed in his earlier application filed before the CyberMan controller was on the market.

40.    The CyberMan controller was material to the patentability of one or more claims at issue in the '525 application.  The CyberMan controller disclosed the membrane element that Mr. Armstrong did not include in his applications until the '525 application was filed in 1996.  Furthermore, the CyberMan controller would have been important to a reasonable examiner for purposes of examining at least claims 1-3, 5-8, and 12-23 of the '525 patent because it renders at least those claims obvious under 35 U.S.C. § 103(a).

41.    Mr. Armstrong knew that the CyberMan controller had been on sale more than one year before the '525 application was filed.  On information and belief, Mr. Armstrong recognized the materiality of the CyberMan controller to one or more claims of the '525 application.  On information and belief, while the '525 application was pending before the PTO, Mr. Armstrong knew that the CyberMan controller rendered obvious one or more claims of the '525 application.

42.    In doing the aforesaid acts, Mr. Armstrong violated the duty of disclosure and the duty of candor and good faith imposed by Rule 56, and upon information and belief, did so with an intent to mislead and/or deceive the PTO.

43.    The failure by Mr. Armstrong to disclose the CyberMan controller constitutes inequitable conduct in the procurement of the '525 patent, which renders it unenforceable.

*Unenforceability of the '802, '886, and '991 Patents:*

44.    U.S. Patent No. 5,164,697, entitled "Input Keyboard for An Electronic Appliance in Entertainment Electronics," issued to Richard Kramer on November 17, 1992 (hereafter the "Kramer patent").  The Kramer patent, as its title suggests, is directed generally to a controller for inputting information into an electronic entertainment device.  The input keyboard in Kramer generates a variable, analog output by utilizing a thin carbonized plastic foil with an electrical

resistance that varies with the pressure applied to the button.  The Kramer patent also describes an embodiment in which the button includes a resilient snap-through dome cap.

45.     The application which led to the '084 patent, U.S. Patent Application No. 09/106,825 (the "'084 application"), was filed on November 29, 1996.  On or about April 26, 1999, the PTO mailed to Brad Armstrong an Office Action rejecting all pending claims of the '084 application.  As part of that April 26, 1999 Office Action, the PTO informed Mr. Armstrong of the Kramer patent and told him that it disclosed "variable resistors or switches" and was "considered pertinent to applicant's disclosure."  In a Response dated April 30, 1999, Mr. Armstrong acknowledged that he had received the April 26, 1999 Office Action and that he had undertaken a "careful reading" of the Kramer patent.

46.     At the time he undertook his "careful reading" of the Kramer patent on or before April 30, 1999, the '802, '886, and '991 patents had not issued.  Indeed, as of April 30, 1999, Mr. Armstrong was actively prosecuting the applications that ultimately issued as the '802 and '886 patents and had not even filed the application that ultimately issued as the '991 patent. Specifically, the application which led to the '802 patent, U.S. Patent Application No. 08/942,450 (the "'802 application"), was filed on October 1, 1997 and did not issue until August 15, 2000.  The application which led to the '886 patent, U.S. Patent Application No. 09/122,269 (the "'886 application"), was filed on July 24, 1998 and did not issue until October 24, 2000. The application which led to the '991 patent, U.S. Patent Application No. 09/510,572 (the "'991 application"), was filed on February 22, 2000 and did not issue until February 5, 2002.  The timeline below shows the time after which Mr. Armstrong had read the Kramer Patent, knew of its teachings, and had an opportunity to disclose the Kramer Patent to the Examiners examining the '802 application, the '886 application, and the '991 application:



47.    Mr. Armstrong, the alleged inventor, appears to have filed and prosecuted the '802, '886, or '991 applications himself.  At all times during the prosecution of the '802, '886, and '991 applications, Mr. Armstrong had a duty to disclose information material to patentability under Rule 56 and understood the duty of disclosure.

48.    The '084 application was examined in the PTO by Supervisory Examiner Michael Gellner and Assistant Examiner Karl Easthorn in the PTO's Technology Center 2800.  In contrast, the '802, '886, and '991 applications were all examined by PTO Examiners located in a different PTO Technology Center, Technology Center 3700.  The '802 and '886 applications were examined by Supervisory Examiner Valencia Martin-Wallace and Assistant Examiner John Paradiso, while the '991 application was examined by Supervisory Examiner Rinaldi Rada and Assistant Examiner John Paradiso.  Thus, the Examiners who brought the Kramer patent to Mr. Armstrong's attention in the '084 application were not involved in the examination of the '802, '886, or '991 applications, a fact which Mr. Armstrong knew or should have known.

49.    Mr. Armstrong never disclosed the Kramer patent to the PTO Examiners who were examining the '802, '886, or '991 applications.  Indeed, two years later, on May 21, 2001, Mr. Armstrong submitted an Information Disclosure Statement disclosing prior art of which he was aware, but did not include the Kramer patent in the disclosure.  Nor is there any indication in

the PTO records that any of the PTO Examiners who examined the '802, '886, or '991 applications saw or considered the Kramer patent as part of their examination of those applications.

50.     The Kramer patent was material to one or more claims of the '802 application. The Kramer patent was material to one or more claims of the '886 application. The Kramer patent was material to one or more claims of the '991 application. Indeed, the PTO has recently agreed that the Kramer patent raises a substantial new question of patentability for one or more claims of the '802 patent. (PTO Order Granting Request for Ex Parte Reexamination of the '802 Patent, dated March 9, 2007, at 10). Also, in finding a substantial new question of patentability for the '084 patent, the PTO has also stated that the Kramer patent discloses the use of "pressure-sensitive variable-conductance material and sensor" and a "snap through dome cap type configuration." (PTO Order Granting Request for Ex Parte Reexamination of the '084 Patent, dated Feb. 21, 2007, at 5-7).

51.     Mr. Armstrong knew that the Kramer patent was prior art to the '802 application, the '886 application, and the '991 application. On information and belief, Mr. Armstrong recognized the materiality of the Kramer patent to claims of the '802 application, the '886 application, and the '991 application. On information and belief, while the '802 application was pending before the PTO, Mr. Armstrong knew that the Kramer patent anticipated and/or rendered obvious one or more claims of the '802 application. On information and belief, while the '886 application was pending before the PTO, Mr. Armstrong knew that the Kramer patent anticipated and/or rendered obvious one or more claims of the '886 application. On information and belief, while the '991 application was pending before the PTO, Mr. Armstrong knew that the Kramer patent anticipated and/or rendered obvious one or more claims of the '991 application.

