# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

|  |  |  |
|---|---|---|
| ANASCAPE, LTD., | § § § § | |
| Plaintiff, | § § | Hon. Ron Clark |
| v. | § § | Civil Action No.: 9:06-CV-00158-RC |
| MICROSOFT CORP. and NINTENDO OF AMERICA INC., | § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

## DEFENDANT NINTENDO OF AMERICA INC.'S FIRST AMENDED ANSWER AND COUNTERCLAIMS TO ANASCAPE, LTD.'S FIRST AMENDED COMPLAINT

Defendant Nintendo of America Inc. ("NOA"), by and through its undersigned counsel, hereby submits this Answer and Counterclaims in response to the First Amended Complaint for Patent Infringement by plaintiff Anascape, Ltd. dated November 21, 2006 (the "Amended Complaint"). For its Amended Answer, NOA states as follows:

### THE PARTIES

1.      NOA is without sufficient information or belief to admit or deny the allegations of paragraph 1 and, therefore, denies these allegations.

2.      NOA is without sufficient information or belief to admit or deny the allegations of paragraph 2 and, therefore, denies these allegations.

3.      NOA admits the allegations of the first and second sentences of paragraph 3. NOA admits that it sells video game consoles and video game controllers to consumers in the

NY\1217915.3

United States, including in the Eastern District of Texas, but denies the remaining allegations of the third sentence of paragraph 3.

4.     NOA admits that pursuant to paragraph 4 Anascape purports to collectively refer to Microsoft and Nintendo in the Complaint as the "Defendants."

## JURISDICTION AND VENUE

5.     NOA admits that pursuant to paragraph 5 Anascape purports to bring this action under Title 35, United States Code, with subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), but NOA denies any liability thereunder.

6.     NOA admits that venue is proper in the Eastern District of Texas under 28 U.S.C. §§ 1391 and 1400.

7.     NOA does not contest personal jurisdiction over it in this case. NOA admits the allegations of the second and third sentences of paragraph 7 insofar as they relate to NOA. NOA denies that it has directly infringed or contributed to or induced acts of infringement in the Eastern District of Texas or elsewhere. NOA is without sufficient information or belief to admit or deny the allegations of paragraph 7 insofar as they relate to Microsoft and, therefore, denies these allegations. NOA denies the remaining allegations of paragraph 7.

## PATENT INFRINGEMENT

8.     NOA incorporates by reference paragraphs 1-7 as if fully set forth herein.

9.     NOA admits that U.S. Patent No. 5,999,084 (the "'084 patent") entitled "Variable-Conductance Sensor" issued on December 7, 1999 and lists Brad A. Armstrong as the named inventor. NOA denies that this patent was duly and legally issued. NOA admits that an uncertified copy of a document purporting to be the '084 patent is attached as Exhibit A to the Complaint. NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 9 and, therefore, denies these allegations.

2

10.     NOA admits that U.S. Patent No. 6,102,802 (the "'802 patent") entitled "Game Controller with Analog Pressure Sensor(s)" issued on August 15, 2000 and lists Brad A. Armstrong as the named inventor.  NOA denies that this patent was duly and legally issued. NOA admits that an uncertified copy of a document purporting to be the '802 patent is attached as Exhibit B to the Complaint.  NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 10 and, therefore, denies these allegations.

11.     NOA admits that U.S. Patent No. 6,135,886 (the "'886 patent") entitled "Variable-Conductance Sensor with Elastomeric Dome-Cap" issued on October 24, 2000 and lists Brad A. Armstrong as the named inventor.  NOA denies that this patent was duly and legally issued.  NOA admits that an uncertified copy of a document purporting to be the '886 patent is attached as Exhibit C to the Complaint.  NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 11 and, therefore, denies these allegations.

12.     NOA admits that U.S. Patent No. 6,208,271 (the "'271 patent") entitled "Remote Controllers with Analog Button(s)" issued on March 27, 2001 and lists Brad A. Armstrong as the named inventor.  NOA denies that this patent was duly and legally issued.  NOA admits that an uncertified copy of a document purporting to be the '271 patent is attached as Exhibit D to the Complaint.  NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 12 and, therefore, denies these allegations.

13.     NOA admits that U.S. Patent No. 6,222,525 (the "'525 patent") entitled "Image Controllers with Sheet Connected Sensors" issued on April 24, 2001 and lists Brad A. Armstrong as the named inventor.  NOA denies that this patent was duly and legally issued.  NOA admits that an uncertified copy of a document purporting to be the '525 patent is attached as Exhibit E

NY\1217915.3

to the Complaint. NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 13 and, therefore, denies these allegations.

14.    NOA admits that U.S. Patent No. 6,343,991 (the "'991 patent") entitled "Game Control with Analog Pressure Sensor" issued on February 5, 2002 and lists Brad A. Armstrong as the named inventor. NOA denies that this patent was duly and legally issued. NOA admits that an uncertified copy of a document purporting to be the '991 patent is attached as Exhibit F to the Complaint. NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 14 and, therefore, denies these allegations.

15.    NOA admits that U.S. Patent No. 6,344,791 (the "'791 patent") entitled "Variable Sensor with Tactile Feedback" issued on February 5, 2002 and lists Brad A. Armstrong as the named inventor. NOA denies that this patent was duly and legally issued. NOA admits that an uncertified copy of a document purporting to be the '791 patent is attached as Exhibit G to the Complaint. NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 15 and, therefore, denies these allegations.

