# EXHIBIT B



| | |
|---|---:|
| 1998 WL 35230724 | Page 1 |
| 1998 WL 35230724 (N.D.Tex.) | |

For opinion see 2002 WL 356755, 2000 WL 34204431

United States District Court, N.D. Texas,
Dallas Division.
Harris CORPORATION, Plaintiff,
v.
SANYO NORTH AMERICA CORPORATION, Sanyo Manufacturing Corporation, and Sanyo Video Components (USA) Corporation, Defendants.
**No. 3-98-CV-2712-M.**
1998.

(Partial Testimony of Walter Bratic)

**Name of Expert:** Walter Bratic

**Area of Expertise:** Accounting & Finance >> Accountant

**Area of Expertise:** Accounting & Finance >> Valuation/Appraisal (Non-Real Estate)

**Case Type:** Intellectual Property >> Patent

**Jurisdiction:** N.D.Tex.

**Representing:** Plaintiff

 The other thing that you are going to hear about the hypothetical negotiation -- And you probably picked this up in my questioning of Mr. Andre and Mr. O'Molesky, is when the parties come together to agree upon a reasonable royalty pursuant to the legal standard that the Judge is going to instruct you on at the end of this case, they agree that the patents are infringed and are valid and then go forth from there and act as reasonable business people do to try and agree upon a number. And you will hear from Mr. Bratic the number will be something similar to this, perhaps higher, during his testimony. So that's what we're trying to set the stage for. Thank you.

 THE COURT: All right. Thank you. You may call your next witness.

 MR. FERRAL: Your Honor, Harris Corporation calls Walter Bratic.

 (Witness sworn)

*MR. WALTER BRATIC DIRECT EXAMINATION*

BY MR. FERRAL:

 Q Mr. Bratic, tell the Ladies and Gentlemen of the Jury a little bit about yourself, where you live and where you are from.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

  Q Sticking with the Matsushita license, did you consider that?

  A I considered it.

  Q What did you make of it?

  A Well, I did not rely on it as being instructable of what a reasonable royalty would be back at the time of the hypothetical negotiation back in 1993.

  Q Why not?

  A First of all, it was settled by litigation. It was tainted by the bias that in fact that the parties were litigating after Matsushita was sued. To include that litigation. Second of all, that litigation which included the '063 patent and '064 patent was concluded and negotiated after the patent expired. They expired in 1999, and here you have a Harris agreement that is executed several months after these various patents in this lawsuit had expired. So they don't tell you anything about what a prospective license would be if you are sitting there in 1993, in July of 1993, with six years left on the life of the patent. A license which is consummated after the patent has expired doesn't shed any light on what the value to the licensee would be on a go-forward basis with six years left in the life of the patent.

  Q Now, perhaps to streamline this, is the Sharp agreement that was signed in 2000 -- does basically the same analysis apply to the Sharp agreement?

  A Yes, except you have to add one more feature to it. The Sharp agreement had a cross-license agreement.

  Q How does that affect it?

  A That makes it very difficult to carve out the value of what Sharp gave back to Harris from the lump sum payment.

  Q What about the Sony license agreement? Harris never sued Sony?

  A That's correct.

  Q Tell me how that license agreement affected your analysis, if at all?

  A Well, it didn't affect my analysis, but I certainly considered it, and after reviewing it, much like the other licenses, this one was executed -- the Sony license was executed with six or seven weeks left in the life of these two patents. So basically the history of the patents had passed as far as Sony was concerned. And so they were negotiating on past liability, and there wouldn't have been much leverage for Harris to assert liability on Sony if they wanted to because they had six weeks left. Plus, it was a cross-license with technology and value going both ways as opposed to a one-way license which is what we have here.

  Q Did you hear Mr. Andre and also perhaps Mr. O'Molesky refer to patent peace?

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

A. Because I had interviewed him during my work in this case, and so I was familiar with Harris' philosophy in licensing, Sanyo's practice of licensing, and the licenses I was able to review. And on that basis I concluded that $2.50 a unit was a fair and reasonable royalty rate.

Q. Now that you know what those licenses that were entered into in 1999, 2000, and 2001 are, how does that, if at all, how does that affect your conclusion?

A. Well, those licenses are very different. First of all, they were executed either on the eve of -- in one case, the Sony, or in the case of Sharp and Matsushita, they were executed after the patents expired. So there was no leverage from Harris' standpoint to assert rights or try and get value out of the '063 and '064 patents. Particularly when they had pretty much expired.

Secondly, two of those licenses, the Sharp and the Sony, were cross-licenses. So you can't find out the value of the cross-license piece, you know, until you take that out of the equation to figure out what the true value of what was licensed by Harris to either Sony or Sharp was worth.

Plus Sharp and Matsushita were settled as the result of litigation. So whenever parties engaged in litigation settle the litigation -- in fact, there is an addendum to the Sharp and Matsushita license agreement that says that the parties are settling the litigation because they were sued in this very lawsuit at the beginning and they settled out.

So whenever you have settlement, there is case law that's come down from the federal courts that talks about disregarding licenses executed as a result of litigation because they are tainted and they don't represent an arm's length transaction.

Q. I want to touch upon another area that you were asked about on cross-examination.

How long were the patents, the '063 and the '064 patents, how long were they available to the public as of the hypothetical negotiation date of 1993?

A. Twelve years.

Q. Okay. And you have some familiarity with standard setting processes?

A. Yes.

Q. Would -- based upon your understanding of the way that process works, do you know do the standard setting body have an opportunity to do searches of patents and text searches of patents?

A. Yes. The working committee -- which the working committee of a standard sitting body is usually the one that works on the technical standards. And those members are usually drawn from the industry, sometimes governmental agencies and the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.