52.    In doing the aforesaid acts, Mr. Armstrong violated the duty of disclosure and the duty of candor and good faith imposed by Rule 56, and upon information and belief, did so with an intent to mislead and/or deceive the PTO.

53.    The failure by Mr. Armstrong to disclose the Kramer patent constitutes inequitable conduct in the procurement of the '802 patent, the '886 patent, and the '991 patent, which renders at least those three patents unenforceable.

### c.    Unenforceability of the '084 Patent:

54.    The '084 application was filed on June 29, 1998.  In the '084 application, Mr. Armstrong claimed that his "invention" was the combination of (1) a tactile feedback dome cap with (2) "pressure-sensitive variable-conductance material" that is capable of providing variable conductance between the two conductive elements depending on pressure on the dome cap.  For example, Mr. Armstrong stated in the '084 application:  "The present invention specifically involves the use of a tactile feedback dome-cap in conjunction with pressure-sensitive variable-conductance material to provide momentary-On pressure dependant variable electrical output." ('084 Patent, at col. 1, lines 7-12).

55.    In the '084 application, Mr. Armstrong admitted that the prior art included dome caps having snap-through tactile feedback but assured the Examiner that such prior art dome caps had not included the second part of the alleged invention—pressure-sensitive variable conductance material:

> There have been hundreds of millions of momentary-On snap switches made and sold in the last 25 years.  Pressure-sensitive variable-conductance sensors have also been known for decades, and yet the prior art does not teach a pressure-sensitive variable-conductance sensor which includes tactile feedback to the user upon actuation and de-actuation of the sensor. … FIG. 3 shows a median cross section view of a prior art flat mount sensor package showing structuring thereof and which is common to some of the present sensor embodiments, but lacking

pressure-sensitive variable-conductance material 30 (see FIGS. 4 through 13) as used in the present invention.

('084 Patent, col. 2, lines 23-30, col. 4, lines 62-66).

56.      The figures below from the '084 application illustrate the distinction Mr. Armstrong made to the Examiner between his alleged "invention" and the prior art.  In the first (Figure 3), which Mr. Armstrong labeled "Prior Art," there is a tactile feedback dome cap (labeled 16) but no "pressure-sensitive variable-conductance material."  The second figure (Figure 5), which is described as one of the embodiments of the "invention" of the '084 Patent, is identical to Figure 3 in all respects except that it includes a piece of "pressure-sensitive variable-conductance material" (labeled 30).



**'084 Patent**
**"Prior Art"**

**'084 Patent**
**Embodiment**

57.      After filing the '084 application, Mr. Armstrong filed a number of related applications that were based on and included the same text and figures as the '084 application. The application that led to the '205 patent, U.S. Patent Application No. 09/455,821 (the "'205 application") was filed on December 6, 1999.  The application that led to the '415 patent, U.S. Patent Application No. 09/955,838 (the "'415 application") was then filed on September 18, 2001.  Each of these applications included the same distinctions between the prior art and the "invention" as those described in paragraphs 33-35 above from the '084 patent, namely that the

"invention" was a combination of a tactile feedback dome cap and "pressure-sensitive variable-conductance material" while the prior art dome caps lacked the "pressure-sensitive variable-conductance material."

58.    While telling the Examiners of the '084 application, the '205 application, and the '415 application that prior art dome caps *lacked* pressure-sensitive variable-conductance material, Mr. Armstrong admitted to the Examiners of a different application that the prior art dome caps *did* in fact include pressure-sensitive variable conductance material.  Specifically, the application that led to the '271 patent, U.S. Patent Application No. 09/148,806 (the "'271 application") was filed on September 4, 1998, just a few months after the '084 application was filed.  In the '271 application, Mr. Armstrong described prior art dome cap sensors that included an "elastomeric one-piece injection molded dome cap" and an "active element" known as a "conductive pill."  ('271 Patent, col. 12, lines 39-50).   Figure 7 shows this prior art dome cap sensor having a "conductive pill," which the '271 Patent states is "in accordance with the prior art."  ('271 Patent, Fig. 7, col. 12, lines 41-42):



**'271 Patent**
**"Prior Art"**

Mr. Armstrong also informed the Examiner in the '271 application that this "conductive pill" in

the prior art dome cap sensor is in fact "pressure-sensitive variable-conductance material."

> I have discovered that the active element (conductive pill or element" of such prior art dome cap sensors is compression or pressure sensitive and variably conductive to a useful degree, and is thus pressure sensitive variable-conductance material.

('271 Patent, col. 7, lines 42-46).

> The conductive pill or active element 14 of typical prior art elastomeric dome-cap sensors is variably conductive and pressure-sensitive to a degree quite useful in an analog sensing circuit as herein disclosed.

('271 Patent, col. 16, lines 30-35).

59.    Thus, at least as early as September 4, 1998, Mr. Armstrong knew, as shown by

what he told the Examiner of the '271 application, that prior art dome caps included conductive

pills that met his definition of "pressure-sensitive variable-conductance material."  However,

after that time, he continued to prosecute the '084 application without correcting his statement to

the Examiner in that application that the prior art dome caps lacked "pressure-sensitive variable-

conductance material."  Furthermore, after that time, he filed both the '205 application and the

'415 application in which he told the Examiner that falsehood about the prior art dome caps

lacking "pressure-sensitive variable-conductance material."  The timeline below shows the time

during which Mr. Armstrong believed that prior art dome caps included "pressure-sensitive

variable-conductance material" but continued to tell the Examiners in the '084, '205, and '415

applications that such material was ***not*** found in the prior art dome caps:



60.    Mr. Armstrong, the alleged inventor, appears to have filed and prosecuted the '084, '205, and '415 applications himself.  At all times during the prosecution of the '084, '205, and '415 applications, Mr. Armstrong had a duty to disclose information material to patentability under Rule 56 and understood the duty of disclosure.

61.    The '271 application was examined in the PTO by Supervisory Examiner Michael Horabik and Assistant Examiner Timothy Edwards, Jr. in the PTO's Technology Center 2700. In contrast, the '084, '205, and '415 applications were all examined by PTO Examiners located in a different PTO Technology Center, Technology Center 2800. The '084 application was examined by Supervisory Examiner Michael Gellner and Assistant Examiner Karl Easthorn, while the '415 and '205 applications were examined solely by Examiner Karl Easthorn. Thus, the Examiners of the '271 application who were told by Mr. Armstrong that prior art dome caps included "pressure-sensitive variable-conductance material" were not involved in the examination of the '084, '205, and '415 applications in which Mr. Armstrong stated in the applications that such prior art dome caps lacked "pressure-sensitive variable-conductance material."