16.    NOA admits that U.S. Patent No. 6,347,997 (the "'997 patent") entitled "Analog Controls Housed with Electronic Displays" issued on February 19, 2002 and lists Brad A. Armstrong as the named inventor. NOA denies that this patent was duly and legally issued. NOA admits that an uncertified copy of a document purporting to be the '997 patent is attached as Exhibit H to the Complaint. NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 16 and, therefore, denies these allegations.

17.    NOA admits that U.S. Patent No. 6,351,205 (the "'205 patent") entitled "Variable-Conductance Sensor" issued on February 26, 2002 and lists Brad A. Armstrong as the named inventor. NOA denies that this patent was duly and legally issued. NOA admits that an

NY\1217915.3

uncertified copy of a document purporting to be the '205 patent is attached as Exhibit I to the Complaint. NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 17 and, therefore, denies these allegations.

18.    NOA admits that U.S. Patent No. 6,400,303 (the "'303 patent") entitled "Remote Controller with Analog Pressure Sensor(s)" issued on June 4, 2002 and lists Brad A. Armstrong as the named inventor. NOA denies that this patent was duly and legally issued. NOA admits that an uncertified copy of a document purporting to be the '303 patent is attached as Exhibit J to the Complaint. NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 18 and, therefore, denies these allegations.

19.    NOA admits that U.S. Patent No. 6,563,415 (the "'415 patent") entitled "Analog Sensor(s) with Snap-Through Tactile Feedback" issued on May 13, 2003 and lists Brad A. Armstrong as the named inventor. NOA denies that this patent was duly and legally issued. NOA admits that an uncertified copy of a document purporting to be the '415 patent is attached as Exhibit K to the Complaint. NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 19 and, therefore, denies these allegations.

20.    NOA admits that U.S. Patent No. 6,906,700 (the "'700 patent") entitled "3D Controller with Vibration" issued on June 14, 2005 and lists Brad A. Armstrong as the named inventor. NOA denies that this patent was duly and legally issued. NOA admits that an uncertified copy of a document purporting to be the '700 patent is attached as Exhibit L to the Complaint. NOA is without sufficient information or belief to admit or deny the remaining allegations of paragraph 20 and, therefore, denies these allegations.

21.    NOA admits that pursuant to paragraph 21 Anascape purports to collectively refer to the '084, '802, '886, '271, '525, '991, '791, '997, '205, '303, '415, and '700 patents as the "Patents-in-Suit."

22.    NOA is without sufficient information or belief to admit or deny the allegations of paragraph 22 and, therefore, denies these allegations.

23.    NOA denies the allegations of paragraph 23.

24.    NOA denies the allegations of paragraph 24 insofar as they relate to NOA. NOA is without sufficient information or belief to admit or deny the allegations of paragraph 24 insofar as they relate to Microsoft and, therefore, denies these allegations.

25.    NOA asserts that the allegations of paragraph 25 insofar as they relate to NOA contain legal conclusions to which no response is required and, therefore, denies these allegations. NOA is without sufficient information or belief to admit or deny the allegations of paragraph 25 insofar as they relate to Microsoft and, therefore, denies these allegations.

26.    NOA denies the allegations of paragraph 26 insofar as they relate to NOA. NOA is without sufficient information or belief to admit or deny the allegations of paragraph 26 insofar as they relate to Microsoft and, therefore, denies these allegations.

## AFFIRMATIVE DEFENSES

Further answering the complaint, NOA asserts that:

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

27.    The Amended Complaint fails to state a claim upon which relief can be granted.

NY\1217915.3

## SECOND AFFIRMATIVE DEFENSE

### (Non-Infringement)

28.     NOA has not infringed, and is not infringing, any valid and enforceable claim of the '525, '791, '205, '415 or '700 patents, either literally or under the doctrine of equivalents, nor has it induced or contributorily infringed any claim of the '525, '791, '205, '415 or '700 patents.

## THIRD AFFIRMATIVE DEFENSE

### (Invalidity)

29.     The '525, '791, '205, '415 and '700 patents, and each claim thereof, are invalid for failure to meet at least one of the requirements of patentability set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## FOURTH AFFIRMATIVE DEFENSE

### (Laches)

30.     Anascape's claims for relief are barred, in whole or in part, by the equitable doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE

### (35 U.S.C. § 287)

31.     Anascape's claims for relief are barred, in whole or in part, pursuant to 35 U.S.C. § 287.

## SIXTH AFFIRMATIVE DEFENSE

### (Prosecution Laches)

32.     Anascape's claims for relief are barred, in whole or in part, by the equitable doctrine of prosecution laches.

NY\1217915.3

## SEVENTH AFFIRMATIVE DEFENSE

### (Prosecution History Estoppel)

33.     Anascape's claims for relief are barred under the doctrine of prosecution history estoppel to the extent that Anascape alleges infringement under the doctrine of equivalents.

## EIGHTH AFFIRMATIVE DEFENSE

### (Double Patenting)

34.     Claims of one or more of the '525, '791, '205, '415 and '700 patents are invalid for double patenting.

## NINTH AFFIRMATIVE DEFENSE

### (Inequitable Conduct)

35.     The '700 and '525 patents are unenforceable due to inequitable conduct in its prosecution before the United States Patent and Trademark Office (the "PTO"), as more particularly alleged below.