62.     The information that prior art dome caps included conductive pills that constituted "pressure-sensitive variable-conductance material," which Mr. Armstrong disclosed in the '271 application but withheld from the '084 application, was material to one or more claims of the '084 application.  For example, the prior art dome caps with conductive pills, as Mr. Armstrong described them in his '271 application, would anticipate at least claim 5 of the '084 Patent.  Furthermore, the information that prior art dome caps included "pressure-sensitive variable-conductance material" would have been particularly important to the Examiners of the '084 application given that Mr. Armstrong was telling the Examiners in that application that the "invention" was the combination of a tactile feedback dome cap and  "pressure-sensitive variable-conductance material" while the prior art dome caps supposedly lacked that material.

63.     If Mr. Armstrong had been truthful with the PTO and properly advised the Examiners who were examining the '084 applications that prior art dome caps did in fact include "pressure-sensitive variable-conductance material," the Examiners would have rejected one or more claims of that application.

64.     Mr. Armstrong knew that the dome caps he described in the '271 application as having "pressure-sensitive variable-conductance material" were also prior art to the '084 application.  On information and belief, Mr. Armstrong recognized that these prior art dome caps having "pressure-sensitive variable-conductance material" that he described in the '271 application were material to one or more claims of the '084 application.  On information and belief, while the '084 application was pending before the PTO, Mr. Armstrong knew that these prior art dome caps having "pressure-sensitive variable-conductance material" that he described in the '271 application anticipated and/or rendered obvious one or more claims of the '084 application.

65.     In sum, in the prosecution of the '084 application, Mr. Armstrong failed to disclose to the PTO Examiners examining that application the prior art dome caps having "pressure-sensitive variable-conductance material," despite the fact that he disclosed those prior art dome caps in a different application.  Furthermore, while hiding from the Examiners of the '084 application the existence of these prior art dome caps with "pressure-sensitive variable-conductance material," Mr. Armstrong falsely told those Examiners that his "invention" was the combination of a dome cap and "pressure-sensitive variable-conductance material," and that the prior art lacked such a combination.

66.     In doing the aforesaid acts, Mr. Armstrong violated the duty of disclosure and the duty of candor and good faith imposed by Rule 56, and upon information and belief, did so with an intent to mislead and/or deceive the PTO.

67.     The false description of the prior art and failure to disclose the prior art dome caps that had "pressure-sensitive variable-conductance material" to the Examiners of the '084 application constitutes inequitable conduct in the procurement of the '084 patent, which renders at least that patent unenforceable.

68.     The same inequitable conduct applies to the '205 and '415 patents.  However, because the Court has stayed this litigation with respect to those two patents, Microsoft does not plead the inequitable conduct against those two patents at this time.  Microsoft reserves the right to plead the inequitable conduct against the '205 and '415 patents should the stay ever be lifted.

## <u>COUNTERCLAIMS</u>

Microsoft Corporation pleads the following counterclaims against Plaintiff Anascape, Ltd.:

## COUNT I
## <u>DECLARATORY JUDGMENT OF PATENT NONINFRINGEMENT</u>

1.     This counterclaim arises under the patent laws of the United States, Title 35 U.S.C.  This Court has subject matter jurisdiction over this counterclaim under 28 U.S.C. §§ 1338, 2201, and 2202.

2.     Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business in Redmond, Washington.

3.     Upon information and belief, Plaintiff Anascape, Ltd. ("Plaintiff") is a limited partnership, and has filed suit against Microsoft in this District.

4.     Plaintiff purports to be the owner of U.S. Patent No. 5,999,084 ("the '084 patent"), U.S. Patent No. 6,102,802 ("the '802 patent"), U.S. Patent No. 6,135,886 ("the '886 patent"), U.S. Patent No. 6,208,271 ("the '271 patent"), U.S. Patent No. 6,222,525 ("the '525 patent"), U.S. Patent No. 6,343,991 ("the '991 patent"), U.S. Patent No. 6,344,791 ("the '791 patent") U.S. Patent No. 6,347,997 ("the '997 patent"), U.S. Patent No. 6,351,205 ("the '205 patent") U.S. Patent No. 6,400,303 ("the '303 patent") U.S. Patent No. 6,563,415 ("the '415 patent"), and U.S. Patent No. 6,906,700 ("the '700 patent").

5.     Plaintiff has alleged that Microsoft has infringed the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents.

6.     An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, exists between Plaintiff, on the one hand, and Microsoft, on the other hand, regarding the

noninfringement of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents.

7.     Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '084 patent, and is not liable for infringement thereof.

8.     Microsoft has sold two models of controllers for use with its original Xbox video game system.  Photographs of these two controllers are attached hereto as Exhibit A.  These controllers are hereinafter collectively referred to as "Microsoft's Xbox Controllers."

9.     Microsoft also sells controllers for use with its Xbox 360 video game system.  Photographs of these controllers are attached hereto as Exhibit B.  These controllers are hereinafter collectively referred to as "Microsoft's Xbox 360 Controllers."

10.    The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '084 patent.

11.    The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '084 patent.

12.    Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '802 patent, and is not liable for infringement thereof.

13.    The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '802 patent.

14.    The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '802 patent.

15.    Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '886 patent, and is not liable for infringement thereof.

16.    The sale of Microsoft's Xbox Controllers does not in any way infringe any claim

of the '886 patent.

17.     The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '886 patent.

18.     Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '271 patent, and is not liable for infringement thereof.

19.     The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '271 patent.

20.     The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '271 patent.

21.     Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '525 patent, and is not liable for infringement thereof.

22.     The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '525 patent.

23.     The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '525 patent.

24.     Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '991 patent, and is not liable for infringement thereof.

25.     The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '991 patent.

26.     The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '991 patent.

27.     Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '791 patent, and is not liable for infringement thereof.

28.     The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '791 patent.

29.     The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '791 patent.

30.     Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '997 patent, and is not liable for infringement thereof.

31.     The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '997 patent.

32.     The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '997 patent.

33.     Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '205 patent, and is not liable for infringement thereof.

34.     The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '205 patent.

35.     The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '205 patent.

36.     Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '303 patent, and is not liable for infringement thereof.

37.     The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '303 patent.

38.     The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '303 patent.

39.     Microsoft has not infringed, contributed to the infringement of, or induced the

infringement of the '415 patent, and is not liable for infringement thereof.

40.    The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '415 patent.

41.    The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '415 patent.

42.    Microsoft has not infringed, contributed to the infringement of, or induced the infringement of the '700 patent, and is not liable for infringement thereof.