### Unenforceability of the '700 Patent:

36.     The application which led to the '700 patent, U.S. Patent Application No. 09/715,532 (the "'700 application"), was filed on November 16, 2000.  Brad A. Armstrong, the named inventor, filed and prosecuted the '700 application himself.  Mr. Armstrong originally filed the '700 application on November 16, 2000 with claims 1-38 claiming his alleged invention.

37.     On information and belief, after filing the '700 application, Mr. Armstrong obtained and/or otherwise learned of the structure comprising one or more video game controllers, such as those available from Nintendo, Microsoft Corporation and/or Sony Corporation.

8

38.    On information and belief, after learning of the structure of such video game controller(s), and during prosecution of the '700 application, Mr. Armstrong amended his '532 patent application in a July 15, 2002 Preliminary Amendment to cancel all original claims 1-38 and substitute new claims 39-77.

39.    On information and belief, Mr. Armstrong added various of the new substitute claims 39-77 in an attempt to obtain a claim scope that would cover one or more of the available video game controllers, rather than cover any of the disclosed embodiments contained within the '700 application as originally filed.  As a result, Mr. Armstrong, through his July 15, 2002 Preliminary Amendment, intentionally added new matter by introducing new claims 39-77 in a manner that is prohibited by 35 U.S.C. § 112.

40.    At least new claims 54 and 55 (corresponding to issued claims 16 and 17, respectfully, in the '700 patent) are not supported by the '700 application as originally filed.  By way of example, there is no support in the '700 application as originally filed for a 3-D graphics controller having the specific combination of elements defined in claims 54 and 55 being connected to the first sheet as claimed.  More specifically, the '700 application lacks support for the combination of the claimed first element structured to activate four unidirectional sensors and the claimed second element structured to activate a first two bi-directional proportional sensors, wherein both the first element and second element are connected to the claimed first sheet present in a 3-D graphics controller, as required by claims 54 and 55.  For at least this reason, issued claims 16 and 17 of the '700 patent contain new matter.

41.    Mr. Armstrong provided the following sworn statement in the Preliminary Amendment:

> I, Brad A. Armstrong, believe I am the original, first and sole inventor
> of the subject matter which is now claimed and for which a patent is

sought in the instant application. I hereby declare that no new matter has been added by amendment and that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the Unites States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

42.    The sworn statement made by Mr. Armstrong was false, known to be false and made with the intent to mislead the PTO. On information and belief, Mr. Armstrong knew at the time he made the sworn statement that he was, in fact, adding new matter to at least new claims 54 and 55, and that he was not, in fact, the inventor of the alleged invention defined by at least these claims.

43.    Mr. Armstrong's false sworn statement was highly material to the patentability of the new claims. Section 112 of Title 35 of the United States Code states, in pertinent part:

The specification shall contain a written description of the invention, and the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor for carrying out his invention.

Section 2163.06 (I) of the Manual of Patent Examining Procedure (MPEP) states, in pertinent part:

If new matter is added to the claims, the examiner should reject the claims under 35 U.S.C. 112, first paragraph – written description requirement. *In re Rasmussen*, 650 F.2d 1212, 211 USPQ 323 (CCPA 1981).

44.    If Mr. Armstrong had been truthful with the PTO and properly advised the PTO that the new claims included new matter, the examiner handling the application would have rejected the claims as failing to satisfy the written description requirement of 35 U.S.C. § 112, as

10

required by Section 2163.06(I) of the MPEP. Instead, Mr. Armstrong's sworn statement falsely

advised the examiner that no new matter was being added and the PTO relied on Mr.

Armstrong's representation. In allowing the claims, the PTO also relied on Mr. Armstrong's

false sworn statement that he was the inventor of the subject matter added by the amendment.

Mr. Armstrong made the false sworn statement with the intent to mislead the examiner handling

the '532 application.

45.     Mr. Armstrong's false sworn statement constitutes inequitable conduct in the

procurement of the '700 patent which renders the '700 patent unenforceable.

### Unenforceability of the '525 Patent:

46.     Two of Anascape's patents that are not asserted in this litigation are U.S. Patent

No. 5,589,828 ("the '828 patent) and U.S. Patent No. 5,565,891 ("the '891 patent"). These two

patents are in a chain of related patents that starts with the '828 patent, continues to the '891

patent, continues to the asserted '525 patent, and continues to the asserted '700 patent. The

application which issued as the '828 patent was U.S. Patent Application No. 07/847,619 ("the

'828 application"), filed on March 5, 1992. After filing the '828 application, Mr. Armstrong

filed on February 23, 1995 the application that issued as the '891 patent, U.S. Patent Application

No. 08/393,495 ("the '891 application).

47.     During the prosecution of the '828 application, Mr. Armstrong disclosed a six-

degree-of-freedom controller sold by Logitech called the CyberMan to the PTO Examiners

reviewing that application. Specifically, on June 3, 1994, Mr. Armstrong filed with the PTO an

Amendment in the '828 application to which he attached a flyer for the CyberMan controller. In

that Amendment, Mr. Armstrong stated that he was disclosing the CyberMan controller because

he believed that the Cyberman controllers were "precise copies of my invention in the instant

application" and that he wanted the PTO to help him by expediting the examination process. (Amendment of June 3, 1994, at 2-3).