43.    The sale of Microsoft's Xbox Controllers does not in any way infringe any claim of the '700 patent.

44.    The sale of Microsoft's Xbox 360 Controllers does not in any way infringe any claim of the '700 patent.

## COUNT II
## DECLARATORY JUDGMENT OF PATENT INVALIDITY

45.    Microsoft repeats and realleges paragraphs 1-5 of its Counterclaims, as if fully restated herein.

46.    An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, exists between Plaintiff, on the one hand, and Microsoft, on the other hand, regarding the invalidity of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents.

47.    The claims of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents are invalid for failing to comply with the provisions of the Patent Laws, Title 35 U.S.C., including without limitation one or more of 35 U.S.C. §§ 101, 102, 103, 112 and 135.

48.    Claims of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and/or '700 patents are invalid for double patenting.

## COUNT III
## <u>DECLARATORY JUDGMENT OF PATENT UNENFORCEABILITY</u>

49.     Microsoft repeats and realleges paragraphs 1-5 of its Counterclaims, as if fully restated herein.

50.     An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, exists between Plaintiff, on the one hand, and Microsoft, on the other hand, regarding the unenforceability of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents.

51.     At least the '700, '525, '084, '802, '991, and '886 patents are unenforceable due to inequitable conduct in its prosecution before the United States Patent and Trademark Office (the "PTO"), as more particularly alleged below.

### *Unenforceability of the '700 Patent:*

52.     The application which led to the '700 patent, U.S. Patent Application No. 09/715,532 (the "'700 application"), was filed on November 16, 2000.  Brad A. Armstrong, the alleged inventor, appears to have filed and prosecuted the '700 application himself.  Mr. Armstrong originally filed the '700 application on November 16, 2000 with claims 1-38 claiming his alleged invention.

53.     On information and belief, after filing the '700 application, Mr. Armstrong obtained and/or otherwise learned of the structure comprising one or more video game controllers, such as those available from Microsoft, Nintendo Corporation, and/or Sony Corporation.

54.     On information and belief, after learning of the structure of available video game controllers, and during prosecution of the '700 application, Mr. Armstrong amended his '700

patent application in a July 15, 2002 Preliminary Amendment to cancel all original claims 1-38 and substitute new claims 39-77.

55.     On information and belief, Mr. Armstrong added various of the new substitute claims 39-77 in an attempt to obtain a claim scope that would cover one or more of the available video game controllers, rather than cover any of the disclosed embodiments contained within the '700 application as originally filed.  As a result, Mr. Armstrong, through his July 15, 2002 Preliminary Amendment, intentionally added new matter by introducing new claims 39-77 in a manner that is prohibited by 35 U.S.C. § 112.

56.     At least new claims 54 and 55 (corresponding to issued claims 16 and 17, respectively, in the '700 patent) are not supported by the '700 application as originally filed.  By way of example, there is no support in the '700 application as originally filed for a 3-D graphics controller having the specific combination of elements defined in claims 54 and 55 being connected to the first sheet as claimed.  More specifically, the '700 application lacks support for the combination of the claimed first element structured to activate four unidirectional sensors and the claimed second element structured to activate a first two bi-directional proportional sensors, wherein both the first element and second element are connected to the claimed first sheet present in a 3-D graphics controller, as required by claims 54 and 55.  For at least this reason, issued claims 16 and 17 of the '700 patent contain new matter.

57.     Mr. Armstrong provided the following sworn statement (the "July 15 Sworn Statement") in the Preliminary Amendment:

> I, Brad A. Armstrong, believe I am the original, first and sole inventor of the subject matter which is now claimed and for which a patent is sought in the instant application.  I hereby declare that ***no new matter has been added*** by amendment and that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false

statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the Unites States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

(Emphasis added).

58.     The July 15 Sworn Statement made by Mr. Armstrong was false.  On information and belief, Mr. Armstrong knew that the July 15 Sworn Statement was false and made the statement with the intent to mislead the examiner handling the '700 application.  On information and belief, Mr. Armstrong knew at the time he made the July 15 Sworn Statement that he was, in fact, adding new matter to at least new claims 54 and 55, and that he was not, in fact, the inventor of the alleged invention defined by at least these claims.

59.     Mr. Armstrong's false sworn statement was highly material to the patentability of the new claims.  Section 112 of Title 35 of the United States Code states, in pertinent part:

The specification shall contain a written description of the invention, and the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor for carrying out his invention.

Section 2163.06 (I) of the PTO's Manual of Patent Examining Procedure (MPEP) states, in pertinent part:

If new matter is added to the claims, the examiner should reject the claims under 35 U.S.C. 112, first paragraph – written description requirement.  *In re Rasmussen*, 650 F.2d 1212, 211 USPQ 323 (CCPA 1981).

60.     If Mr. Armstrong had been truthful with the PTO and properly advised the PTO that the new claims included new matter, the examiner handling the application would have rejected the claims as failing to satisfy the written description requirement of 35 U.S.C. § 112, as required by Section 2163.06(I) of the MPEP.  Instead, Mr. Armstrong's sworn statement falsely advised the examiner that no new matter was being added, and the PTO relied on Mr.

Armstrong's representation.  In allowing the claims, the PTO also relied on Mr. Armstrong's false sworn statement that he was the inventor of the subject matter added by the amendment.

61.     Mr. Armstrong's false sworn statement constitutes inequitable conduct in the procurement of the '700 patent which renders at least the '700 patent unenforceable.

*Unenforceability of the '525 Patent:*

62.     Two of Anascape's patents that are not asserted in this litigation are U.S. Patent No. 5,589,828 ("the '828 patent) and U.S. Patent No. 5,565,891 ("the '891 patent").  These two patents are in a chain of related patents that starts with the '828 patent, continues to the '891 patent, continues to the asserted '525 patent, and continues to the asserted '700 patent.  The application which issued as the '828 patent was U.S. Patent Application No. 07/847,619 ("the '828 application"), filed on March 5, 1992.  After filing the '828 application, Mr. Armstrong filed on February 23, 1995 the application that issued as the '891 patent, U.S. Patent Application No. 08/393,495 ("the '891 application).

63.     During the prosecution of the '828 application, Mr. Armstrong disclosed a six-degree-of-freedom controller sold by Logitech called the CyberMan to the PTO Examiners reviewing that application.  Specifically, on June 3, 1994, Mr. Armstrong filed with the PTO an Amendment in the '828 application to which he attached a flyer for the CyberMan controller.  In that Amendment, Mr. Armstrong stated that he was disclosing the CyberMan controller because he believed that the Cyberman controllers were "precise copies of my invention in the instant application" and that he wanted the PTO to help him by expediting the examination process. (Amendment of June 3, 1994, at 2-3).