48.     In the next application in the chain, the '891 application, the Examiner rejected a number of claims based on the CyberMan. (Office Action of July 5, 1995). However, Mr. Armstrong met with the Examiner and convinced him that the CyberMan controller was not prior art by arguing that the '891 application was a "continuation" of its parent, the '828 application, because no new matter had been added to the '891 application. (Interview Summary of October 2, 1995). Because the flyer for the CyberMan controller was dated 1993, after the filing of the parent '828 application and because the Examiner believed the '891 application was a continuation application entitled to claim the benefit of the '828 application's filing date, the Examiner withdrew the rejection based on CyberMan. (*Id.*).

49.     The next application in this chain was the application that led to the asserted '525 patent, U.S. Patent Application No. 08/677,378 ("the '525 application"), filed on July 5, 1996. The '525 application was not, however, a "continuation" of the previous applications in the chain. Instead, in the '525 application as filed, Mr. Armstrong specifically stated that the application only included "in part" material from his previous applications. In an Amendment dated September 23, 1996, Mr. Armstrong even directed the Examiner to withdraw the claim that the '525 application contained "in part" the material from previous applications.

50.     The '525 application was very different from the previous two applications in the chain. One key element that Mr. Armstrong first added in the '525 application was the idea of using a flexible membrane sheet connected to a circuit board. Mr. Armstrong did not disclose such a membrane element in his previous two applications, the '828 and '891 applications. In fact, a search through the '828 and '891 patents will not find even a mention of a membrane.

NY\1217915.3

Thus, for any claims in the '525 application that were directed to the membrane element that first appeared in the '525 application filed on July 5, 1996, Mr. Armstrong would not have been able to rely on his previous two applications to leapfrog behind the 1993 CyberMan controller.

51.    The claims of the '525 patent are in fact directed to the membrane element that first appeared in Mr. Armstrong's '525 application filed in 1996.  For example claims 1 and 5 of the '525 patent are directed to an "image controller" that includes, among other elements, a "flexible membrane sheet connected to a rigid circuit board sheet."  Likewise, claim 12 of the '525 patent is directed to an "image controller" that includes, among other elements, a "flexible membrane sheet."

52.    The '525 patent issued on April 24, 2001.  However, throughout the entire time the '525 application was pending, from July 5, 1996 until April 24, 2001, Mr. Armstrong never disclosed the existence of the CyberMan controller to the PTO Examiners reviewing the '525 application.

53.    On November 16, 2000, just before the '525 patent issued, Mr. Armstrong filed the next application in this chain, the '700 patent application.  During the prosecution of the later-filed '700 application, Mr. Armstrong disclosed the CyberMan to the PTO Examiner reviewing that application.  Specifically, on December 4, 2003, Mr. Armstrong filed with the PTO an Information Disclosure Statement ("the December 4, 2003 IDS") that brought a number of prior art references to the attention of the Examiner in the '700 application, including the CyberMan controller.

54.    In the December 4, 2003 IDS of the '700 application, Mr. Armstrong admitted that the CyberMan controller had been "first sold in 1993 in the USA by Logitech Inc. ..."  Mr. Armstrong also submitted with this IDS the same flyer he had submitted in the '828 application,

as well as photographs of the CyberMan, both in assembled and disassembled states, with annotations apparently added to the photographs by Mr. Armstrong.

55.     In the December 4, 2003 IDS of the '700 application, Mr. Armstrong also admitted that the 1993 CyberMan controller included a "membrane element" connected to a circuit board:

> Photograph 2 shows a portion of the CyberMan in a disassembled state and showing the handle, three buttons, a microswitch for one of the buttons, a wiring harness spanning between a membrane located in the handle and a circuit board located in the base. … The membrane is located in the handle and the circuit board is located in the base. The expensive conventional wiring harness spans between the membrane in the handle and the circuit board in the base.

56.     In describing the CyberMan in the December 4, 2003 IDS of the '700 application, Mr. Armstrong further admitted that such a "membrane element" was included in his '525 application but had not appeared in his earlier application, the '828 application. Thus, Mr. Armstrong confirmed in the December 4, 2003 IDS of the '700 application what is plain from a review of the chain of applications:  Mr. Armstrong did not disclose the flexible membrane element in his earlier '828 and '891 applications, that he first added that element in the '525 application filed in 1996, and that the 1993 Cyberman controller included such a flexible membrane element.

57.     In sum, while Mr. Armstrong knew about the CyberMan controller and had disclosed it to the PTO in the two applications (the '828 and '891 application) for which he could claim a priority date of 1992, prior to CyberMan's 1993 date, he did *not* disclose CyberMan to the PTO Examiners reviewing the '525 application that added the new flexible membrane element, an element that the CyberMan controller had included three years before that '525 application.

14

58.     The timeline below illustrates the knowledge by Mr. Armstrong of the CyberMan controller and how he selectively disclosed it in earlier application in which he believed he could claim a filing date earlier than the CyberMan but failed to disclose it during the prosecution of the later-filed '525 application that could not claim priority back to his earlier applications because of the newly added membrane element:



59.     There was no reason for Mr. Armstrong to expect the Examiners in the '525 application to know anything about the CyberMan controller because they were not the same Examiners who had worked on the earlier '828 and '891 applications in which the CyberMan controller had been disclosed.  The Examiners in the '525 application included John Suraci, Steven Saras, and Jeffrey Brier, all in Technology Center 2700.  In contrast, the Examiners who had been involved with the earlier '828 and '891 applications were other Examiners and all were in Technology Centers 2600 or 2400.

60.     Mr. Armstrong never disclosed the CyberMan controller to the PTO Examiners who were examining the '525 application.  Nor is there any indication in the PTO records that

any of the PTO Examiners who examined the '525 application saw or considered the CyberMan controller as part of their examination of this application.