64.     In the next application in the chain, the '891 application, the Examiner rejected a number of claims based on the CyberMan.  (Office Action of July 5, 1995).  However, Mr.

Armstrong met with the Examiner and convinced him that the CyberMan controller was not prior art by arguing that the '891 application was a "continuation" of its parent, the '828 application, because no new matter had been added to the '891 application.  (Interview Summary of October 2, 1995).  Because the flyer for the CyberMan controller was dated 1993, after the filing of the parent '828 application and because the Examiner believed the '891 application was a continuation application entitled to claim the benefit of the '828 application's filing date, the Examiner withdrew the rejection based on CyberMan.  (*Id.*).

65.     The next application in this chain was the application that led to the asserted '525 patent, U.S. Patent Application No. 08/677,378 ("the '525 application"), filed on July 5, 1996.  The '525 application was not, however, a "continuation" of the previous applications in the chain.  Instead, in the '525 application as filed, Mr. Armstrong specifically stated that the application only included "in part" material from his previous applications.  In an Amendment dated September 23, 1996, Mr. Armstrong even directed the Examiner to withdraw the claim that the '525 application contained "in part" the material from previous applications.

66.     The '525 application was very different from the previous two applications in the chain.  One key element that Mr. Armstrong first added in the '525 application was the idea of using a flexible membrane sheet connected to a circuit board.  Mr. Armstrong did not disclose such a membrane element in his previous two applications, the '828 and '891 applications.  In fact, a search through the '828 and '891 patents will not find even a mention of a membrane.  Thus, for any claims in the '525 application that were directed to the membrane element that first appeared in the '525 application filed on July 5, 1996, Mr. Armstrong would not have been able to rely on his previous two applications to leapfrog behind the 1993 CyberMan controller.

67.    The claims of the '525 patent are in fact directed to the membrane element that first appeared in Mr. Armstrong's '525 application filed in 1996.  For example claims 1 and 5 of the '525 patent are directed to an "image controller" that includes, among other elements, a "flexible membrane sheet connected to a rigid circuit board sheet."  Likewise, claim 12 of the '525 patent is directed to an "image controller" that includes, among other elements, a "flexible membrane sheet."

68.    The '525 patent issued on April 24, 2001.  However, throughout the entire time the '525 application was pending, from July 5, 1996 until April 24, 2001, Mr. Armstrong never disclosed the existence of the CyberMan controller to the PTO Examiners reviewing the '525 application.

69.    On November 16, 2000, just before the '525 patent issued, Mr. Armstrong filed the next application in this chain, the '700 patent application.  During the prosecution of the later-filed '700 application, Mr. Armstrong disclosed the CyberMan to the PTO Examiner reviewing that application.  Specifically, on December 4, 2003, Mr. Armstrong filed with the PTO an Information Disclosure Statement ("the December 4, 2003 IDS") that brought a number of prior art references to the attention of the Examiner in the '700 application, including the CyberMan controller.

70.    In the December 4, 2003 IDS of the '700 application, Mr. Armstrong admitted that the CyberMan controller had been "first sold in 1993 in the USA by Logitech Inc. …"  Mr. Armstrong also submitted with this IDS the same flyer he had submitted in the '828 application, as well as photographs of the CyberMan, both in assembled and disassembled states, with annotations apparently added to the photographs by Mr. Armstrong.

71.    In the December 4, 2003 IDS of the '700 application, Mr. Armstrong also admitted that the 1993 CyberMan controller included a "membrane element" connected to a circuit board:

> Photograph 2 shows a portion of the CyberMan in a disassembled state and showing the handle, three buttons, a microswitch for one of the buttons, a wiring harness spanning between a membrane located in the handle and a circuit board located in the base. … The membrane is located in the handle and the circuit board is located in the base. The expensive conventional wiring harness spans between the membrane in the handle and the circuit board in the base.

72.    In describing the CyberMan in the December 4, 2003 IDS of the '700 application, Mr. Armstrong further admitted that such a "membrane element" was included in his '525 application but had not appeared in his earlier application, the '828 application. Thus, Mr. Armstrong confirmed in the December 4, 2003 IDS of the '700 application what is plain from a review of the chain of applications: Mr. Armstrong did not disclose the flexible membrane element in his earlier '828 and '891 applications, that he first added that element in the '525 application filed in 1996, and that the 1993 Cyberman controller included such a flexible membrane element.

73.    In sum, while Mr. Armstrong knew about the CyberMan controller and had disclosed it to the PTO in the two applications (the '828 and '891 application) for which he could claim a priority date of 1992, prior to CyberMan's 1993 date, he did *not* disclose CyberMan to the PTO Examiners reviewing the '525 application that added the new flexible membrane element, an element that the CyberMan controller had included three years before that '525 application.

74.    The timeline below illustrates the knowledge by Mr. Armstrong of the CyberMan controller and how he selectively disclosed it in earlier application in which he believed he could claim a filing date earlier than the CyberMan but failed to disclose it during the prosecution of

the later-filed '525 application that could not claim priority back to his earlier applications because of the newly added membrane element:



75.     There was no reason for Mr. Armstrong to expect the Examiners in the '525 application to know anything about the CyberMan controller because they were not the same Examiners who had worked on the earlier '828 and '891 applications in which the CyberMan controller had been disclosed. The Examiners in the '525 application included John Suraci, Steven Saras, and Jeffrey Brier, all in Technology Center 2700. In contrast, the Examiners who had been involved with the earlier '828 and '891 applications were other Examiners and all were in Technology Centers 2600 or 2400.

76.     Mr. Armstrong never disclosed the CyberMan controller to the PTO Examiners who were examining the '525 application. Nor is there any indication in the PTO records that any of the PTO Examiners who examined the '525 application saw or considered the CyberMan controller as part of their examination of this application.

77.     Mr. Armstrong, the alleged inventor, appears to have filed and prosecuted the '828, '891, '525, and '700 applications himself. At all times during the prosecution of the '525

application, Mr. Armstrong had a duty to disclose information material to patentability under 37

C.F.R. § 1.56 ("Rule 56") and understood the duty of disclosure.  Rule 56 reads in part:

> § 1.56  Duty to disclose information material to patentability.
>
> (a) A patent by its very nature is affected with a public interest. The public
> interest is best served, and the most effective patent examination occurs when, at
> the time an application is being examined, the Office is aware of and evaluates the
> teachings of all information material to patentability. Each individual associated
> with the filing and prosecution of a patent application has a ***duty of candor and
> good faith*** in dealing with the Office, which includes a ***duty to disclose*** to the
> Office all information known to that individual to be material to patentability as
> defined in this section.
> …
> (c) Individuals associated with the filing or prosecution of a patent application
> within the meaning of this section are:
>
> > (1) ***Each inventor named in the application***;
> ….