61.    Mr. Armstrong, the alleged inventor, appears to have filed and prosecuted the '828, '891, '525, and '700 applications himself.  At all times during the prosecution of the '525 application, Mr. Armstrong had a duty to disclose information material to patentability under 37 C.F.R. § 1.56 ("Rule 56") and understood the duty of disclosure.  Rule 56 reads in part:

§ 1.56  Duty to disclose information material to patentability.

(a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a *duty of candor and good faith* in dealing with the Office, which includes a *duty to disclose* to the Office all information known to that individual to be material to patentability as defined in this section.
…
(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

(1) *Each inventor named in the application*;
….

(Rule 56, emphasis added).

62.    By Mr. Armstrong's own admissions in the December 4, 2003 IDS, the CyberMan controller was on sale in the United States in 1993, more than one year prior to the filing date of the '525 application.  Thus, the CyberMan controller was prima facie prior art to the '525 application under 35 U.S.C. § 102(b).  Furthermore, the CyberMan controller included elements that Mr. Armstrong admitted in the December 4, 2003 IDS were first added in the '525 application and were not disclosed in his earlier application filed before the CyberMan controller was on the market.

16

63.     The CyberMan controller was material to the patentability of one or more claims at issue in the '525 application.  The CyberMan controller disclosed the membrane element that Mr. Armstrong did not include in his applications until the '525 application was filed in 1996. Furthermore, the CyberMan controller would have been important to a reasonable examiner for purposes of examining at least claims 1-3, 5-8, and 12-23 of the '525 patent because it renders at least those claims obvious under 35 U.S.C. § 103(a).

64.     Mr. Armstrong knew that the CyberMan controller had been on sale more than one year before the '525 application was filed.  On information and belief, Mr. Armstrong recognized the materiality of the CyberMan controller to one or more claims of the '525 application.  On information and belief, while the '525 application was pending before the PTO, Mr. Armstrong knew that the CyberMan controller rendered obvious one or more claims of the '525 application.

65.     In doing the aforesaid acts, Mr. Armstrong violated the duty of disclosure and the duty of candor and good faith imposed by Rule 56, and upon information and belief, did so with an intent to mislead and/or deceive the PTO.

66.     The failure by Mr. Armstrong to disclose the CyberMan controller constitutes inequitable conduct in the procurement of the '525 patent, which renders it unenforceable.

## TENTH AFFIRMATIVE DEFENSE

### (Indispensable Parties/Lack of Standing)

67.     Anascape's claims are barred in whole or in part to the extent that parties retaining rights to one or more of the '525, '791, '205, '415 and '700 patents are not parties to this lawsuit.

## ELEVENTH AFFIRMATIVE DEFENSE

NY\1217915.3

**(Dedication to the Public)**

68.     Anascape has dedicated to the public any method or apparatus in the '525, '791, '205, '415 and '700 patents but not literally claimed therein, and is estopped from claiming infringement by any such public domain method or apparatus.

## TWELFTH AFFIRMATIVE DEFENSE

**(Specification and Prosecution Disclaimer)**

69.     Anascape's claims for relief are barred under the doctrines of specification and prosecution history disclaimer.

## THIRTEENTH AFFIRMATIVE DEFENSE

**(Unavailability of Relief (Enhanced Damages))**

70.     On information and believe, Anascape has failed to plead and meet the requirements of enhanced damages.

## FOURTEENTH AFFIRMATIVE DEFENSE

**(Reservation of Rights)**

71.     NOA reserves the right to assert additional defenses which may become apparent during discovery in this action.

## COUNTERCLAIMS

Defendant and counterclaim plaintiff NOA, for its counterclaims against counterclaim defendant Anascape, alleges as follows:

72.     Defendant and counterclaim plaintiff NOA is a Washington corporation having its principal place of business at 4820 150th Avenue NE, Redmond, Washington 98052.

73.     Upon information and belief, plaintiff and counterclaim defendant Anascape is a limited partnership organized and existing under the laws of the State of Texas having its principal place of business in Tyler, Texas.

18

74.    In its Amended Complaint, Anascape alleges that it is the owner of the '791, '205, '415, '700 and '525 patents.

75.    Under 28 U.S.C. § 1338(a), this Court has subject matter jurisdiction over these counterclaims for declaratory judgment, brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Venue for this counterclaim is proper under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

76.    Based on the Amended Complaint that Anascape filed against NOA, a justiciable actual controversy exists between NOA and Anascape with respect to the alleged infringement and validity of the '525, '791, '205, '415 and '700 patents.

## IRST COUNTERCLAIM

### (Declaratory Judgment of Noninfringement)

77.    NOA realleges and incorporates herein by reference all allegations in Paragraph Nos. 27-55 above.

78.    NOA has not infringed and is not infringing (either directly, contributorily or by inducement), any claim of the '525, '791, '205, '415 and '700 patents.

## SECOND COUNTERCLAIM

### (Declaratory Judgment of Invalidity)

79.    NOA realleges and incorporates herein by reference all allegations in paragraphs 27-57 above.

80.    NOA seeks a declaration that the '525, '791, '205, '415 and '700 patents and each claim thereof are void and invalid for failure to comply with one or more of the requirements of Title 35, United States Code, including, but not limited to, Sections 101, 102, 103, and/or 112.