(Rule 56, emphasis added).

78.     By Mr. Armstrong's own admissions in the December 4, 2003 IDS, the

CyberMan controller was on sale in the United States in 1993, more than one year prior to the

filing date of the '525 application.  Thus, the CyberMan controller was prima facie prior art to

the '525 application under 35 U.S.C. § 102(b).  Furthermore, the CyberMan controller included

elements that Mr. Armstrong admitted in the December 4, 2003 IDS were first added in the '525

application and were not disclosed in his earlier application filed before the CyberMan controller

was on the market.

79.     The CyberMan controller was material to the patentability of one or more claims

at issue in the '525 application.  The CyberMan controller disclosed the membrane element that

Mr. Armstrong did not include in his applications until the '525 application was filed in 1996.

Furthermore, the CyberMan controller would have been important to a reasonable examiner for

purposes of examining at least claims 1-3, 5-8, and 12-23 of the '525 patent because it renders at least those claims obvious under 35 U.S.C. § 103(a).

80.    Mr. Armstrong knew that the CyberMan controller had been on sale more than one year before the '525 application was filed.  On information and belief, Mr. Armstrong recognized the materiality of the CyberMan controller to one or more claims of the '525 application.  On information and belief, while the '525 application was pending before the PTO, Mr. Armstrong knew that the CyberMan controller rendered obvious one or more claims of the '525 application.

81.    In doing the aforesaid acts, Mr. Armstrong violated the duty of disclosure and the duty of candor and good faith imposed by Rule 56, and upon information and belief, did so with an intent to mislead and/or deceive the PTO.

82.    The failure by Mr. Armstrong to disclose the CyberMan controller constitutes inequitable conduct in the procurement of the '525 patent, which renders it unenforceable.

**_Unenforceability of the '802, '886, and '991 Patents:_**

83.    U.S. Patent No. 5,164,697, entitled "Input Keyboard for An Electronic Appliance in Entertainment Electronics," issued to Richard Kramer on November 17, 1992 (hereafter the "Kramer patent").  The Kramer patent, as its title suggests, is directed generally to a controller for inputting information into an electronic entertainment device.  The input keyboard in Kramer generates a variable, analog output by utilizing a thin carbonized plastic foil with an electrical resistance that varies with the pressure applied to the button.  The Kramer patent also describes an embodiment in which the button includes a resilient snap-through dome cap.

84.    The application which led to the '084 patent, U.S. Patent Application No. 09/106,825 (the "'084 application"), was filed on November 29, 1996.  On or about April 26,

1999, the PTO mailed to Brad Armstrong an Office Action rejecting all pending claims of the

'084 application.  As part of that April 26, 1999 Office Action, the PTO informed Mr. Armstrong

of the Kramer patent and told him that it disclosed "variable resistors or switches" and was

"considered pertinent to applicant's disclosure."  In a Response dated April 30, 1999, Mr.

Armstrong acknowledged that he had received the April 26, 1999 Office Action and that he had

undertaken a "careful reading" of the Kramer patent.

85.     At the time he undertook his "careful reading" of the Kramer patent on or before

April 30, 1999, the '802, '886, and '991 patents had not issued.  Indeed, as of April 30, 1999,

Mr. Armstrong was actively prosecuting the applications that ultimately issued as the '802 and

'886 patents and had not even filed the application that ultimately issued as the '991 patent.

Specifically, the application which led to the '802 patent, U.S. Patent Application No.

08/942,450 (the "'802 application"), was filed on October 1, 1997 and did not issue until August

15, 2000.  The application which led to the '886 patent, U.S. Patent Application No. 09/122,269

(the "'886 application"), was filed on July 24, 1998 and did not issue until October 24, 2000.

The application which led to the '991 patent, U.S. Patent Application No. 09/510,572 (the "'991

application"), was filed on February 22, 2000 and did not issue until February 5, 2002.  The

timeline below shows the time after which Mr. Armstrong had read the Kramer Patent, knew of

its teachings, and had an opportunity to disclose the Kramer Patent to the Examiners examining

the '802 application, the '886 application, and the '991 application:



86.    Mr. Armstrong, the alleged inventor, appears to have filed and prosecuted the '802, '886, or '991 applications himself.  At all times during the prosecution of the '802, '886, and '991 applications, Mr. Armstrong had a duty to disclose information material to patentability under Rule 56 and understood the duty of disclosure.

87.    The '084 application was examined in the PTO by Supervisory Examiner Michael Gellner and Assistant Examiner Karl Easthorn in the PTO's Technology Center 2800.  In contrast, the '802, '886, and '991 applications were all examined by PTO Examiners located in a different PTO Technology Center, Technology Center 3700.  The '802 and '886 applications were examined by Supervisory Examiner Valencia Martin-Wallace and Assistant Examiner John Paradiso, while the '991 application was examined by Supervisory Examiner Rinaldi Rada and Assistant Examiner John Paradiso.  Thus, the Examiners who brought the Kramer patent to Mr. Armstrong's attention in the '084 application were not involved in the examination of the '802, '886, or '991 applications, a fact which Mr. Armstrong knew or should have known.

88.    Mr. Armstrong never disclosed the Kramer patent to the PTO Examiners who were examining the '802, '886, or '991 applications.  Indeed, two years later, on May 21, 2001, Mr. Armstrong submitted an Information Disclosure Statement disclosing prior art of which he was aware, but did not include the Kramer patent in the disclosure.  Nor is there any indication in

the PTO records that any of the PTO Examiners who examined the '802, '886, or '991 applications saw or considered the Kramer patent as part of their examination of those applications.

89.    The Kramer patent was material to one or more claims of the '802 application. The Kramer patent was material to one or more claims of the '886 application. The Kramer patent was material to one or more claims of the '991 application. Indeed, the PTO has recently agreed that the Kramer patent raises a substantial new question of patentability for one or more claims of the '802 patent. (PTO Order Granting Request for Ex Parte Reexamination of the '802 Patent, dated March 9, 2007, at 10). Also, in finding a substantial new question of patentability for the '084 patent, the PTO has also stated that the Kramer patent discloses the use of "pressure-sensitive variable-conductance material and sensor" and a "snap through dome cap type configuration." (PTO Order Granting Request for Ex Parte Reexamination of the '084 Patent, dated Feb. 21, 2007, at 5-7).