## THIRD COUNTERCLAIM

### (Declaratory Judgment of Unenforceability of the '700 and '525 Patents)

NY\1217915.3

81.     NOA realleges and incorporates herein by reference all allegations in paragraphs 27-59 above.

**Unenforceability of the '700 Patent**

82.     The '700 patent is unenforceable due to inequitable conduct in its prosecution before the United States Patent and Trademark Office (the "PTO"), as more particularly alleged below.

83.     The application which led to the '700 patent, U.S. Patent Application No. 09/715,532 (the "'700 application"), was filed on November 16, 2000. Brad A. Armstrong, the named inventor, filed and prosecuted the '700 application himself. Mr. Armstrong originally filed the '700 application on November 16, 2000 with claims 1-38 claiming his alleged invention.

84.     On information and belief, after filing the '700 application, Mr. Armstrong obtained and/or otherwise learned of the structure comprising one or more video game controllers, such as those available from Nintendo, Microsoft Corporation and/or Sony Corporation.

85.     On information and belief, after learning of the structure of such video game controller(s), and during prosecution of the '700 application, Mr. Armstrong amended his '532 patent application in a July 15, 2002 Preliminary Amendment to cancel all original claims 1-38 and substitute new claims 39-77.

86.     On information and belief, Mr. Armstrong added various of the new substitute claims 39-77 in an attempt to obtain a claim scope that would cover one or more of the available video game controllers, rather than cover any of the disclosed embodiments contained within the '700 application as originally filed. As a result, Mr. Armstrong, through his July 15, 2002

20

Preliminary Amendment, intentionally added new matter by introducing new claims 39-77 in a

manner that is prohibited by 35 U.S.C. § 112.

87.    At least new claims 54 and 55 (corresponding to issued claims 16 and 17,

respectfully, in the '700 patent) are not supported by the '700 application as originally filed.  By

way of example, there is no support in the '700 application as originally filed for a 3-D graphics

controller having the specific combination of elements defined in claims 54 and 55 being

connected to the first sheet as claimed.  More specifically, the '700 application lacks support for

the combination of the claimed first element structured to activate four unidirectional sensors and

the claimed second element structured to activate a first two bi-directional proportional sensors,

wherein both the first element and second element are connected to the claimed first sheet

present in a 3-D graphics controller, as required by claims 54 and 55.  For at least this reason,

issued claims 16 and 17 of the '700 patent contain new matter.

88.    Mr. Armstrong provided the following sworn statement in the Preliminary

Amendment:

> I, Brad A. Armstrong, believe I am the original, first and sole inventor
> of the subject matter which is now claimed and for which a patent is
> sought in the instant application.  I hereby declare that no new matter
> has been added by amendment and that all statements made herein of
> my own knowledge are true and that all statements made on
> information and belief are believed to be true; and further that these
> statements were made with the knowledge that willful false statements
> and the like so made are punishable by fine or imprisonment, or both,
> under Section 1001 of Title 18 of the United States Code and that such
> willful false statements may jeopardize the validity of the application
> or any patent issued thereon.

89.    The sworn statement made by Mr. Armstrong was false, known to be false and

made with the intent to mislead the PTO.  On information and belief, Mr. Armstrong knew at the

time he made the sworn statement that he was, in fact, adding new matter to at least new claims

21

54 and 55, and that we has not, in fact, the inventor of the alleged invention defined by at least these claims.

90.    Mr. Armstrong's false sworn statement was highly material to the patentability of the new claims.  Section 112 of Title 35 of the United States Code states, in pertinent part:

> The specification shall contain a written description of the invention, and the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor for carrying out his invention.

Section 2163.06 (I) of the Manual of Patent Examining Procedure (MPEP) states, in pertinent part:

> If new matter is added to the claims, the examiner should reject the claims under 35 U.S.C. 112, first paragraph – written description requirement.  *In re Rasmussen*, 650 F.2d 1212, 211 USPQ 323 (CCPA 1981).

91.    If Mr. Armstrong had been truthful with the PTO and properly advised the PTO that the new claims included new matter, the examiner handling the application would have rejected the claims as failing to satisfy the written description requirement of 35 U.S.C. § 112, as required by Section 2163.06(I) of the MPEP.  Instead, Mr. Armstrong's sworn statement falsely advised the examiner that no new matter was being added and the PTO relied on Mr. Armstrong's representation.  In allowing the claims, the PTO also relied on Mr. Armstrong's false sworn statement that he was the inventor of the subject matter added by the amendment.  Mr. Armstrong made the false sworn statement with the intent to mislead the examiner handling the '532 application.

92.    Mr. Armstrong's false sworn statement constitutes inequitable conduct in the procurement of the '700 patent which renders the '700 patent unenforceable.

## Unenforceability of the '525 Patent:

93.     Two of Anascape's patents that are not asserted in this litigation are U.S. Patent

No. 5,589,828 ("the '828 patent) and U.S. Patent No. 5,565,891 ("the '891 patent"). These two

patents are in a chain of related patents that starts with the '828 patent, continues to the '891

patent, continues to the asserted '525 patent, and continues to the asserted '700 patent. The

application which issued as the '828 patent was U.S. Patent Application No. 07/847,619 ("the

'828 application"), filed on March 5, 1992. After filing the '828 application, Mr. Armstrong

filed on February 23, 1995 the application that issued as the '891 patent, U.S. Patent Application

No. 08/393,495 ("the '891 application).