90.    Mr. Armstrong knew that the Kramer patent was prior art to the '802 application, the '886 application, and the '991 application. On information and belief, Mr. Armstrong recognized the materiality of the Kramer patent to claims of the '802 application, the '886 application, and the '991 application. On information and belief, while the '802 application was pending before the PTO, Mr. Armstrong knew that the Kramer patent anticipated and/or rendered obvious one or more claims of the '802 application. On information and belief, while the '886 application was pending before the PTO, Mr. Armstrong knew that the Kramer patent anticipated and/or rendered obvious one or more claims of the '886 application. On information and belief, while the '991 application was pending before the PTO, Mr. Armstrong knew that the Kramer patent anticipated and/or rendered obvious one or more claims of the '991 application.

DEFENDANT MICROSOFT CORPORATION'S FIRST AMENDED
ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT                    Page 46

91.    In doing the aforesaid acts, Mr. Armstrong violated the duty of disclosure and the duty of candor and good faith imposed by Rule 56, and upon information and belief, did so with an intent to mislead and/or deceive the PTO.

92.    The failure by Mr. Armstrong to disclose the Kramer patent constitutes inequitable conduct in the procurement of the '802 patent, the '886 patent, and the '991 patent, which renders at least those three patents unenforceable.

### c.    Unenforceability of the '084 Patent:

93.    The '084 application was filed on June 29, 1998.  In the '084 application, Mr. Armstrong claimed that his "invention" was the combination of (1) a tactile feedback dome cap with (2) "pressure-sensitive variable-conductance material" that is capable of providing variable conductance between the two conductive elements depending on pressure on the dome cap.  For example, Mr. Armstrong stated in the '084 application:  "The present invention specifically involves the use of a tactile feedback dome-cap in conjunction with pressure-sensitive variable-conductance material to provide momentary-On pressure dependant variable electrical output." ('084 Patent, at col. 1, lines 7-12).

94.    In the '084 application, Mr. Armstrong admitted that the prior art included dome caps having snap-through tactile feedback but assured the Examiner that such prior art dome caps had not included the second part of the alleged invention—pressure-sensitive variable conductance material:

> There have been hundreds of millions of momentary-On snap switches made and sold in the last 25 years.  Pressure-sensitive variable-conductance sensors have also been known for decades, and yet the prior art does not teach a pressure-sensitive variable-conductance sensor which includes tactile feedback to the user upon actuation and de-actuation of the sensor. … FIG. 3 shows a median cross section view of a prior art flat mount sensor package showing structuring thereof and which is common to some of the present sensor embodiments, but lacking

pressure-sensitive variable-conductance material 30 (see FIGS. 4 through 13) as used in the present invention.

('084 Patent, col. 2, lines 23-30, col. 4, lines 62-66).

95.     The figures below from the '084 application illustrate the distinction Mr.

Armstrong made to the Examiner between his alleged "invention" and the prior art.  In the first

(Figure 3), which Mr. Armstrong labeled "Prior Art," there is a tactile feedback dome cap

(labeled 16) but no "pressure-sensitive variable-conductance material."  The second figure

(Figure 5), which is described as one of the embodiments of the "invention" of the '084 Patent, is

identical to Figure 3 in all respects except that it includes a piece of "pressure-sensitive variable-

conductance material" (labeled 30).



**'084 Patent**
**"Prior Art"**

**'084 Patent**
**Embodiment**

96.     After filing the '084 application, Mr. Armstrong filed a number of related

applications that were based on and included the same text and figures as the '084 application.

The application that led to the '205 patent, U.S. Patent Application No. 09/455,821 (the "'205

application") was filed on December 6, 1999.  The application that led to the '415 patent, U.S.

Patent Application No. 09/955,838 (the "'415 application") was then filed on September 18,

2001.  Each of these applications included the same distinctions between the prior art and the

"invention" as those described in paragraphs 33-35 above from the '084 patent, namely that the

"invention" was a combination of a tactile feedback dome cap and "pressure-sensitive variable-conductance material" while the prior art dome caps lacked the "pressure-sensitive variable-conductance material."

97.    While telling the Examiners of the '084 application, the '205 application, and the '415 application that prior art dome caps *lacked* pressure-sensitive variable-conductance material, Mr. Armstrong admitted to the Examiners of a different application that the prior art dome caps *did* in fact include pressure-sensitive variable conductance material.  Specifically, the application that led to the '271 patent, U.S. Patent Application No. 09/148,806 (the "'271 application") was filed on September 4, 1998, just a few months after the '084 application was filed.  In the '271 application, Mr. Armstrong described prior art dome cap sensors that included an "elastomeric one-piece injection molded dome cap" and an "active element" known as a "conductive pill."  ('271 Patent, col. 12, lines 39-50).   Figure 7 shows this prior art dome cap sensor having a "conductive pill," which the '271 Patent states is "in accordance with the prior art."  ('271 Patent, Fig. 7, col. 12, lines 41-42):



**'271 Patent**
**"Prior Art"**

Mr. Armstrong also informed the Examiner in the '271 application that this "conductive pill" in the prior art dome cap sensor is in fact "pressure-sensitive variable-conductance material."

> I have discovered that the active element (conductive pill or element" of such prior art dome cap sensors is compression or pressure sensitive and variably conductive to a useful degree, and is thus pressure sensitive variable-conductance material.

('271 Patent, col. 7, lines 42-46).

> The conductive pill or active element 14 of typical prior art elastomeric dome-cap sensors is variably conductive and pressure-sensitive to a degree quite useful in an analog sensing circuit as herein disclosed.

('271 Patent, col. 16, lines 30-35).

98.    Thus, at least as early as September 4, 1998, Mr. Armstrong knew, as shown by what he told the Examiner of the '271 application, that prior art dome caps included conductive pills that met his definition of "pressure-sensitive variable-conductance material."  However, after that time, he continued to prosecute the '084 application without correcting his statement to the Examiner in that application that the prior art dome caps lacked "pressure-sensitive variable-conductance material."  Furthermore, after that time, he filed both the '205 application and the '415 application in which he told the Examiner that falsehood about the prior art dome caps lacking "pressure-sensitive variable-conductance material."  The timeline below shows the time during which Mr. Armstrong believed that prior art dome caps included "pressure-sensitive variable-conductance material" but continued to tell the Examiners in the '084, '205, and '415 applications that such material was **not** found in the prior art dome caps:



99.    Mr. Armstrong, the alleged inventor, appears to have filed and prosecuted the '084, '205, and '415 applications himself.  At all times during the prosecution of the '084, '205, and '415 applications, Mr. Armstrong had a duty to disclose information material to patentability under Rule 56 and understood the duty of disclosure.