94.     During the prosecution of the '828 application, Mr. Armstrong disclosed a six-

degree-of-freedom controller sold by Logitech called the CyberMan to the PTO Examiners

reviewing that application. Specifically, on June 3, 1994, Mr. Armstrong filed with the PTO an

Amendment in the '828 application to which he attached a flyer for the CyberMan controller. In

that Amendment, Mr. Armstrong stated that he was disclosing the CyberMan controller because

he believed that the Cyberman controllers were "precise copies of my invention in the instant

application" and that he wanted the PTO to help him by expediting the examination process.

(Amendment of June 3, 1994, at 2-3).

95.     In the next application in the chain, the '891 application, the Examiner

rejected a number of claims based on the CyberMan. (Office Action of July 5, 1995). However,

Mr. Armstrong met with the Examiner and convinced him that the CyberMan controller was not

prior art by arguing that the '891 application was a "continuation" of its parent, the '828

application, because no new matter had been added to the '891 application. (Interview Summary

of October 2, 1995). Because the flyer for the CyberMan controller was dated 1993, after the

filing of the parent '828 application and because the Examiner believed the '891 application was

23

a continuation application entitled to claim the benefit of the '828 application's filing date, the Examiner withdrew the rejection based on CyberMan. (*Id.*).

96.    The next application in this chain was the application that led to the asserted '525 patent, U.S. Patent Application No. 08/677,378 ("the '525 application"), filed on July 5, 1996. The '525 application was not, however, a "continuation" of the previous applications in the chain. Instead, in the '525 application as filed, Mr. Armstrong specifically stated that the application only included "in part" material from his previous applications. In an Amendment dated September 23, 1996, Mr. Armstrong even directed the Examiner to withdraw the claim that the '525 application contained "in part" the material from previous applications.

97.    The '525 application was very different from the previous two applications in the chain. One key element that Mr. Armstrong first added in the '525 application was the idea of using a flexible membrane sheet connected to a circuit board. Mr. Armstrong did not disclose such a membrane element in his previous two applications, the '828 and '891 applications. In fact, a search through the '828 and '891 patents will not find even a mention of a membrane. Thus, for any claims in the '525 application that were directed to the membrane element that first appeared in the '525 application filed on July 5, 1996, Mr. Armstrong would not have been able to rely on his previous two applications to leapfrog behind the 1993 CyberMan controller.

98.    The claims of the '525 patent are in fact directed to the membrane element that first appeared in Mr. Armstrong's '525 application filed in 1996. For example claims 1 and 5 of the '525 patent are directed to an "image controller" that includes, among other elements, a "flexible membrane sheet connected to a rigid circuit board sheet." Likewise, claim 12 of the

'525 patent is directed to an "image controller" that includes, among other elements, a "flexible membrane sheet."

99.        The '525 patent issued on April 24, 2001.  However, throughout the entire time the '525 application was pending, from July 5, 1996 until April 24, 2001, Mr. Armstrong never disclosed the existence of the CyberMan controller to the PTO Examiners reviewing the '525 application.

100.        On November 16, 2000, just before the '525 patent issued, Mr. Armstrong filed the next application in this chain, the '700 patent application.  During the prosecution of the later-filed '700 application, Mr. Armstrong disclosed the CyberMan to the PTO Examiner reviewing that application.  Specifically, on December 4, 2003, Mr. Armstrong filed with the PTO an Information Disclosure Statement ("the December 4, 2003 IDS") that brought a number of prior art references to the attention of the Examiner in the '700 application, including the CyberMan controller.

101.        In the December 4, 2003 IDS of the '700 application, Mr. Armstrong admitted that the CyberMan controller had been "first sold in 1993 in the USA by Logitech Inc. …"  Mr. Armstrong also submitted with this IDS the same flyer he had submitted in the '828 application, as well as photographs of the CyberMan, both in assembled and disassembled states, with annotations apparently added to the photographs by Mr. Armstrong.

102.        In the December 4, 2003 IDS of the '700 application, Mr. Armstrong also admitted that the 1993 CyberMan controller included a "membrane element" connected to a circuit board:

> Photograph 2 shows a portion of the CyberMan in a disassembled state and showing the handle, three buttons, a microswitch for one of the buttons, a wiring harness spanning between a membrane located in the handle and a circuit board located in the base. … The membrane is located in the handle and the circuit

25

board is located in the base.  The expensive conventional wiring harness spans between the membrane in the handle and the circuit board in the base.

103.    In describing the CyberMan in the December 4, 2003 IDS of the '700 application, Mr. Armstrong further admitted that such a "membrane element" was included in his '525 application but had not appeared in his earlier application, the '828 application.  Thus, Mr. Armstrong confirmed in the December 4, 2003 IDS of the '700 application what is plain from a review of the chain of applications:  Mr. Armstrong did not disclose the flexible membrane element in his earlier '828 and '891 applications, that he first added that element in the '525 application filed in 1996, and that the 1993 Cyberman controller included such a flexible membrane element.

104.    In sum, while Mr. Armstrong knew about the CyberMan controller and had disclosed it to the PTO in the two applications (the '828 and '891 application) for which he could claim a priority date of 1992, prior to CyberMan's 1993 date, he did *not* disclose CyberMan to the PTO Examiners reviewing the '525 application that added the new flexible membrane element, an element that the CyberMan controller had included three years before that '525 application.