100.    The '271 application was examined in the PTO by Supervisory Examiner Michael Horabik and Assistant Examiner Timothy Edwards, Jr. in the PTO's Technology Center 2700. In contrast, the '084, '205, and '415 applications were all examined by PTO Examiners located in a different PTO Technology Center, Technology Center 2800. The '084 application was examined by Supervisory Examiner Michael Gellner and Assistant Examiner Karl Easthorn, while the '415 and '205 applications were examined solely by Examiner Karl Easthorn. Thus, the Examiners of the '271 application who were told by Mr. Armstrong that prior art dome caps included "pressure-sensitive variable-conductance material" were not involved in the examination of the '084, '205, and '415 applications in which Mr. Armstrong stated in the applications that such prior art dome caps lacked "pressure-sensitive variable-conductance material."

101.    The information that prior art dome caps included conductive pills that constituted "pressure-sensitive variable-conductance material," which Mr. Armstrong disclosed in the '271 application but withheld from the '084 application, was material to one or more claims of the '084 application.  For example, the prior art dome caps with conductive pills, as Mr. Armstrong described them in his '271 application, would anticipate at least claim 5 of the '084 Patent.  Furthermore, the information that prior art dome caps included "pressure-sensitive variable-conductance material" would have been particularly important to the Examiners of the '084 application given that Mr. Armstrong was telling the Examiners in that application that the "invention" was the combination of a tactile feedback dome cap and  "pressure-sensitive variable-conductance material" while the prior art dome caps supposedly lacked that material.

102.    If Mr. Armstrong had been truthful with the PTO and properly advised the Examiners who were examining the '084 applications that prior art dome caps did in fact include "pressure-sensitive variable-conductance material," the Examiners would have rejected one or more claims of that application.

103.    Mr. Armstrong knew that the dome caps he described in the '271 application as having "pressure-sensitive variable-conductance material" were also prior art to the '084 application.  On information and belief, Mr. Armstrong recognized that these prior art dome caps having "pressure-sensitive variable-conductance material" that he described in the '271 application were material to one or more claims of the '084 application.  On information and belief, while the '084 application was pending before the PTO, Mr. Armstrong knew that these prior art dome caps having "pressure-sensitive variable-conductance material" that he described in the '271 application anticipated and/or rendered obvious one or more claims of the '084 application.

104.     In sum, in the prosecution of the '084 application, Mr. Armstrong failed to disclose to the PTO Examiners examining that application the prior art dome caps having "pressure-sensitive variable-conductance material," despite the fact that he disclosed those prior art dome caps in a different application.  Furthermore, while hiding from the Examiners of the '084 application the existence of these prior art dome caps with "pressure-sensitive variable-conductance material," Mr. Armstrong falsely told those Examiners that his "invention" was the combination of a dome cap and "pressure-sensitive variable-conductance material," and that the prior art lacked such a combination.

105.     In doing the aforesaid acts, Mr. Armstrong violated the duty of disclosure and the duty of candor and good faith imposed by Rule 56, and upon information and belief, did so with an intent to mislead and/or deceive the PTO.

106.     The false description of the prior art and failure to disclose the prior art dome caps that had "pressure-sensitive variable-conductance material" to the Examiners of the '084 application constitutes inequitable conduct in the procurement of the '084 patent, which renders at least that patent unenforceable.

107.     The same inequitable conduct applies to the '205 and '415 patents.  However, because the Court has stayed this litigation with respect to those two patents, Microsoft does not plead the inequitable conduct against those two patents at this time.  Microsoft reserves the right to plead the inequitable conduct against the '205 and '415 patents should the stay ever be lifted.

## PRAYER FOR RELIEF

WHEREFORE, Microsoft prays for the following relief:

A.     That the Court enter judgment against Plaintiff on, and dismiss with prejudice, each claim of Plaintiff's Amended Complaint against Microsoft;

B.      That the Court enter a judgment declaring that the claims of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents are invalid.

C.      That the Court enter a judgment declaring that the claims of the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents are not infringed by Microsoft;

D.      That the Court enter a judgment declaring that at least the '700, '525, '886, '802, '991, and '084 patents are unenforceable.

E.      That the Court declare this an exceptional case pursuant to 35 U.S.C. § 285 and award to Microsoft its reasonable costs and attorneys' fees, together with interest, including prejudgment interest, thereupon; and

D.      That the Court grant to Microsoft such other and further relief as may be deemed just and appropriate.

## <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b) and Local Rule CV-38, Defendant Microsoft Corporation respectfully demands a trial by jury.

Respectfully submitted,

Dated: July ___, 2007                    By:    /s/ J. Christopher Carraway _____
                                                J. Christopher Carraway (admitted *pro hac vice*)
                                                Lead Attorney
                                                christopher.carraway@klarquist.com
                                                Joseph T. Jakubek (admitted *pro hac vice*)
                                                joseph.jakubek@klarquist.com
                                                Stephen J. Joncus (admitted *pro hac vice*)
                                                stephen.joncus@klarquist.com
                                                Richard D. Mc Leod (Bar No. 24026836)
                                                rick.mcleod@klarquist.com
                                                Derrick W. Toddy (admitted *pro hac vice*)
                                                derrick.toddy@klarquist.com
                                                KLARQUIST SPARKMAN, LLP
                                                121 S.W. Salmon Street, Suite 1600
                                                Portland, Oregon  97204
                                                Telephone:  503-595-5300

J. Thad Heartfield (Bar No. 09346800)
thad@jth-law.com
Law Offices of J. Thad Heartfield
2195 Dowlen Road
Beaumont, Texas 77706
Telephone: 409-866-3318
Facsimile: 409-866-5789

Clayton E Dark Jr. (Bar No. 05384500)
clay.dark@yahoo.com
Clayton E Dark Jr., Law Office
207 E Frank Ave # 100
Lufkin, TX 75901
Telephone:  936-637-1733

Stephen McGrath, Esq. (admitted *pro hac vice*)
MICROSOFT CORPORATION
One Microsoft Way, Building 8
Redmond, Washington  98052-6399
Telephone:  425-882-8080
Facsimile:  425-706-7329

*Attorneys for Defendant Microsoft Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this the ___ day of July, 2007.  Any other counsel of record will be served by first class mail.

/s/ J. Christopher Carraway _____

CERTIFICATE OF SERVICE