105.    The timeline below illustrates the knowledge by Mr. Armstrong of the CyberMan controller and how he selectively disclosed it in earlier application in which he believed he could claim a filing date earlier than the CyberMan but failed to disclose it during the prosecution of the later-filed '525 application that could not claim priority back to his earlier applications because of the newly added membrane element:



106.    There was no reason for Mr. Armstrong to expect the Examiners in the

'525 application to know anything about the CyberMan controller because they were not the

same Examiners who had worked on the earlier '828 and '891 applications in which the

CyberMan controller had been disclosed.  The Examiners in the '525 application included John

Suraci, Steven Saras, and Jeffrey Brier, all in Technology Center 2700.  In contrast, the

Examiners who had been involved with the earlier '828 and '891 applications were other

Examiners and all were in Technology Centers 2600 or 2400.

107.    Mr. Armstrong never disclosed the CyberMan controller to the PTO

Examiners who were examining the '525 application.  Nor is there any indication in the PTO

records that any of the PTO Examiners who examined the '525 application saw or considered the

CyberMan controller as part of their examination of this application.

108.    Mr. Armstrong, the alleged inventor, appears to have filed and prosecuted

the '828, '891, '525, and '700 applications himself.  At all times during the prosecution of the

'525 application, Mr. Armstrong had a duty to disclose information material to patentability

under 37 C.F.R. § 1.56 ("Rule 56") and understood the duty of disclosure.  Rule 56 reads in part:

27

NY\1217915.3

§ 1.56  Duty to disclose information material to patentability.

(a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a ***duty of candor and good faith*** in dealing with the Office, which includes a ***duty to disclose*** to the Office all information known to that individual to be material to patentability as defined in this section.
…
(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

> (1) ***Each inventor named in the application***;
….

(Rule 56, emphasis added).

109.        By Mr. Armstrong's own admissions in the December 4, 2003 IDS, the CyberMan controller was on sale in the United States in 1993, more than one year prior to the filing date of the '525 application.  Thus, the CyberMan controller was prima facie prior art to the '525 application under 35 U.S.C. § 102(b).  Furthermore, the CyberMan controller included elements that Mr. Armstrong admitted in the December 4, 2003 IDS were first added in the '525 application and were not disclosed in his earlier application filed before the CyberMan controller was on the market.

110.        The CyberMan controller was material to the patentability of one or more claims at issue in the '525 application.  The CyberMan controller disclosed the membrane element that Mr. Armstrong did not include in his applications until the '525 application was filed in 1996.  Furthermore, the CyberMan controller would have been important to a reasonable examiner for purposes of examining at least claims 1-3, 5-8, and 12-23 of the '525 patent because it renders at least those claims obvious under 35 U.S.C. § 103(a).

111.     Mr. Armstrong knew that the CyberMan controller had been on sale more than one year before the '525 application was filed. On information and belief, Mr. Armstrong recognized the materiality of the CyberMan controller to one or more claims of the '525 application. On information and belief, while the '525 application was pending before the PTO, Mr. Armstrong knew that the CyberMan controller rendered obvious one or more claims of the '525 application.

112.     In doing the aforesaid acts, Mr. Armstrong violated the duty of disclosure and the duty of candor and good faith imposed by Rule 56, and upon information and belief, did so with an intent to mislead and/or deceive the PTO.

113.     The failure by Mr. Armstrong to disclose the CyberMan controller constitutes inequitable conduct in the procurement of the '525 patent, which renders it unenforceable.

## EXCEPTIONAL CASE

114.     This case is exceptional under 35 U.S.C. § 285.

## JURY DEMAND

NOA respectfully demands a trial by jury of any and all issues triable of right by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, NOA prays that this Court:

(a)     Dismiss the Amended Complaint in its entirety with prejudice, with Anascape taking nothing by its Amended Complaint;

(b)     Adjudge and decree that all of Anascape's claims are denied;

(c)     Adjudge and decree that NOA has not infringed the '525, '791, '205, '415 and '700 patents;

(d)    Adjudge and decree that NOA has not willfully infringed the '525, '791, '205, '415 and '700 patents;

(e)    Adjudge and decree that the '525, '791, '205, '415 and '700 patents are invalid;

(f)    Adjudge and decree that the '700 and '525 patents are unenforceable;

(g)    Award NOA its reasonable attorney fees and the costs of this action pursuant to 35 U.S.C. § 285;

(h)    Award NOA such further and other relief as the Court may deem just and proper.

Dated:  July 18, 2007                                          Respectfully submitted,

By: /s/ James S. Blank_____
Robert J. Gunther, Jr.
(robert.gunther@wilmerhale.com)
WILMERHALE
399 Park Avenue
New York, NY  10022
Tel:  (212) 230-8800
Fax:  (212) 230-8888

Robert W. Faris
(rwf@nixonvan.com)
Joseph S. Presta
(jsp@nixonvan.com)
NIXON & VANDERHYE, P.C.
1100 North Glebe Road
8th Floor
Arlington, VA  22201
Tel.:  (703) 816-4000
Fax:  (703) 816-4100

James S. Blank
(james.blank@lw.com)
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY  10022
Tel.:  (212) 906-1200
Fax:  (212) 751-4864

Lawrence L. Germer

Texas Bar No. 07824000
GERMER GERTZ L.L.P.
550 Fannin, Suite 400
P.O. Box 4915
Beaumont, Texas  77704
Tel.:    (409) 654-6700
Fax:    (409) 835-2115

Attorneys for Defendant and Counterclaimant
Nintendo of America, Inc.